**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff,**

v.

**Charles E. HURWITZ, et al., Defendants.**

**No. CIV.A. H–95–3956.**

United States District Court, S.D. Texas.

Aug. 23, 2005.

Darryl W. Malone, Attorney at Law, Lionel M. Schooler, Jackson Walker LLP, Houston, TX, F. Thomas Hecht, Michael A. Ficaro, Ungaretti & Harris, John Rogers, Foley & Lardner, Chicago, IL, Gregory F. Taylor, Washington, DC, Lori Beyer Bellows, Nokia Inc., Irving, TX, Thomas

Manick, Adorno & Zeder, Miami, FL, for Plaintiff.

Jacks C. Nickens, Richard P. Keeton, Nickens Keeton et al., Daniel K. Hedges, Porter & Hedges, Walter B. Stuart, IV, Vinson & Elkins, James Crawford Slaughter, Fulbright & Jaworski, Julia A. Cook, Schlanger Silver et al., Steven D. Grossman, Sheiness Scott et al., Houston, TX, Bruce Rinaldi, Richard C. Stearns, Office of Thrift Supervision, Washington, DC, for Defendants.

### Opinion on Sanctions

HUGHES, District Judge.

1. *Introduction.*

This is a cautionary tale where the emperor has new clothes—a bandit's mask. The Federal Deposit Insurance Corporation sought to hold Charles Hurwitz individually responsible for all losses at United Savings, even though he had no obligation to the thrift or the government. Unable to focus its claims and unwilling to disclose its records in this suit—one that it brought—the FDIC surreptitiously paid another agency to bring a parallel administrative claim against Hurwitz, several companies, and other people. Later—much later—the FDIC dismissed its claims here. Hurwitz and two companies have asked that they recover their costs of defending the suit. They will recover their costs because the record reveals corrupt individuals within a corrupt agency with corrupt influences on it, bringing this litigation.

2. *Background.*

This is the final stage in a suit that should have never happened. Ten years ago, the Federal Deposit Insurance Corporation sued Charles Hurwitz, a Texas businessman. In essence, it blamed him for the failure of a Texas thrift—United Savings Association of Texas. The case oc-

curred on two fronts. The FDIC sued Hurwitz in this court. The Office of Thrift Supervision brought an administrative action. Together, the agencies claimed over one billion dollars from Hurwitz. Recovery in either action would go to the FDIC because the FDIC had procured the Thrift Office's proceeding against Hurwitz, paying it to bring that action.

### A. Companies.

The FDIC sued Hurwitz because of his involvement in two companies that owned stock in the thrift's holding company. They owned no stock in the thrift. In the 1980s, Hurwitz was chairman and chief executive officer of Maxxam, Inc., a publicly held corporation with subsidiaries in aluminum, timber, and land. He was also chairman and chief executive officer of Federated Development Company, a New York business trust with a portfolio of real estate and mortgages. Until February 1988—ten months before the United Savings failed—Hurwitz had been chairman of United Financial Group, its holding company.

Hurwitz owned about 52% of Federated, and Federated owned 63% of Maxxam. In 1988, Federated and Maxxam jointly owned less than one-quarter of United Financial. United Financial owned 100% of United Savings of Texas.[1] United Savings was a thrift; that is a bank that operated under a set of regulations slightly distinct from ordinary commercial banks. Thrifts are the current incarnation of the savings part of the old federal system of full-service banks and savings-and-loans. Along with credit unions—banks and thrifts are depository institutions. What each is permitted by the several regulatory agencies varies slightly.

### B. Climate.

Despite the expensive and pervasive regulation by governmental agencies, in the decade 1986–1995, approximately 1,043 thrifts failed, leading to the insolvency of the agency that insured their deposits and supervised them—Federal Savings and Loan Insurance Corporation.[2] FSLIC's responsibilities were eventually passed to the FDIC, which is how it became interested in United Savings and Hurwitz. During 1980–1994, the FDIC itself lost 1,617 banks under its responsibility.[3] In 1997 dollars, the direct cost of the thrifts to the public treasury was about $200 billion.

The FDIC may manage failures by simply honoring its insurance commitment and paying the depositors to the policy limits. It can also arrange for another bank or investor to buy the failed bank and assume its obligation to the depositors. Its third technique is to run the insolvent bank itself, supplying capital and management, until it can be sold or returned to independence. This is called a bridge bank. The FDIC prefers to sell with an assumption because it relieves it of having to collect the assets of the bank—the funds due it on loans mostly—and of having to pay the full depositor claims directly. Of 169 banks that failed in 1990, 20 were insurance payments, one was a bridge bank, and 148 were sales to other banks.

### C. United Savings.

A thrift, Houston First American Savings Association, was insolvent in 1983,

---

1. See Appendix A for a simplified corporate organization and Appendix B for a schedule of this case's *dramatis personae*.

2. Timothy Curry and Lynn Shibut, *The Cost of the Savings and Loan Crisis: Truth and Consequences*, 13 FDIC BANK. REV. 26 (2000).

3. Ricki Helfer, Speech at the FDIC Symposium, History of the Eighties: Lessons for the Future (Jan. 16, 1997).

when it was owned by people wholly unrelated to Hurwitz and Maxxam. The FDIC allowed United Financial to take First American off its hands. After extensive negotiations, United Financial bought First American and merged it into its thrift, United Savings of Texas. The FDIC sought a personal guaranty from Hurwitz as part of the deal, but he declined. It asked for guaranties from Maxxam and Federated, but they declined. The final arrangement was simply that United Financial acquired the failed thrift and reconstituted it with its thrift as United Savings of Texas. United Financial committed the capital that it had agreed to invest.

Unfortunately, United Savings did not succeed. In 1989, the FDIC declared it insolvent. United Financial's investment was eroded completely. The FDIC met its insurance obligation by selling United Savings to Ranieri/Hyperion—a joint venture.

The cause of United's failure was indistinct from what caused most of the other insolvencies. The original plan for thrifts was that (a) they could pay slightly higher rates on savings accounts than banks, (b) their lending was essentially limited to home mortgages, and (c) deposit insurance was at a low level, reflecting the safety-net role it played. Prolonged, government-induced inflation eroded the assets of the whole system. The government's response was to release the interest rate restrictions, expand the lending authority to nearly everything, and raise the insurance coverage from $20,000 to $100,000. This allowed the industry as a whole to attempt to earn its way out of its general insolvency—an insolvency that was not publicly acknowledged.

The collapse of oil and real-estate prices in the middle 1980s made many of the high-rate, business loans unrecoverable. Other forces affected thrifts, like the rise of money market funds and corporate—

non-deposit based—lending. Although actively dishonest people were in charge of some thrifts that failed, the bureaucratic response to the mess was generally to accuse officers and directors of malfeasance when misfeasance was the worst that the facts would support.

### D. *FDIC.*

Soon after the collapse of United Savings in 1988, the FDIC approached Hurwitz about his contributing to paying its losses. Hurwitz agreed to extensions of the time limit for the FDIC to sue him. Having found no focus of their claims against him by 1995, Hurwitz declined to extend the deadline again, but the actual directors and officers of the thrift continued to sign tolling agreements. The FDIC sued Hurwitz right before the last extension expired.

After an adverse ruling or two from this court, the FDIC illegally paid the Office of Thrift Supervision to bring an administrative action. The Thrift Office sued Hurwitz, Barry Munitz, Jenard Gross, Arthur Berner, Ronald Huebsch, Michael Crow, Federated, and Maxxam. Munitz, Gross, Berner, Huebsch, and Crow were former directors and officers of United Financial and United Savings. While the claims by the Thrift Office had a technical regulatory basis, they were the same as the FDIC's contention that somehow the accused were responsible for the thrift's failure—responsible legally.

### E. *Hurwitz Responds.*

The FDIC abandoned its claims here in November 2002. Hurwitz, however, had counterclaimed in this court that the suit was a ruse—political extortion. Its true purpose, he said, had nothing to do with the management of thrifts and everything to do with the politics of trees.

In the late 1980s, Maxxam had acquired Pacific Lumber, a timber company. Pacific Lumber owned 44,000 acres of redwoods in Northern California, including the Headwaters Forest, a 4,400–acre tract of ancient redwoods.

Environmentalist activists accused Hurwitz of plans to raze the forest. They lobbied the Clinton Administration, California officials, and members of Congress, urging the government to gain control of the forest. The Forest Service studied the redwoods, but it decided that acquiring them would require an appropriation that was not politically practical.

In the early 1990s, one environmental group proposed that the government make claims against Maxxam-related companies and people and then trade those claims for the trees—the "debt-for-nature" swap. The group insisted that the FDIC sue Hurwitz for so much money—creating the "debt"—that he would be compelled to settle by surrendering the redwoods—the "nature."

Hurwitz says that the FDIC joined the effort to appease the green lobby, congressional pressure, and Administration political preferences. Despite a learned opinion from its private counsel that it had no viable claim against Hurwitz and the others, the FDIC sued here and later illegally hired the Office of Thrift Supervision to bring identical, baseless claims.

F. FDIC *Posture & Harsh Reality.*

The FDIC swears that it gave no "serious consideration" to the exhortations of green groups or legislators; that it spent no time evaluating the written or oral proposals of outsiders; that it never discussed a debt-for-nature swap; and that no employee of the agency ever analyzed a proposed swap.[4] The FDIC maintains that it had a solid case; that it exercised only its independent regulatory judgment; that it did not participate in extra-agency proposals or deals; and that it was promptly and thoroughly candid in this and the regulatory action.

The facts are otherwise. An extensive record—produced at substantial expense and by repeated court compulsion—reveals a regulatory scheme that slipped into self-absorbed, extra-legal, politically motivated trampling of citizens and the law.

The record includes (a) memoranda sent to as well as received from environmental groups; (b) notes of telephone calls between the FDIC and these groups; (c) minutes of conferences among FDIC staff, its counsel, and greens; (d) e-mails discussing a debt-for-nature swap, including adjustments to the dollar amount of the United Savings's claims to reflect the value of the timber; (e) letters from Congress; (f) minutes of regular meetings of green groups, congressional staff, and other executive-branch staff; (g) recalcitrance in disclosure; (h) its squelching its inspector-general investigation; and (i) behavior at depositions that ranged from manipulative evasiveness to plain perjury.

The record reveals that the FDIC attacked Hurwitz in a perverse combination of personal and political hostility. The personal part was political, too, since it was derived from the bureaucrats' and their like-thinking co-conspirators' appreciation of a successful entrepreneur as the personification of what they opposed in America. As individuals they are free to think and act as they wish, but as agents of the government they are constrained by their particular bureau's statutory mandate and the Constitution's restriction on personal, partial, and irregular government.

When the government invokes the authority of the judiciary, it is obliged to

---

4. Depo. of Jeff Williams, Ex. 211 at 307–08.

follow the rules. This is called equal justice under law.

The FDIC's documents contradict its protestations of independence, the merit of its suit, and the legality of the arrangement with OTS. The FDIC was refractory about disclosing its internal documents because they demonstrate, beyond question, that it became a tool in a political guerrilla war at the behest of interest groups and the administration. These outsiders, in fact, shaped this case, including the damage "calculation." The FDIC knew that it had no authority to pay the OTS for the other action. Despite these realities, the FDIC persisted in its expensive, abusive litigation for a decade.

The public, through this court, has devoted substantial resources to this case. On sanctions alone, the court held a two-day hearing and has scrutinized the pleadings and exhibits totaling approximately 10,000 pages. It has also reviewed the rest of the record. The court concludes that the FDIC has lied to Charles Hurwitz, the public, and this court. Over the past ten years, the suit—here and in Washington—has cost the taxpayers in whose name these people acted tens of millions of dollars. Naturally, the agencies cost the defendants millions, too. Hurwitz is not content with the torture stopping. He has sought compensation.

3. *Chronology: 1980–84.*

United Savings Association of Texas was a thrift: it held savings accounts and lent or otherwise invested them.[5] It acquired deposits by agreeing to pay interest and to repay the principal in the short term. Like other institutions that borrow on a short term and lend on a longer term, United Savings's long-term receivables like home mortgages would drop in value when interest rates rose. Rates on the loan would remain where they were fixed when the money was lent, but the rates that United Savings paid for its deposits would rise with the market. Basically, as long as the average return on loans and other investments equaled or exceeded its deposit expense—its cost of capital—the thrift would be solvent. After a brief respite from the high rates of the late 1970s, rates rose steeply in the early 1980s. United Savings was paying more for deposits than it was recovering from loans and other investments. The thrift and its holding company were losing millions.[6] In 1982, for example, United Financial suffered almost $19 million in losses. Its return on capital was a negative thirty-four percent.[7] The government would later remark that United Savings was "hopelessly insolvent." [8]

In 1982, Federated Reinsurance—a company of which Hurwitz was the chief executive officer and president—began investing in United Financial Group, the thrift's holding company.[9] Federated Reinsurance was a wholly owned subsidiary of Federated Development Company. Both Federateds are related to Maxxam only by Federated Development's owning a majority of Maxxam.

In 1983, Federated and Maxxam bought just under 25% of United Financial's stock.[10] This enabled United Financial to buy First American Financial of Texas, a holding company of a Houston savings and loan. United Financial then merged United Savings with Houston First American Savings Association, forming United Sav-

---

**5.** Ex. 1 at 27.

**6.** *Id.;* Ex. 2 at 26.

**7.** Ex. 2 at 17.

**8.** Ex. 121 at 14.

**9.** Ex. 9; ex. 10.

**10.** Ex. 12 at 6–7.

ings Association of Texas. Despite First American's precarious financial condition at the time, regulators approved the merger on the condition that United Financial maintain the regulatory net worth of United Savings; that means that it was committing its capital to support the thrift's solvency. United Financial agreed.[11] Although the FDIC asked for guaranties from Hurwitz, Maxxam, and Federated, they all refused.

After the merger, banks and thrifts across the nation began failing at an average of one each day.[12] Over the next fifteen years, nearly 3,000 depository institutions—banks and thrifts—failed. The savings-and-loan crisis hit Texas especially hard: its thrifts lost $19 billion.[13] Approximately one-third of the banks and thrifts that failed in the nation were in Texas.[14]

4. *Late 1985.*

In December 1985, Maxxam and Drexel Burnham Lambert, Inc., agreed that, between July 1 and 30, 1988, Maxxam would have the option to buy 300,000 shares of United Financial stock from Drexel for $2,577,000—a call. If Maxxam did not exercise it, Drexel could sell the shares to Maxxam for $2,577,000 from August 1 to 31, 1988—a put. Since Maxxam was a "controlling shareholder" of United Financial, under securities and banking law, United Financial disclosed the agreement as the law required.[15] Banking regulators were also told about the deal.[16]

Regulators confirmed that, so long as neither company exercised the option,

Drexel owned the shares and had sole right to them.[17] This is important because, at the time, Maxxam and Federated owned just under 25% of United Financial. If Maxxam were deemed to own the 300,000 shares, then it and Federated might have owned at least twenty-five percent of the holding company, obliging it to maintain United Savings's regulatory net worth. Since Drexel owned the shares, Maxxam had no net-worth obligation.

In the 1980s, Drexel Burnham was highly successful in using bonds to finance companies that had historically been unable to borrow in that market. It became notorious when its star trader, Michael Milken, was convicted in 1989 for stock manipulation. Milken became a political symbol for dishonest greed on Wall Street. "Junk bonds" was used to denigrate transactions without an understanding of corporate finance generally or credit markets particularly. It was an opaque slogan rather than a analytical tool.[18]

The government would later imagine that (a) Hurwitz's companies invested in Drexel bonds in exchange for Drexel's financing his takeover activities and (b) he concealed this arrangement. The FDIC, after a decade of litigiousness, has offered nothing—nothing—to support this charge. This is an illustration of the FDIC's trial by press release. Keep mentioning Hurwitz and related companies in connection with Drexel Burnham and impugn them in the eyes of the court, public, other regulators, and credit. That is slander as legal leverage.[19] That is wrong.

---

11. Ex. 13.

12. Ex. 191 at 4.

13. Ex. 7.

14. Ex. 4.

15. Ex. 14.

16. Ex. 15.

17. *Id.;* Ex. 14 at OFD2640.

18. See GLENN YAGO, JUNK BONDS. HOW HIGH YIELD SECURITIES RESTRUCTURED CORPORATE AMERICA, 3–13 (Oxford 1991).

19. *See, e.g.,* 333 at 23; ex. 129 at 1–2.

### 5. *1986.*

In mid–1986, Federated and Maxxam asked to modify the Federal Home Loan Bank Board's conditional approval of their acquiring control of United Financial, the holding company.[20] Regulators defined control as owning more than 25% of the holding company's stock; Federated and Maxxam wanted to increase their aggregate ownership of United Financial to 35%.[21] In December 1984, the Bank Board had approved their application so long as the companies maintained United Savings's net worth—guaranteed its solvency. If they owned more than 25% but less than 50% of the holding company, they would have to contribute funds in proportion to their ownership to maintain the thrift's net worth. If they owned more than 50% of United Financial, they would each be 100% liable for maintaining United Saving's net worth.

Federated and Maxxam proposed a modified condition. They offered no guaranty so long as they owned less than 50% of United Financial's stock. If they acquired more than 50%, they wanted a cap on how much they would have to contribute. In exchange for this concession, they proposed to raise $40 million for United Savings within eighteen months after they acquired control. As part of the deal, United Savings also asked that it be allowed to count proceeds from bond sales in its net worth. The thrift had fallen below its net-worth requirement and was trying to stay solvent.

One of Federated and Maxxam's concerns was that, even if they acquired less than 50% of the holding company, they would be the only companies who would have to infuse capital into the thrift. This was a serious obligation, especially since they did not have "control of the operations of [United Financial] or [United Savings's] as minority stockholders."[22] In addition, investment banks and rating agencies would not be able to evaluate their own financial condition easily based on an open-ended net-worth agreement for United Savings. This would impair their stock prices and credit ratings.[23] Last, Federated's and Maxxam's businesses—oil and gas, timber, real estate—frequently required them to raise capital. They were reluctant to enter agreements that would limit their ability to enter capital markets.[24]

Regulators said that, "in light of the depressed economy in Texas," United Savings's situation was "not surprising."[25] Still, the thrift was "one of the stronger financial institutions" in their district.[26] United Savings consistently maintained a higher net worth than other Texas thrifts. Unlike other thrifts whose problems were caused by high-risk, commercial real-estate loans, United Savings still lent money primarily for residential mortgages.

The regulators praised the thrift's efforts to minimize the effects of the crisis. United Savings was diversifying from home loans to mortgage-backed securities and high-yield bonds. It was generating equal or greater profits than it had been making from mortgages.[27] The proposed bond issuance would also give the thrift "an additional capital buffer" that would shift risk away from the FSLIC.[28]

---

**20.** Ex. 16.

**21.** Ex. 15; Ex. 16 at 2.

**22.** Ex. 16 at 4.

**23.** *Id.* at 5.

**24.** *Id.*

**25.** *Id.* at 8.

**26.** *Id.* at 7.

**27.** Ex. 17 at US–3 002291.

**28.** Ex. 16 at 8.

They cited the thrift's many strengths, including its strong capital base, diversification, profitability, and access to capital markets. They also noted that troubled banks regularly asked United Savings's managers for help and that United Savings's and United Financial's managers were also the managers of Federated and Maxxam. That Federated and Maxxam were controlling shareholders of United Financial would offer "a source of strength" to the thrift.[29] The regional regulators recommended approval of the Federated–Maxxam proposal and the thrift's request about the bond proceeds.

## 6. *1986–1987.*

In early 1986, Maxxam bought Pacific Lumber. It owned 44,000 acres of redwoods. Dissident shareholders said that because Maxxam had no cash for the deal, it had had to finance it with Drexel bonds. They said that this would force Maxxam to accelerate logging to pay the debt. They also feared that the value of the standing timber would be eroded by the increased supply to the market. Greens began to protest. Soon the government's scrutiny of Hurwitz increased, and the regulators' earlier enthusiasm for United Savings and Charles Hurwitz cooled.

Congressman John Dingell, for example, requested all information on United Savings from January 1, 1987, to the present that the Federal Home Loan Bank of Dallas had. Dingell refused to say why he needed it.[30] It later surfaced that he assumed that Hurwitz was using United Savings to finance acquisitions. Neither Dingell nor the FDIC found a shred of evidence to support this accusation.

In mid-December 1986, the executive committee of United Financial unanimously approved the holding company's infusion of capital into United Savings to comply with the regulatory net-worth requirement.[31] In late October 1987, it again unanimously approved another infusion.[32]

In 1987, the Texas economy crashed: crude-oil prices plummeted and mortgage defaults surged. Losses at Texas savings-and-loans accounted for more than one-half of the losses nationwide.[33] Of the 20 largest failures, fourteen were in Texas.

In November 1987, Arthur Berner, United Savings's general counsel, met with Neil Twomey, a regulator from the Federal Home Loan Bank of Dallas. That agency was part of the regulatory machinery. Twomey told Berner about the Dallas bank's plan to combine failed thrifts and sell them as a package to the highest bidder.[34] The goal was to resolve insolvencies quickly and preserve the government's funds by not having to liquidate failed banks, paying depositors now and collecting assets eventually. Twomey assured Berner that United Savings would be "a major factor" in the process and would be either asked or told to take on at least one failing institution. The two men also discussed the likelihood of the thrift's going below its net-worth requirement and its need for forbearance. Twomey suggested how to apply for assistance in a way that would not hamper their planned activities.

Most important, Twomey assured Berner that there was "no question" that United Savings would survive, saying that the thrift was "too big to fail" and that regulators would not let it fail.[35] Twomey

---

29. *Id.* at 9.

30. *Id.*

31. Ex. 18.

32. Ex. 27.

33. Ex. 3 at 3.

34. Ex. 28 at 1.

35. From 1983 to 1987, United Savings's net worth was consistently higher than the average net worth of Texas thrifts. Ex. 6.

praised United Savings's management, including Charles Hurwitz. He added, however, that "it would have made (and would continue to make) his life easier if Charles Hurwitz had never heard of Redwood trees" but that it was important to have smart business people running Texas thrifts. In a later meeting, Twomey observed that Hurwitz had a "high profile" in Washington.[36]

During this same period, the Dallas bank published several articles about the usefulness of risk-controlled arbitrage and investment in mortgage-backed securities[37]—strategies that United Savings had been using for over a year.

### 7. *1988.*

In January 1988, the FSLIC—the FDIC's predecessor—began investigating United Savings.[38] Its lawyers were developing a strategy. This was almost a year before United Savings would be placed into receivership.

In February, Hurwitz resigned from the board of United Financial; he had never been an officer or director of United Savings itself. That month, after examining the thrift's mortgage-backed securities portfolio, regulators concluded that "it appears no speculation is involved" and that "the generated benefits from these type of transactions outweighs the inherent risk associated."[39] Months later, United Savings was among the 100 thrifts in the nation with the largest mortgage-backed securities holdings.[40] Also in February,

the Bank Board introduced the Southwest Plan—the consolidation plan that Twomey and Berner had discussed.

In March 1988, regulators reviewed United Savings's capital-forbearance application. It recommended that United Savings be allowed to operate below its net worth because (a) its failure to meet its net worth was due to the poor economy; (b) it was well managed; (c) it had a detailed and reasonable plan for rebuilding its capital; and (d) it would furnish regular progress reports.[41]

In May 1988, regulators assessed United Saving's participating in the Southwest Plan. Two years earlier they had praised Hurwitz as a "smart business man;"[42] they now labeled him a "corporate raider."[43] They criticized the thrift for investing in mortgage-backed securities and high-yield bonds and decreasing its home-loan activity. Still, the regulators recommended that the thrift participate in the Southwest Plan, pending results of the thrift's final examination. They expressed internally reservations because Congress was investigating Hurwitz's dealings with Drexel Burnham. They, however, wanted United Savings to succeed.

In early June, Twomey reported optimistically to Berner that "for the first time, the people in Washington and Dallas were talking about United's role in the Southwest Plan."[44] He was extremely optimistic that United Savings would either participate in the plan or receive open assistance from the government.

Twomey and Berner also discussed United Financial's net-worth obligation.[45]

---

**36.** Ex. 36 at 2.

**37.** Ex. 29.

**38.** Ex. 185, *see, e.g.,* items 234, 249, 297, 298, 299, 300, 301, 303, 304, 307, 308. The FDIC had even begun investigating as early as November 1987. *Id.* item 306.

**39.** Ex. 30 at 1, 2.

**40.** Ex. 37.

**41.** Ex. 31.

**42.** Ex. 28 at 2.

**43.** Ex. 33 at 3; *see also* ex. 35 at 3.

**44.** Ex. 36, para. 4.

**45.** *Id.,* para. 7.

Twomey had written the holding company's board of directors, reminding them of the company's net-worth obligation and directing them to make United Financial ensue capital into the thrift.[46] Berner told Twomey that it was impossible for United Financial to do this. Twomey said that he would "as a matter of course" make an official demand on United Financial to infuse capital but that, since he knew that United Financial had no money, this would be a "pro forma requirement." Twomey told Berner that "if UFG didn't, what could I do."[47]

On July 19, Arthur Berner and United Savings president and chief executive officer Larry Connell met with the regulators—Neil Twomey, Robert Brick, Ginger Baugh, and Dave Freimuth—to discuss the thrift and the Southwest Plan. The regulators had apparently received criticism from Congressman Dingell for contemplating giving the thrift capital forbearance in light of what he perceived was Hurwitz's involvement with United Savings. When discussing the thrift's forthcoming results from its November 1987 examination, Twomey assured Connell and Berner that "once again ... there were no surprises."[48]

Two days later, regulator Ginger Baugh suggested that United Savings be placed under increased supervision for its "unsafe and unsound practices."[49] One continued concern was "the adverse national attention given to Charles Hurwitz."[50] Another concern was "the *appearance* of conflict" by other officers based on their involvement with other companies. (emphasis added)[51] Baugh did not say that a conflict actually existed, only that one appeared to exist. In the course of her report, Baugh took the opportunity to remind regulators that the thrift had applied to buy 20 institutions through the Southwest Plan.[52]

Eight days after Twomey said that there would be no surprises in the thrift's examination, he forwarded the results of it to the thrift's board.[53] The examiners had raised the concerns that Baugh raised in her recommendation. One of their criticisms was the lack of S & L operations—home-loan activity. This, however, was no surprise to Twomey or the examiners. They had long known that the thrift—like other thrifts—was making few home loans: consumers could not afford them, and Congress had intentionally expanded thrifts' lending authority into non-traditional areas. Regulators had, in fact, praised United Savings for its steering the thrift away from the home-loan market and diversifying its sources of income.

In addition, examiners criticized the thrift for falling below its net worth. Twomey knew, however, that United Financial had no money and that United Savings needed capital forbearance. In late July, he denied its forbearance, despite previously recommending it.[54] He said that the thrift could reapply, if it wanted.

In August, regulators wanted United Savings to consent to be merged, citing all its recent concerns.[55] Also, in August, they expanded the thrift's examination, de-

**46.** Ex. 34.

**47.** Ex. 36, para. 7.

**48.** Ex. 38.

**49.** Ex. 39 at CNM321733.

**50.** *Id.* at CNM321731.

**51.** *Id.*

**52.** *Id.*

**53.** Ex. 40.

**54.** Ex. 41.

**55.** Ex. 42 at CNM321746.

spite having reported the last examination's results only a month earlier.[56] By September, the FSLIC's lawyers had created a United Savings's "takedown checklist." [57]

Also in September, an outside auditor examined United Savings's books. They had "vastly improved" since a May 1986 examination and were "in most respects, adequate." [58] The regulators still had concerns about the thrifts' participation in the Southwest Plan based on its employment contracts for management—an issue that United Savings was resolving; United Financial's selling its bond portfolios—something that the regulators had wanted it to do; and Dingell's hostility to Hurwitz. The regulators said that Hurwitz "indirectly controls a significant percentage" of United Financial.[59] Hurwitz himself actually owned 0.006% of the holding company's stock.[60] He owned a slight majority of stock in Federated, which owned a majority of Maxxam.[61] Based on his involvement in Federated and Maxxam, Hurwitz's indirect, tertiary personal interest in United Financial was less than 10%. Whether looking at his personal interest in United Financial or Federated and Maxxam's ownership of less than 25% in the company, Hurwitz did not control a "significant percentage" of it.

Regardless of their concerns, the regulators recommended United Savings's participation in the Southwest Plan as the best way to recapitalize it.[62] The government invited Maxxam to bid on United Savings in the Southwest Plan. Maxxam did, and in December, the government rejected the bid.

Maxxam's bid would have cost the Treasury—the taxpayers—$100 million less than the bid that the government accepted. This loss occurred, despite the government's seeking a better bid from the ultimate "winner" of United Savings—Ranieri/Hyperion. The government never asked Maxxam to rebid.

 Compounding the rejection's waste, it was illegal. Once the government invites a person to bid on a failed institution and determines that the bid is adequate, that bidder must be awarded the deal.[63] Knowing this, the regulators discussed their need to doctor the records, saying that they "needed more in the record" for rejecting Maxxam's bid and that "this was the weakest Getty record of any Southwest Plan case." [64]

A draft report on the Southwest Plan shows the government's reasons for rejecting Maxxam's bid—Hurwitz. It would not include his company because of the junk-bond investigation.[65] The lead negotiator for the plan, however, concluded that he had no lawful reason for rejecting Maxxam's bid. He was told he could continue working with Hurwitz because "he had capital." [66] Two lawyers for the regulators

---

**56.** Ex. 43.

**57.** Ex. 185, item 90.

**58.** Ex. 44 at CNM321752.

**59.** *Id.* at CNM321753.

**60.** Ex. 14; Ex. 49.

**61.** Ex. 23. These figures come from a chart created in 1984. Neither party has shown that these numbers changed significantly by late 1988.

**62.** Ex. 44 at CNM321753.

**63.** *Getty v. FSLIC,* 805 F.2d 1050, 1062 (D.C.Cir.1986).

**64.** Ex. 50 at 10; Ex. 51 at 10.

**65.** Ex. 50 at 10; Ex. 51 at 10.

**66.** Ex. 51 at 3.

said that FSLIC had pressured them to find that Maxxam was an unqualified bidder.[67]

As the regulators fiddled, thrifts lost ground. Without its being included in the package sale or sold to Maxxam, on December 30, 1988, United Savings was placed into receivership. It cost the public $1.6 billion—the fifth costliest thrift failure.

### 8. Investigation: 1989–1991.

In 1989, Congress abolished the Bank Board and the Federal Savings Loan Insurance Corporation.[68] The FDIC was assigned the duties of the FSLIC. The 1989 act also created the Office of Thrift Supervision to regulate thrifts in the new system. It created the Resolution Trust Corporation to manage the assets and liabilities of insolvent thrifts.

In 1991, two law firms hired by the FSLIC completed an exhaustive, three-year investigation on possible claims against Hurwitz and other officers and directors for United Savings's failure. The lawyers concluded that the thrift was not a perfect operation but that "the most serious criticism of the officer and directors, in general, was that they exercised poor business judgment...."[69] They found that:

> In view of the consultation and reliance on outside auditors, it will be hard to prove gross negligence or breach of duty unless there was actual fraud and we have been unable to find such evidence.
>
> . . . . .
>
> The proof indicates more than anything else that the directors and senior man-

agement found themselves trying to keep the institution afloat....

. . . . .

the directors' motivation was maintenance of the institution in compliance with the capitalization requirements and not self gain or violation of their duty of loyalty. It will be difficult to show gross negligence on the part of the directors, and the efforts at control undertaken by the officers may not be far from that which would have been undertaken by reasonably prudent person faced with the same volatile market.[70]

They predicted a 35 to 50% success rate on the gross-negligence and breach-of-fiduciary-duty claims against the officers and directors. They said that the agency had less than a 50% chance of success on the claims stemming from Hurwitz's supposed indirect control of the thrift. Because of his securities expertise, it was not unreasonable for the officers to rely on him from time to time.[71] The case, they said, was rife with uncertainties. They recommended settlement of the gross-negligence and fiduciary-duty claims for $2–3 million. These were versions of claims that the FDIC would later bring, seeking exponentially larger damages.

### 9. Investigation: 1992–1993.

The government hired another law firm to investigate the thrift's failure.[72] As limitations approached, the FDIC got its targets to sign tolling agreements.[73] It spent the next two years interviewing—and coercing—former officers and directors. In Arthur Berner's interview, for example, the government's lawyer suggested that he "may want to rethink his position" on what

---

**67.** Ex. 51 at vii, n. 114.

**68.** Financial Institutions Reform Recovery and Enforcement Act, 103 Stat. 183 (1989).

**69.** Ex. 53 at 7.

**70.** *Id.* at 16, 17.

**71.** *Id.* at 15.

**72.** Depo. of Thomas Manic, Ex. 140 at 10–11.

**73.** *See, e.g.,* ex. 54.

the regulators were told about United Savings's investment portfolio.[74] Berner was an un-indemnified, former employee of the thrift with no "deep pocket." [75] In the end, the government got the result that it paid for: the firm found that the thrift's officers and directors had been grossly negligent.[76]

Meanwhile, the FDIC and OTS shared information about the investigation of United Savings's failure.[77] They agreed to maintain the "privileged and confidential" nature of their materials. In February 1992, the FDIC sent OTS a document entitled, "Possible Enforcement Claims." [78] The OTS did not act on the document.

In January 1993, OTS revised its procedures for handling thrift failures. Because of budgetary constraints and a large case load, the agency's chief counsel, Carolyn Lieberman, had to approve new investigations.[79] Regional directors needed to show what goals an enforcement would achieve and when.

10. *Debt for Nature: 1993.*

In August 1993, Congressman Dan Hamburg of California introduced a bill that would authorize the federal government to buy Pacific Lumber's redwoods.[80] It authorized California to contribute funds to the purchase and the federal government to exchange for the redwoods other land that it owned.

In November, Congressman Henry Gonzalez—chair of the House Banking Committee—wrote the FDIC and expressed

his frustration that the agency had not yet sued.[81] Hamburg's bill had magnified his concern. Aping Dingell, Gonzalez suggested that the "principals" of Pacific Lumber—presumably Hurwitz—had bought the company with Drexel bonds and caused United Saving's failure. He even offered the FDIC a valuation of its claim—$548 million—based on a filing by United Financial with the Securities and Exchange Commission.

Three days after Gonzalez's letter, FDIC officials faxed among themselves handouts from environmental groups. The circular of one anonymous group—whose telephone happens to be at the Mendocino Environmental Center—told the FDIC, "Go get Hurwitz." [82] The group urged the FDIC to sue Hurwitz for $548 million—an interesting figure—so that he would have to surrender the redwoods to settle. A flyer from the National Audubon Society prodded people to tell their representatives to support the Headwaters bill. Earth First! wanted "Debt for nature and jail for Hurwitz." [83] Like Dingell and Gonzalez, Earth First! said that Hurwitz had raided Pacific Lumber and caused the thrift's failure. It wanted the government to sue him for $548 million to force a surrender of the trees.

The same month as Gonzalez's letter, an FDIC officer sent the Headwaters bill to Jack Smith, the agency's deputy general counsel. She complained, "Passage would put millions more in Hurwitz's pocket." [84] On the net-worth maintenance claim, she wrote, "If it's not viable, we need to have a

74. Ex. 55, at CN069604.

75. *Id.*

76. *See,* ex. 56.

77. Ex. 52.

78. Ex. 185, item 1308.

79. Ex. 59 at 3.

80. Headwaters Forest Act, H.R. 2866, 103d Cong (1993).

81. Ex. 63.

82. Ex. 64 at 3.

83. Ex. 64 at 5.

84. Ex. 65.

reliable analysis that will withstand substantial scrutiny." Years into the agency's investigation, it had no factual basis for a claim within its authority.[85] To paraphrase her: we are going to attack him without a legitimate reason, so paper the file.

In December, the FDIC director, Alan Whitney, told Skip Hove, the board's chairman, that "even if Hurwitz satisfied our claim by giving us the redwoods, it wouldn't result in what Earth First! (the folks who demonstrated in front of the main building last month) apparently is proposing, i.e., that we then deed the redwoods property to the Interior Department."[86]

Wrapping up 1993, later that month Counsel Smith wrote Chairman Skip Hove about the investigation of claims against the thrift's officers and directors and Hurwitz.[87] He relayed, "We are also reviewing a suggestion by ' "Earth First" ' that the FDIC trade its claims against Hurwitz for 3000 acres of redwood forests owned by Pacific Lumber...."

### 11. *Investigation: 1994.*

In January, Hove responded to a letter from Congressman Ronald Dellums of California. He said that the FDIC was following debt for nature closely and that it would pursue the redwoods if Maxxam could be held liable for United Savings's failure.[88]

On February 3, FDIC lawyers met with Congressman Hamburg to discuss the case. Hamburg had an "immediate interest" in a suit against Hurwitz and did not want "this possible avenue" to be lost.[89]

The FDIC said that it wanted to enforce net-worth obligations. John Thomas—the lawyer overseeing the investigation—had to concede that the agency could not find a signed agreement between (a) Maxxam or Federated and (b) FSLIC, the agency at the time of the purchase by Federated. Nevertheless, the FDIC's Smith reassured Hamburg that it was examining the claims of its "most optimistic dreams." He suggested that if it could "convince other side that we have claim worth $400m, they want to settle. Could be a hook into the holding co."

A calendar entry from around the same time shows a meeting among Alice Goodman of the FDIC's Office of Legislative Affairs, Gonzalez, and Hamburg to discuss the redwoods.[90]

On February 4, the FDIC contacted OTS about bringing a net-worth claim against United Financial and Maxxam.[91] The FDIC said that it had "no viable claim" against the holding company and pressed OTS to sue "UFG and perhaps others" by the end of the year because of limitations. It specifically noted:

"You should be aware that this case has attracted public attention because of the involvement of Charles Hurwitz, and environmental groups have suggested that possible claims against Mr. Hurwitz should be traded for 44,000 acres of North West timber land owned by Pacific Lumber, a subsidiary of Maxxam. Chairman Gonzalez has inquired about the matter and we have advised him we would make a decision by this May.... After you have reviewed these papers, please call me or Pat Bak ... to discuss the next step and *to arrange coordina-*

**85.** *See also* ex. 326.

**86.** Ex. 66.

**87.** Ex. 328.

**88.** Ex. 69.

**89.** Ex. 70 at 1.

**90.** *Id.* at 5.

**91.** Ex. 71.

*tion with our professional liability claims.* (emphasis added) [92]

The FDIC says that its contacting OTS the day after the meeting with Hamburg was coincidence.[93] It lies. The FDIC's last contact with OTS was eighteen months earlier when it urged the OTS to sue Hurwitz, Maxxam, and Federated. OTS did not respond. The only development in the year and one-half was the lobbying by the green groups, Headwaters bill, correspondence from members of Congress, and the meeting with Hamburg the day before.

Also on February 4, Eric Spitler from the Office of Legislative Affairs and Jack Smith discussed what law firm to hire. In the world of the FDIC, the professional-liability section needed advice from legislative affairs on hiring lawyers. Spitler's e-mail titled "Redwoods" explains why:

> I thought about our conversation yesterday. My advice from a *political* perspective is that the "C" firm is still politically risky. We would catch less political heat for another firm, perhaps one with some *environmental* connections. (emphasis added) [94]

The agency hired Hopkins & Sutter, where Steve Lambert was a partner in its environmental-law section. Handwritten notes of Robert DeHenzel, an FDIC lawyer, show that the FDIC was assembling an "issue driven" staff for the case. Lambert's duties were to be "environmental/*trees*." (emphasis original) [95] During the initial interview of Hopkins & Sutter, DeHenzel noted that Lambert had "Lumber experience in Washington, D.C." [96] He also noted that the firm had "Connections on the *Hill* and w/other agencies, *particularly Interior (Debt for Nature)*." (emphasis original) [97]

The professional-liability section is the staff who handle claims against officers, directors, auditors, and other professionals. During his deposition, Jeffrey Williams, the head of professional-liability, swore that "it was completely fortuitous" that Lambert was at Hopkins & Sutter. Williams swore that Lambert's presence in no way influenced the decision to hire the firm.[98] Incredibly, Williams added that, when the FDIC hired the firm, the agency did not anticipate raising an environmental issue in the case and, therefore, needed no environmental lawyer.[99] Perjury by a lawyer is especially ugly.

At Vice President Gore's request, Hurwitz met with him that month while "senior members of Congress kept up pressure on the FDIC." [100] Gore and Hurwitz talked about the government's buying the redwoods.

In late February, OTS met with the FDIC. Lieberman said that OTS could sue United Financial for not maintaining the thrift's net worth, but it would need (a) more time to examine claims against Maxxam and Federated and (b) documents from the FDIC.[101] Lieberman also noted a significant limitation on OTS's ability to bring the case: money. If OTS sued for the FDIC's benefit, she said "the FDIC would have to make some arrangement with the OTS to offset the agency's costs for pursuing such a proceeding."

---

92. *Id.* at 1.

93. Depo. of Jack Smith, Ex. 218 at 33.

94. Ex. 72.

95. Ex. 339A.

96. Ex. 343 at 3.

97. *Id.* at 1

98. Depo. of Jeffrey Williams, Ex. 211, vol. 4 at 344–345.

99. *Id.* at 345.

100. Ex. 73.

101. Ex. 74 at 1; *see also* ex. 290.

The FDIC became the target of an "intense lobbying effort by certain environmental activists led by the Rose Foundation."[102] The Rose Foundation is an environmental interest group. Like similar groups, the Rose wanted a debt-for-nature swap. The Sierra Club also wanted the swap. In April, backed by "its more than 500,000 members," it wrote the FDIC, urging suit.[103]

Around this time, the *Wall Street Journal* reported that "the long-dormant federal investigation into the collapse of" United Savings was "heating up" because of debt for nature.[104] A Hamburg aide said, "The more pressure the government puts on" Hurwitz, "the better our hopes of saving those forests become."'[105] Though the government has objected to this article's relevance, the FDIC found it important enough at the time to file and comment on it internally.[106]

The day after the article, OTS announced its new enforcement policy.[107] It would undertake only those actions that would strengthen struggling thrifts, prevent their failure, and prohibit the leadership of a failed bank from participating in the industry again. The agency would turn cases seeking restitution over to the FDIC. The FDIC's vision of an OTS suit for United Savings's failure—an event from six years earlier—contradicted this new policy.

John Thomas's notes from around May show the FDIC's contemplating whether to sue and how to coordinate with OTS. The FDIC wanted more time to examine the merit of its suit as well as OTS's net-worth claim against Maxxam.[108] The reason was because "Tactically, combining FDIC/OTS' claims—*if* they all stand scrutiny—is more likely to produce a large recovery/the trees than is a piecemeal approach." The government had "pared the case 'back' to $200m." It cannot explain how it calculated this number. On when to sue, the FDIC said, "*If* this wasn't public, the FDIC would do # 1"—that is, "Defer it all, incl. OTS, until (probably) 4th quarter '94." The notes continued, "I think we should do it here—but complaints are likely (whatever we do)." Jeff Williams observed that "OTS' case broader bec/not constrained by [Texas's statute of limitations], [business judgment] . . . may be in our [interest] to stay."[109] The FDIC has repeatedly argued that it moved to stay to avoid duplicative litigation. William's notes reveal that to be false. The FDIC wanted to stay because it preferred the administrative forum. It also knew that its case here would fail. Williams also asked, "What is our *proof* that is more than bad bus. judgmt.?"[110]

In May, the FDIC hired OTS. It agreed to cover OTS's costs because "OTS faces severe budgetary constraints and that, as a result of these limitations, OTS cannot consider issues which implicate a failed institution to be its first priority."[111] The agencies agreed that recovery would go to the FDIC.[112] OTS promised that it would

102. Ex. 108 at 1.

103. Ex. 75.

104. Ex. 76.

105. *Id.*

106. Ex. 185, item 747.

107. Exs. 77, 78.

108. Ex. 79 at 1.

109. Dkt. 491 at 12.

110. *Id.* at 15.

111. Ex. 80 at 1–2.

112. Ex. 82 at 2.

submit its investigative plan to the FDIC. After agreeing to do the FDIC's bidding, OTS papered the record with an insistence that its investigation and decision would be autonomous.

If the FDIC had not suborned the OTS with its subsidy, OTS would have done nothing.[113] Getting the OTS to participate was critical because the FDIC had no claim for United Savings's failure. In addition, according to the FDIC, its own "claims alone are not likely to be sufficient to cause Hurwitz to offer the Headwaters Forest." [114] In the words of the Office of Management and Budget, OTS's claims were needed to "fill in the gap bet[ween] forest value and FDIC claims." [115]

In May, Chairman Skip Hove promised the executive director of the Sierra Club that he was following the debt for nature issue closely and that "issues involving the redwoods might be brought into play." [116] Hove received another letter from Congressman Dellums, who advised that he had met with the "team of public interest lawyers" who advocated the debt-for-nature swap. Dellums chastised the FDIC for not having yet sued nor having told him about the debt-for-nature proposal.[117] Dellums forwarded copies of his letter to Gonzalez and Hamburg.

In June, Thomas Hecht, a private lawyer for the FDIC with Hopkins & Sutter, met with Jill Ratner, the founder of the Rose Foundation, for the first of many meetings.[118] Rose's work would become integral to the government's case. That same month, Williams noted that there were "2 basic issues surrounding this claim." These were: the "high level of discomfort on the·merits of the claim" and "the subst. political attention focused on this claim." [119]

In July, Hopkins & Sutter's Steve Lambert—the lumber lawyer—drafted the FDIC's talking points for a conference.[120] His memorandum was *entirely* about the Headwaters bill, its status, implementation, and supporters, of which "34 are on one of the Committees dealing with FDIC."

The retained lawyers sent Williams a memorandum in mid-July that shows the FDIC's thoughts about the suit.[121] Counsel remarked that "time did not permit an *orderly and thorough investigation* of the claims as they now have been delineated." (emphasis added)[122] By this time, the FDIC had been investigating its claims for over six years.

The FDIC referred to the OTS claims as part of "the case." [123] Its outside counsel warned that, because of media attention, "there is an overlay of political issues which must be considered." [124] These considerations included responding to environmentalists and developing "creative" claims against Hurwitz. Again, Williams would later testify that media coverage and pressure from environmentalists did not influence the FDIC.

The memorandum also shows that the agency had no facts to support that the

113. Ex. 74.

114. Ex. 138 at 3.

115. Ex. 155 at 2.

116. Ex. 81.

117. Ex. 83.

118. Ex. 108 at 3.

119. Dkt. 491 at 16.

120. Ex. 87.

121. Ex. 333.

122. *Id.* at 1.

123. *Id.* at 2.

124. *Id.* at 2–3.

thrift was not viable when it was put into receivership.[125] Up to then, the agency had simply told its experts preparing analyses to assume that the thrift was not viable. It now acknowledged that differing opinions about viability were possible, so it needed to "develop the facts relating to [United Savings's] financial condition" to support that the thrift could not have survived.

The FDIC acknowledged that, "as with our other claims," the claims against directors were difficult to support.[126] It doubted whether the directors had recklessly disregarded the law. In addition, this was apparently the first time that the agency had attempted to hold directors responsible for losses from market fluctuations.[127] In other words, the agency wanted the directors to have guaranteed that adverse business conditions would cause no loss to depositors.

Other excerpts reveal the weakness of the FDIC's attempts to link Hurwitz to the Drexel Burnham and Michael Milken scandal:

> While two sets of events ([United Savings] junk bond investing and Drexel money for Hurwitz take overs) clearly took place, it is not clear that a firm agreement linked the two together.... Given that others who have examined this area have found no express agreement, this does not appear to be a priority area for inquiry. *The Drexel connection with Hurwitz will, however, be of significant use in tainting the independence of [United Savings's] decision making process.* (emphasis added) [128]

The FDIC proposed developing the Drexel link by "meeting with the Rose Foundation attorneys and environmental activists who claim they have useful Drexel–Pacific Lumber Co. information." [129]

On the OTS, the FDIC said that the administrative venue was more favorable than federal court. With another bureau, there would be no independent judiciary to slow the regulatory state's seizure of assets and reputations. The FDIC could have joined the OTS in this action; after all, they are both components of the same entity—the national government. It discussed that although a two-agency suit might be viewed as coercive, hiring OTS was necessary because "having the defendants confront two agencies in different venues adds significant pressure." [130] The memorandum confirms that the OTS's declarations of autonomy were a sham.

> Given OTS's limited resources, we must be prepared to develop for them the material they need to move forward. In our prior meetings with OTS we volunteered to develop an overview of the claims and issues along with key supporting documentation.... This outline, along with our substantive discussions with its staff, should provide OTS with a context for pursuing three sets of claims: (i) a net worth maintenance claim against UFG, (ii) a net worth maintenance claim against Maxxam and (iii) claims against [United Savings's] officials for violations of law or regulations which caused injury to [United Savings].[131]

Last, the memorandum shows the weakness of the FDIC's net-worth claim—a

---

125. *Id.* at 10.

126. *Id.* at 27.

127. *Id.* at 11.

128. *Id.* at 23

129. *Id.* at 24.

130. *Id.* at 27, 24.

131. *Id.* at 24–25.

claim that it eventually brought. The agency admitted that it may have waived the claim because of its dealings with the thrift. Also, it could not explain the contemplated damages of $500 million.[132] The FDIC had simply picked a number—a number large enough to cover Dellums's suggestion.

In August, Rose's Ratner faxed Lambert a copy of an article about her from the *San Francisco Daily Journal*.[133] The article describes (a) Ratner as the author of the debt-for-nature idea, (b) her effort to pin United Savings's failure on Hurwitz because of his connection to Pacific Lumber through Maxxam, and (c) her plan's political support from Vice President Gore and Senator Barbara Boxer. The fax is significant for another reason: its cover sheet. The FDIC has not explained how an environmental activist to whom it gave "no serious consideration" knew to what lawyer and at what number to fax the article.

A month later, Ratner sent Lambert a 43–page memorandum exploring the history of Maxxam and Maxxam's acquisition of Pacific Lumber.[134] Ratner concluded that Maxxam's using bonds to buy land in California caused the Texas thrift to fail. She arrived at this, saying:

- Maxxam was a controlling shareholder of United Financial and, therefore, controlled United Savings.
- Maxxam's investing in high-yield bonds breached its fiduciary duty to United Financial and, therefore, to United Savings.
- Because the thrift failed, Maxxam owed the government money. A constructive trust should be placed on Pacific Lumber's assets for the FDIC's benefit.

Maxxam, however, owned less than a controlling share of the holding company and no stock in the thrift. It owed no duty to the thrift. In addition, at no time does Ratner explain how Maxxam's use of bonds to buy land caused United Savings to fail. Ratner's correspondence shows that, contrary to the government's assertions, the FDIC heeded the Rose Foundation's suggestions.[135] Each of Ratner's points could be addressed; her confusion of facts and law is clear to any non-cause lawyer. It is sufficient to list them so that the parallel between them and the FDIC's confused assault is obvious.

On October 3, the FDIC and its lawyers discussed the Rose materials.[136] The next day, Rose Foundation lawyers, the FDIC's outside lawyers, and the FDIC legal staff held a conference call that lasted over an hour.[137] They discussed logging. They also talked about whether published criteria existed for the FDIC board to follow in deciding whether to sue. The agency's only policy guidelines were whatever the staff recommended.[138]

Days later, Ratner wrote Hecht "in response to your requests for more specific information on current logging within the Headwaters area...."[139] Two days later, Ratner summarized for Hecht recent and pending cases affecting the Headwaters.[140] Richard DeStefano, a Rose lawyer, wrote

132. *Id.* at 26.

133. Ex. 89.

134. Ex. 90.

135. Ex. 186, items 3, 5, 4, 7, 8, 10.

136. Ex. 185, item 781.

137. Ex. 91.

138. *Id.* at 2.

139. Ex. 93.

140. Ex. 94.

Hecht a month later about constructive trusts, junk bonds, unjust enrichment, the role of the other United Savings directors, Texas savings-and-loan regulations, and the Endangered Species Act.[141]

Ricki Tigert became chairman of the FDIC board around this time. Tigert's last name would later change to Helfer. Ratner promptly wrote her about debt for nature.[142] She also sent her the 43-page memorandum that she had sent to Lambert.

In late October, OTS began its investigation of United Savings and United Financial.[143] In late November, the FDIC's outside counsel sent the OTS a draft notice of charges, a chronology on the net-worth claim against Maxxam, a summary of a regulator's review of a United Savings real-estate portfolio, and another analysis by the Rose Foundation.[144] The lawyer also mentioned that it was looking at a group of loans that OTS might use for its suit.

In December, the FDIC's Williams sent to "Bob"—presumably DeHenzel at the FDIC—an article from the *Houston Chronicle* about off-track betting in horse racing in Texas.[145] The article quotes Hurwitz. Williams observed that Hurwitz was "pushing for" off-track betting in Texas and that he had signed an agreement to turn a Houston building into a gambling casino. He concluded, "both show he's looking for large cash flows ...." First, Williams's note is another snide personal attack on Hurwitz. Second, his implication that it is somehow sinister for Hurwitz or anyone else to look for cash flows is ridiculous.

12. *Politics: 1995.*

In January, the FDIC met with the National Heritage Foundation, "a group closely associated with the Rose Foundation," to discuss the debt-for-nature issue.

In February, ten well-known environmental groups wrote Chairman Tigert, Senator Boxer, and Leon Panetta, then-chief of staff to President Clinton. They wanted the government to "make protection of the Headwaters Forest one of the bases of ongoing settlement negotiations in the [United Savings] matter." [146] Ten days later, the Rose Foundation published additional material about the debt-for-nature swap.[147]

In March, John Rogers, another Hopkins & Sutter lawyer, sent the OTS the documents that he had mentioned in his comments on the notice of charges.[148] Days later, Ratner wrote Allen McReynolds, Special Assistant to the Secretary of Interior, to memorialize a conversation that they had had about intra-agency land transfers, including using the FDIC and OTS to extract the redwoods from Hurwitz.[149] Also, California state senator Tom Hayden asked Clinton to pressure the FDIC to bring suit and get the redwoods as partial settlement of the government's loss on the thrift.[150] He sent along more Rose material.

The Clinton Administration was promoting the swap. Panetta had told an environmental group that the swap was "worth pursuing," especially since "budgetary con-

---

141. Ex. 99.

142. Ex. 92.

143. Ex. 95.

144. Ex. 334.

145. Notes of Jeff Williams, dkt. 506, at 11, 12.

146. Ex. 102.

147. Ex. 103.

148. Ex. 104.

149. Ex. 105.

150. Ex. 106.

straints" prevented the government from buying the trees "through outright federal purchase."[151] In June, the National Heritage Institute forwarded to the FDIC Panetta's letter.[152] People from the White House, Forest Service, Interior Department, OTS, FDIC, and the Vice President's office were now part of the plan to bring actions against Hurwitz and Maxxam to wring the redwoods from them.

During this time, Hecht assessed the Rose Foundation's proposals and wanted "to memorialize our contacts with these groups and to discuss the options they have urged upon the FDIC and OTS."[153] Hecht noted the deficiencies of the proposals and said that settlement was the government's best option.

> As the theories have become subject to criticisms, certain of the counsel for the Rose Foundation have shifted (at least in part) from arguments compelling the *seizure* of the redwoods to urging the development of an *aggressive and high profile damages case in which the redwoods become a bargaining chip in negotiating a resolution.* This, indeed, may be the best option available to environmental groups: its greatest strength is that it does not depend on difficult seizure theories. This approach would require that both the FDIC and OTS undertake to make the redwoods part of any settlement package. (emphasis added)[154]

An April e-mail by the FDIC's Williams shows the FDIC mulling "creative options that may induce a settlement involving the sequoia redwoods in the FDIC/OTS case."[155] Publicly, the FDIC said that the swap was simply one option that it was considering.[156]

In late April, the agency conceded internally that "we have no claim against Kozmetsky that can survive stat. of limitations."[157] This was a concession from its earlier position that George Kozmetsky needed to be sued because he was a member of the "Hurwitz' core group."[158] Yes, sue him because he was close to Hurwitz; hurt his friends, and he will settle, like Soviet threats to denounce one's colleagues and family if one did not confess to being whatever kind of scapegoat the government needed at the moment. George Kozmetsky was an outside director of Maxxam.

The FDIC originally decided to sue Kozmetsky because he was a member of the audit committee.[159] It also noted that he was highly respected businessman who was active in numerous charities.[160] When the FDIC decided not to sue him, it said simply that "*although* he was an active member of the Audit Committee, ... he was an outside director and was not a member of the Investment Committee." (emphasis added)[161]

The distinction between Hurwitz and Kozmetsky made no sense. Like Kozmetsky, Hurwitz is a successful Texas businessman and prominent in charities. Hurwitz was also a director of Maxxam. Hurwitz, however, was not a director of

---

151. Ex. 107.

152. Ex. 112.

153. Ex. 108 at 2.

154. Ex. 108 at 8.

155. Ex. 110.

156. Ex. 111.

157. Ex. 340.

158. Ex. 358 at 33, n. 35.

159. *Id.* at 30 n. 27.

160. *Id.*

161. Ex. 121 at 41, n. 32.

the thrift or involved in the details of its operations.[162] No rational explanation exists for why the FDIC would drop its claim against Kozmetsky, who was directly involved in the thrift, but persist against Hurwitz. The only possible inference is Hurwitz's connections to the redwoods.

Other problems with the case surfaced in June. The FDIC's Division of Asset Services said that the FDIC could prosecute only those who had depleted the insurance fund by defaulting on loans, not directors and officers.[163] In addition, Maxxam belonged to Maxxam Group Holdings, Inc., a publicly traded company. To sue Maxxam, the FDIC would have to contend with shareholders of the parent, not just Hurwitz.[164]

FDIC officials met on July 20 to discuss whether (a) Hurwitz would toll again and (b) OTS would file suit. Deputy General Counsel Jack Smith said that "we will not go forward if OTS files a case" and that "If OTS *does not* file suit, we will have to decide our case on the merits before tolling expires." (emphasis original)[165] This was fully seven years into the government's investigation. The agency has been issuing press releases, making accusations, and demanding money without— by its own admission—having fully assessed the merits of its case.

On July 20, the thrift's officers and directors extended their tolling agreements. Hurwitz did not. After nearly a decade of being investigated, he had had enough.

The next day, the FDIC met with McReynolds of Interior about the swap.[166] Smith observed that the "Calif deleg. is really putting the pressure on."[167] Notes from John Thomas's "Headwaters" file say that the FDIC had not yet decided to bring suit but would in a few months. According to McReynolds, "the Admin. wants to do deal" and that he was "told to find way to make it happen."[168] The FDIC acknowledged, "If we drop suit, will undercut everything."[169]

In the course of the meeting, the FDIC's Robert DeHenzel noted that "Hurwitz really wants *200 million* for the 8000 acres. *Calif.* will trade 100 million worth of other state forest, but need to come with another 100 million, at least, to *give* Hurwitz (forgiving FDiC/OTS debt.)"(emphasis original)[170] He also wrote that Interior had no money for the deal. Another participant wrote that Interior was under "lots of pressure" from environmentalists and the California delegation.[171] The FDIC had a choice between the "Hit for dismissed suit" and "Hit for walking based on staff analysis of 70% loss."[172] Yes, a 70% chance of loss.

On July 24, members of Congress wrote the FDIC, wanting an update on the case and urging the debt-for-nature swap.[173] FDIC Chairman Ricki Helfer considered the letter important enough that she circulated it to ten FDIC officials.

### 13. *Original Recommendation.*

On July 24, the staff made its initial recommendation on the suit: it told the

---

162. Ex. 5.

163. Ex. 337 at 1.

164. *Id.*

165. Ex. 114

166. Ex. 113; Ex. 185, item 72.

167. Ex. 115 at 3.

168. *Id.* at 1.

169. *Id.*

170. Ex. 235.

171. Ex. 236.

172. Ex. 116.

173. Ex. 117.

board *not* to sue.[174] The FDIC's claims had expired or had little chance on the merits.

The agency wanted to argue that the court should toll limitations, but courts had disagreed with the standard for tolling that the FDIC would have to use. The FDIC could only argue that the thrift's directors and officers and Hurwitz had been grossly negligent in their actions. Decisions in the Court of Appeals for the Fifth Circuit barred that theory. They had held that only self-dealing and fraud—not gross negligence—would toll limitations.[175] The staff admitted that "there is very little, if any, evidence of fraud or self-dealing . . . ." [176]

Even if gross negligence had been sufficient to toll, Texas law had a rigorous standard for it. To establish gross negligence, (a) viewed objectively, an act would have to involve an extreme degree of risk, and (b) the defendant would have had to have been subjectively aware of the risk and have continued disregarding the well-being of others.[177] This would make it "very difficult, if not impossible to prove our claims." [178] The staff predicted the likelihood of dismissal to be greater than 50% and, therefore, did not recommend suit.

The staff knew that the agency would be sharply criticized for not suing but still wanted to pursue the debt-for-nature swap with OTS. It told the board that, if it decided to sue, the agency would have to sue by August 2—only 9 days later.

Another draft of the original recommendation shows the staff "taking the unusual step" of informing the board of its conclusion "because the FDIC is highly likely to lose on statute of limitations grounds." [179] On the de-facto-director claim, the staff wrote, "The law has also moved against us on the merits of the claims. The claims against Hurwitz are more difficult than usual because he was not an officer or director of [United Savings]." [180] It said that this was a "notable hurdle."

Another draft is more candid about dismissal on limitations grounds: the agency predicted a 70% chance and said:

> Under such circumstances, the staff would ordinarily close out the investigation under delegated authority. However, because of the high profile nature of this case (evidenced by numerous letters from Congressmen and environmental groups), we are advising the Board in advance of our action in case there is a contrary view.[181]

Limitations were not the only hurdle. The FDIC faced an "increased risk of dismissal *on the merits*." (emphasis added) [182]

Each draft discusses the unlikelihood of success. Each contains a section about the redwoods, refers to Hurwitz as a "corporate raider," and acknowledges that a decision not to sue would be met with "media coverage and criticism from environmental groups and members of Congress." [183]

---

**174.** Ex. 118.

**175.** *RTC v. Acton,* 49 F.3d 1086 (5th Cir. 1995).

**176.** Ex. 118 at 3.

**177.** *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 23 (Tex.1994).

**178.** Ex. 118 at 3.

**179.** Ex. 119 at 1; *see also* ex. 332.

**180.** Ex. 119 at 4.

**181.** Ex. 120 at 1.

**182.** *Id.* at 4.

**183.** Ex. 118 at 3; ex. 119 at 5; ex. 120 at 5.

The drafts discuss Interior's pursuit of the swap, and two discuss how the swap would extinguish "the FDIC/OTS claim." [184] Each notes the Administration's serious interest in the swap.[185]

### 14. *Helfer Briefing.*

Also on July 24, John Thomas met with his boss, William Kroener, general counsel of the FDIC. Although Kroener swore that he did not recall what Thomas had told him, their conversation was important enough for Kroener to ask for an immediate briefing with Chairman Ricki Helfer.[186]

Thomas thought that the purpose of the briefing was to tell Helfer about the staff's recommendation so that the FDIC could close the investigation.[187] He told her about the recommendation not to sue, and the meeting ended with no plans for the case.[188] Later that day, Helfer asked to see Kroener in her office. She told him to "take another look at the claims." [189] She did not specify what needed another look, saying only that she believed that the behavior had been "egregious." Kroener gave the same instruction to Thomas.

There is no question what Helfer meant. In a binary choice—sue or not—when the result *not* needs to be re-"looked," the only alternative is *sue.* The FDIC had been investigating Hurwitz for almost a decade. It had found nothing to show that Hurwitz had made the thrift fail. Regardless, Helfer was determined to use him for political points generally and to get some trees, although neither facts nor law supported her. Despite the FDIC's duty of independence—of disinterested technical service—

Helfer both casually accepted the political preferences of her pals in the Administration and cravenly bowed to loud environmentalists and congressmen.

In a day, Thomas rewrote the staff's recommendation. He invented a net-worth claim from the one that the FDIC had concluded that it had no authority to bring. The FDIC said that Hurwitz had breached his fiduciary duty to United Savings by failing to cause Maxxam and Federated to maintain United Savings's net worth. This theory is specious. By Thomas's logic, Hurwitz could have been sued for not contributing (a) his personal wealth to the thrift or (b) anything that Hurwitz could influence that was needed to pay the thrift's bills. If Maxxam and Federated did not contribute, he would be liable for not making them do it.

On July 26, Smith wrote other FDIC lawyers, telling them that "The Chairman and General Counsel have decided to recommend suit in Hurwitz." [190] FDIC policy required that recommendations to sue come from the staff; this one came down from one member of the board and her legal advisor.

### 15. *Amended Recommendation.*

On July 27, the staff issued an amended recommendation. The only difference between the amended recommendation and the initial one was the omission of the "not" before "sue"—the manipulated result. The staff still warned the board that the claims faced a 70% chance of dismissal on limitations.[191] It said that changes in

---

**184.** Ex. 119 at 5; ex. 120 at 5.

**185.** Ex. 118 at 3; ex. 119 at 5; ex. 120 at 5.

**186.** Depo. of William Kroener, ex. 216 at 103–04.

**187.** Depo. of John Thomas, ex. 219 at 107, ll.2–9.

**188.** Depo. of William Kroener, ex. 216 at 119, ll.18–20.

**189.** *Id.* at 120, ll.4–5.

**190.** Ex. 330.

**191.** Ex. 121 at 2.

the law would make tolling unlikely and that holding Hurwitz liable for the thrift's net worth would be difficult.[192] It predicted a 50% likelihood of success on the merits.[193]

The staff justified its recommendation by parroting Helfer: the conduct had been "egregious." [194] Helfer, however, never articulated how Hurwitz's conduct had been wrong. After its protracted investigation, the staff could not either. The staff's explanation was a sham. The staff knew it. Helfer knew it. Even the agency's official memorandum *recommending* suit conceded that the case was a loser. The motivation was the redwoods.

Like earlier drafts, the memorandum reminded the board of the media coverage of Pacific Lumber's "harvesting redwoods." It emphasized that the environmentalists had garnered "considerable publicity" for a debt-for-nature swap and that "the Administration is seriously interested in pursuing such a settlement." [195] Last, the document conveyed that Interior had been negotiating with Hurwitz for an exchange of federal property and the "FDIC/OTS claim" for the redwoods.[196] Implicit is that, without a suit, the government had no leverage to extract the forests.

Also on July 27, Jeff Williams updated other FDIC officials on the status of the complaint.[197] He said that the complaint would contain "the newly added" net-worth claim, aiding and abetting breaches of loyalty by other directors, and gross negligence in a real-estate portfolio and a mortgage-backed-securities subsidiary. Apparently, the draft would be flexible enough to add new defendants if they did not agree to toll. It would allow the board to "take a run" at limitations if it wanted.

### 16. *Board Presentation.*

On August 1, the board of directors met. The board comprised Ricki Helfer; Andrew C. (Skip) Hove, vice chairman; Stephen R. Steinbrink, acting Comptroller of the Currency; and Jonathan L. Fiechter, acting director of the OTS. Thomas briefed them, and Helfer presided over the meeting. At no point did either of them disclose that the staff had initially recommended no suit or that Helfer had told them to redo the recommendation.

Thomas said that the staff wanted to sue Hurwitz and three other United Savings insiders for grossly negligent management of two mortgage-backed-securities portfolios.[198] It wanted to sue only Hurwitz for his being a control person and *de facto* director of the thrift. It said that he should have made United Financial, Federated, and Maxxam maintain the thrift's net worth.

Before addressing the recommendation, Thomas reminded the board of the redwoods, saying:

> This is, of course, a very visible matter. It is visible for something having no direct relationship to this case, but having some indirect relationship.
>
> Mr. Hurwitz, through Maxxam, purchased Pacific Lumber. Pacific Lumber owns the largest stand of virgin redwoods in private hands in the world, the Headwaters. That has been the subject of considerable environmental interest, including the picketing downstairs of a

---

192. *Id.* at 3, 5–6.

193. *Id.* at 11.

194. *Id.* at 3.

195. *Id.* at 10.

196. *Id.* at 7.

197. Ex. 331.

198. Trans. of Bd. of Dir., ex. 123 at 6, l.19–7, l.2.

year or so ago. It has been the subject of Congressional inquiry and press inquiry. So, we assume that whatever we do will be visible.

Interior—you should also be aware the Department of Interior is trying to put together a deal to get the Headlands, trade property, and perhaps our claim. They have spoken—we've spoken to the staff a few days ago about that, and the staff of the FDIC has indicated that we would be interested in working with them to see whether something's possible. We believe legislation would ultimately be required to achieve that.

But again, it's the Board's pleasure. We would at least try to find out what's happening and pursue that matter and make sure that nothing goes wrong and we're not part of it.[199]

Thomas said that the agency was in the position where it could "probably spend a lot of money."[200] On the prospects of success, he said that dismissal of the mortgage-backed-securities claims on limitations grounds was 70% likely and that success on the merits was less than 50%.[201] He also said that the net-worth claim against Hurwitz was "a very difficult claim on the merits," especially since Federated and Maxxam never agreed to maintain the thrift's net worth.[202]

Thomas warned the board that "we expect if we bring this claim we will see Rule 11 motions."[203] Helfer—a lawyer and former clerk for the Court of Appeals for the Fifth Circuit—did not know what Rule 11 was.[204] It was explained to her that Rule 11 was designed to allow courts to correct and deter lawsuits unsupported by facts and law. Only two-and-one-half months

earlier, the agency discussed whether it faced sanctions under the rule in another case.[205] Apparently, the FDIC contemplates duplicity frequently.

17. *Deliberate Votes on Independent Judgment.*

After a dishonest presentation of a doctored recommendation, the board deliberated. The board members failed their public trust. The transcript and recording of the meeting show the board's vacillation. Not content to rig the staff report, Helfer insisted on her secret decision.

> Helfer: Are there any other comments or question? May I have a motion to accept the staff's recommendation to authorize the institution of a professional liability suit against certain former directors and officers of United Savings Association of Houston, Texas? Anyone want to make the motion? [*Nervous laughter*]
>
> Fiechter: I take it this is up or down if tomorrow—
>
> Helfer: Yeah, it's up or down.
>
> Fiechter:—if it runs.
>
> Helfer: I think you're saying that there is a high probability that on one of the claims the claim will not go forward on the statute of limitation grounds. There is a lower probability—there is a high probability that the other claim will go forward despite statute of limitation claims; that the chances of recovery on the merits on the first claim are *very high*, the chances of recover on the merits of the second claim are a bit lower, the probability of a *high recovery* should the case go forward on the merits is

199. Ex. 123, at 12, l.23–13, l.23.

200. Ex. 123 at 14, ll.11–12.

201. *Id.* at 34, ll. 23.

202. *Id.* at 14, ll.23–24; 15, ll.5–8.

203. *Id.* at 24, ll.22–23.

204. *Id.* at 25, ll.1–2.

205. Notes of Jack Smith, dkt. 473, attach. at 2.

*significant,* but that has to be offset against the difficulties with respect to one of the claims on statute of limitations grounds. Have I summarized? (emphasis added) [206]

Helfer was inventing recovery probabilities, contradicting even the manipulated report from the staff. If the FDIC had a 30% chance of surviving limitations and a 50% of succeeding substantively, then its chance of success was 15%. That is better than seven to one against winning, as Damon Runyon would say. Helfer claims to be a lawyer; she should have known this. She took the initial vote.

Helfer: ... Is there a motion to accept-accept the staff's recommendation to proceed with suit in this case? No from you? No? No? Can the Chair make a motion?

Board member: Yes.

Langley: Bill says yes, the Chair can make a motion.

Helfer: Okay. I'm going to make a motion to pursue this suit in the case. Is there a second to the motion?

*[Seconds pass with no one seconding the Chair's motion.]*

Steinbrink: I've never seen this before. *[Laughter]*

Helfer: I never have either. We can still vote on the merits of this, you all. I think that we should have a recorded vote. So I ask for second to my motion so we can have a recorded vote on whether to institute suit.

. . . . .

Vice Chairman Hove: Can a motion be seconded and then voted against the motion?

Helfer: Can the person who seconds the motion vote against it?

Langley: Sure. Yes.

Helfer: Yes.

Hove: I will second.

Helfer: All right. All in favor of insti—of the staff's recommendation to authorize suit in this case. Please record that the Chair votes yes. All opposed to instituting in this case.

Hove: Aye.

Fiechter: Aye.

*[Seven seconds of silence followed by nervous laughter.]*

Steinbrink: I think I would defer to the Chair in this case and in the first request vote with the Chair.

Helfer: Okay. So that would be a two-to-two vote, and I assume that would not authorize suit in the case; is that correct?

Langley: Right, that's correct.[207]

Hove and Fiechter said, "Aye," in response to a question for "No" votes. This would be similar to a middle school student's yelling "Yo" to his teacher's question. It is confusing, but the board had voted not to sue Hurwitz. Without explanation, Fiechter moved to reconsider the vote. Helfer and Steinbrink seconded the motion so that the board could discuss the suit. For the remaining fifty minutes of the meeting, the board discussed only:

● Whether this court would allow the FDIC to stay or dismiss its case if OTS sued;

● Whether dismissal with prejudice in this court would preclude the FDIC's recovery in the OTS action;

● Whether the FDIC would harm the OTS action by not pursuing the case; and

● How much the FDIC and OTS claims overlapped and the costs for the overlapping claims;

---

**206.** Ex. 123 at 35, ll. 24–36, ll.24.

**207.** Ex. 123, at 37, l.12–39, l.3.

The directors never discussed the merits of the FDIC's claims or why Hove and Fiechter had voted against the suit. The only reference to the merits came when a director clarified the perceived acts of the thrift's insiders, who did not include Hurwitz. That lasted about a minute.

The board knew that the FDIC was covering OTS's costs.[208] It was concerned about paying for duplicate litigation. Helfer pointed out that the issue would be resolved if this court stayed the action. Even if stayed here, the FDIC would be bringing two bad claims. She did not know whether this court and the court of appeals would stay the case, based on her experience clerking in the Fifth Circuit "with one of the sounder judges of the Circuit [*laughter*] which are not, unfortunately, ones that we seem to come before [*laughter*]."[209]

Steinbrink still could not understand why the staff recommended suit. Helfer still did not tell him why the staff had done it—that the staff was doing her bidding. He reasoned that the agency must have wanted to sue on "the principle of it, but the economics of the thing still doesn't make sense." In the end, Steinbrink relinquished, adding, "in the sense of collegiality, if—if the Chairman is interested in having this go forward, I am willing to let it go forward."[210]

The board discussed the law briefly. Helfer asked for a motion supporting the staff's recommendation. Fiechter moved, and Steinbrink seconded. Hove, Fiechter, and Helfer voted to sue.

18. *Fiechter.*

 Another problem with the decision—aside from Helfer's dishonesty and the others' weakness—was its illegality. Fiechter was participating with no lawful authority. His credentials had long ago expired.

Although the FDIC is called a corporation, it is simply a bureau, a creature of the government of the United States of America. The FDIC is managed by a board of directors. For the FDIC to sue in these circumstances, the board must authorize the suit by a specific vote.[211] The FDIC board has five members, three of them appointed by the president directly with Senate confirmation. The other two members are the Comptroller of the Currency and the Director of the Office of Thrift Supervision; their seats are derived from presidential appointment with Senate confirmation to their primary offices.[212]

When the Board voted to sue Hurwitz, it had one vacant seat and two direct appointments—Helfer and Hove. The other two were there ex officio. Steinbrink was acting comptroller of the currency. Fiechter was the acting director of Thrift Supervision.

Although without Fiechter's participation, the board would have had a quorum of three members. Since a quorum was present, the FDIC says that Fiechter's vote was not necessary and that his presence at the meeting was harmless. The facts are the opposite. Fiechter was not a face in the crowd as the board did its business; he moved to reconsider the initial "No" vote. In the end, he moved to bring the suit. He may have been unnecessary for a quorum or majority, but he was a principal actor in the business conducted.

208. Ex. 121 at 4 n. 4.

209. Ex. 123 at 62, l.4–18.

210. Ex. 123 at 63, ll.10–15.

211. Federal Deposit Insurance Act, 12 U.S.C. § 1819(a).

212. 12 U.S.C. § 1812(a) (1996).

Also, Fiechter was acting as the leader of the OTS. That means that he was on both sides of the process of one agency suborning and another being suborned.

19. *Appointment.*

The Office of Thrift Supervision was created to regulate the savings-and-loan business in the wake of its collapse in the 1980s. It is a subdivision of the Department of the Treasury.[213]

The statute creating OTS requires the director to be appointed after nomination by the president and confirmation by the Senate.[214] Even if this requirement were not in the law, the Constitution would oblige the director to suffer the nomination process. Unless Congress has by law vested an appointment in the courts, the head of a department, or the president alone, an officer who exercises authority under the laws of the United States must be appointed through nomination and confirmation.[215]

On April 4, 1990, after Senate confirmation, President Bush appointed Timothy Ryan as director of OTS. He resigned on December 4, 1992, and his authority devolved to Fiechter, the deputy director. As acting OTS director, Fiechter also acted as a board member of the FDIC. He voted to authorize this suit on August 1, 1995, and it was filed the next day. Fiechter resigned on October 9, 1996, and the following day President Clinton directed Nicolas P. Retsinas to act as director. Fiechter, however, was not an officer who could be replaced by presidential directive. For a temporary succession to be lawful, the re-signing person must have been constitutionally appointed to the actual office. Fiechter was not "duly appointed" so he could not be succeeded by another acting director.[216]

Fiechter's authority expired on July 2, 1993—210 days after Ryan's resignation.[217] On October 28, 1997, the president appointed Ellen Seidman as director of OTS after she was confirmed by the Senate. From July 2, 1993, until October 28, 1997, then, OTS was without a lawfully appointed head. Running a sub-cabinet office with unappointed officers for almost five years mocks the rule of law and the Constitution. A constitution followed only when convenient is not constitutive.

20. *Appointments.*

The Constitution requires that the president "nominate, and by and with the Advice and Consent of the Senate" appoint "Officers of the United States."[218] Congress may make exceptions by law for "inferior Officers" to be appointed by "the President alone." The director of the Office of Thrift Supervision, who exercises significant authority of the United States, is an officer of the United States.[219]

As the deputy director of OTS, Fiechter did not need to be confirmed; the law excepts that job. To execute the powers of the director beyond the statutory period for an interim as acting officer, however, Fiechter, needed to be appointed by the president following nomination and confirmation. Because he was not properly appointed, Fiechter's participation in

---

**213.** Home Owners' Loan Act, 12 U.S.C. §§ 1461–1470 (West 2002).

**214.** 12 U.S.C. § 1462a(c)(1).

**215.** U.S. Const. art. II, § 2, cl. 2.

**216.** Vacancies Act, 5 U.S.C. §§ 3345–3349 (Supp.2005).

**217.** 5 U.S.C. § 3346(a)(1), cl. 2.

**218.** U.S. Const. art. II, § 2, cl. 2.

**219.** *See Buckley v. Valeo,* 424 U.S. 1, 126, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

the authorization of this suit was unconstitutional.

The wisdom and necessity of the Constitution's restrictions on presidential authority over executive branch personnel are not points to be debated; they are in the text, binding us all. Nomination and confirmation may be awkward, but they were meant to be inefficient. These processes are barriers to the aggrandizement and abuse of power, whether deliberate or casual or negligent.

The FDIC argues that Fiechter was a *de facto* officer of the United States. The Constitution does not say that one can become an officer who must be nominated and confirmed by assuming the office. If an administration wants to send someone from the mail room at the State Department to sit as a director of Nuclear Regulatory Commission, it may, but it violates the law. Unlawful government—to belabor the obvious—is unconstitutional. One can be used by the government so that one becomes its agent; that is possible. This was no battlefield promotion, no last man surviving. This was years of neglecting essential functions of an administration and years of arrogating public authority.

21. *The Vacancies Act.*

In 1868, Congress first "by Law" vested the president with authority to appoint an officer to act temporarily in the case of an officer's death or resignation. The temporary replacement may act until a successor is nominated, confirmed, and appointed. This allows continuous operation of the government during the transition from resigned or dead officers to their successors.

In the 1980s and 1990s, the first assistant could perform a resigned officer's duties for up to 120 days. In October 1998, the law extended the lawful acting period to 210 days.[220] The president and Senate may use this time to complete the appointment process. The 210-day limitation may be extended if someone has been nominated to fill the vacancy or if the vacancy occurs while Congress is adjourned indefinitely.[221] If the Senate is in recess, the president may make an appointment that operates immediately.[222] None of these exceptions applied to the vacancy at OTS in 1992–1997.

Fiechter assumed—succeeded to—the duties of director of OTS on December 4, 1992, the day Ryan left office. Fiechter voted to authorize this suit on August 1, 1995, 850 days over the 1998 limit on his authority. He would have been 761 days past the 210-day limit.

- The president did not nominate anyone to fill the vacancy between December 4, 1992, and August 1, 1995, ruling out an extension for pending nominations.

- The 102d Congress adjourned indefinitely on October 9, 1992, and was still in adjournment on December 4, 1992. The 103d Congress convened on January 5, 1993. Theoretically, Fiechter's window of authority could have been extended to 120 days after January 5, 1993, making the last day of his authority May 5, 1993. This would have still been over 800 days short of August 1, 1995, when Fiechter voted to authorize this suit.

- The president made no recess appointment of Fiechter.

22. *Vacancy or Absence.*

The OTS director may designate a representative to act on his behalf during his absence.[223] Ryan resigned on December 4,

---

**220.** 5 U.S.C. §§ 3346(a)(1) (Supp.2005).

**221.** 5 U.S.C. § 3346.

**222.** U.S. Const., art. II, § 2, cl. 3.

**223.** 12 U.S.C. § 1462a(h)(4)(a)(i)(West 2002).

1992. He was not absent. He could not come back the following Tuesday to continue as director. He was not vacationing; he had vacated. A director has no authority under any law to designate his successor—acting, honorary, or otherwise.

When there is a vacancy, the directorship is filled by presidential appointment. Even if the law allowed the departing director to appoint his successor, it would conflict with the Constitution. Congress could "by Law" allow "Heads of Departments" to appoint "inferior Officers," but this does not suggest that any officers, inferior or not, may appoint their successors; as long as the incumbent is there, he has no vacancy to fill, and when he is gone, he cannot fill anything.

### 23. *Board's Decision & Fiechter's Vote.*

*Quorums.* The FDIC board may adopt bylaws to regulate its operations as long as they are consistent with the law.[224] Under its bylaws, a majority of board members *in office* constitutes a quorum to transact business.[225] One member could be a quorum, but this bylaw would plainly conflict with the statutory requirement that the corporation be managed by a board. A collective, deliberative "body" with only one member is as contrary to the regularity of process as an officer without an appointment. Ordinarily, a majority of the membership is the minimum for institutional authority.[226]

On August 1, 1995, four of five directors were present: the chairman, vice chairman, acting Comptroller of the Currency, and Fiechter. Because Fiechter was not properly appointed, only three were members in office. The FDIC points out that three is a quorum of the board; two of those three voted for the suit. It argues that Fiechter's vote, therefore, was unnecessary. It is wrong.

*Prejudice.* This suit is about a thrift. Fiechter's agency, the Office of Thrift Supervision, regulated thrifts. Fiechter investigated Hurwitz and United Savings. Under his guidance, the OTS eventually decided to pursue the very claims that he secretly agreed with the FDIC to bring for it. The FDIC's Jeff Williams noted that Fiechter would, in fact, sign the OTS's Notice of Charges in the administrative proceeding against Hurwitz.[227]

The OTS director is the FDIC's link to the thrifts. United Savings's failure was a regulatory blunder by OTS. Fiechter's presence and participation were critical to the board's decision to sue Hurwitz. While it is impossible to know what the board would have done without Fiechter, the process as actually conducted was corrupt under the Constitution. If the unconstitutional presence of non-voting, *ex officio* members on a commission is sufficient to invalidate its actions, then Fiechter's unconstitutional participation on the FDIC's board is sufficient to say that the authorization to sue Hurwitz was invalid. His commitment to use the OTS against Hurwitz is equally void; he had no authority to act for the OTS, FDIC, or the American public in any capacity. He was a usurper.[228] Fiechter is simply another instance of the wholesale abandonment of regular, lawful government.

---

**224.** 12 U.S.C. § 1819(a).

**225.** Art. IV, § 6(d).

**226.** *See* Thomas Jefferson, *A Manual of Parliamentary Practice* (1801), *reprinted in Jefferson's Parliamentary Writings* (Wilbur Samuel Howell ed., Princeton Univ. Press 1988) (The Papers of Thomas Jefferson Series No. 2).

**227.** Dkt. 491 at 13.

**228.** *See Federal Election Comm'n v. NRA Political Victory Fund,* 6 F.3d 821, 826–828 (D.C.Cir.1993).

*24. Suit.*

On August 2, 1995, the FDIC sued only Hurwitz. It sought damages exceeding $250 million. The agency vilified him. It said that Hurwitz had: manipulated his positions in United Financial, Maxxam, and Federated to control the thrift; used United Savings funds to buy Drexel bonds in exchange for Drexel's financing Hurwitz's other business ventures; plunged the thrift into debt with indifference; gambled on real-estate portfolios; and recklessly invested the thrift's assets. It said that he concealed all this from regulators.

These were the predicate for two claims. One was the net-worth claim against Hurwitz for his relationship to Maxxam and Federated. The other was a claim for gross negligence in the management of an investment portfolio. Their success rested on the FDIC's being able to prove that Hurwitz was a *de facto* director of United Savings and that he had breached his fiduciary duty to the thrift by (a) failing to make Maxxam and Federated maintain the thrift's net worth and (b) allowing United Savings to mismanage its mortgage-backed-securities portfolios.

*25. De Facto Director.*

The *de facto* director doctrine was not merely "a notable hurdle" as the FDIC said.[229] It was wholly inapplicable. The doctrine applies only to those who:

- Hold positions like corporate director in a non-corporate entity. The doctrine

prevents heads of entities from escaping fiduciary requirements in the enterprise simply because of the enterprise's structure.[230]

- Are substantively—but not technically—directors. The doctrine prevents the corporation from evading the consequences of acts of those knowingly held out as directors to third parties.[231]

For United Savings, the doctrine would have applied only to third parties who dealt with the thrift and were unaware of an official's true role there.[232] The FDIC was neither a third party nor unaware of Hurwitz's role. As receiver, the FDIC was United Savings itself.[233] The FDIC knew that Hurwitz had never been elected or served—or held out—as a director of the thrift. It also knew that the thrift's board comprised properly elected directors, in whom, according to the regulators, control of the thrift was really vested.[234]

The day before the board meeting, Thomas Manick, FDIC outside counsel, warned Robert DeHenzel that the doctrine did not apply.[235] The FDIC ignored him, continuing its practice of retaining lawyers and not listening to them.

*26. Net Worth.*

For nearly eight years, the staff never suggested that Hurwitz was obliged to have compelled Maxxam or Federated to pour money into United Savings.[236] This

---

**229.** Ex. 120 at 4.

**230.** *Lockheed Aircraft Corp. v. Rathman,* 106 F.Supp. 810, 812 (S.D.Cal.1952).

**231.** *Austin Lake Estates Recreation Club, Inc. v. Maberry,* 638 S.W.2d 649, 650 (Tex.App.—Austin 1982, writ ref'd n.r.e.).

**232.** *Hoggett v. Brown,* 971 S.W.2d 472, 484 n. 7 (Tex.App.—Houston [14th Dist.] 1997, pet. denied).

**233.** *O'Melveny & Myers v. FDIC,* 512 U.S. 79, 86–87, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994).

**234.** Dkts. 12, 13; 34 at ¶¶ 1; Ex. 20 at 2.

**235.** Ex. 336 at 2.

**236.** Exs. 116, 118, 120, 297, Depo. of William Kroener, 216 at 118; Depo. of Jack Smith, 218 at 304–305; Depo. of John Thomas, 219 at 95–96.

claim did not arise until July 27, 1995—the date of the meretricious final authority-to-sue memorandum.[237]

Net-worth obligations are regulatory. Only OTS, not the FDIC, can assert the claim.[238] The FDIC acknowledged that it had no claim against United Financial.[239] If it had no claim against the United Financial directly, it had no claim against companies who jointly owned less than one-quarter of the holding company much less against a director-shareholder of them.

Maxxam and Federated never agreed to maintain the thrift's net worth. They had refused to agree to be a guarantor. When regulators made net-worth maintenance a condition of their acquiring more than 25% of United Financial, they rejected the condition and bought no more United Financial stock. The FDIC knew this.[240] Despite the bad facts and adverse law, the agency dismissed the absence of a signed net-worth agreement as a "complication," not an "impediment." [241]

The FDIC distorted the 1985 Drexel option to make its claim. The parties agree that Maxxam had an option to buy United Financial stock from Drexel. Only if the *option to buy* stock were the same as *having bought* stock would Maxxam—and therefore indirectly Federated—have owned more than 25% of United Financial's stock. The FDIC said that (1) having the option was the same as owning the stock and (2) the option gave Maxxam—and therefore Federated—more than 25% of United Financial, triggering the net-worth obligation—the one that they had rejected.

Drexel possessed and retained sole rights to the shares, unless either company exercised their option.[242] Drexel exercised the option almost two years after United Savings failed.[243] No thrift existed into which Maxxam or Federated—under Hurwitz's mandate—could have poured money. The Drexel option was fully disclosed, United Savings's federal regulators knew of it, and the Texas regulators approved it.[244] The government never asserted that Maxxam or Federated had a net-worth obligation and raised the issue only when debt-for-nature lobbying occurred ten years later.

The legal premise of the net-worth claim was also confused. The FDIC said that Hurwitz had a fiduciary duty as a director of Maxxam to make Maxxam—unsolicited—pour money into a failing Texas thrift during 1988 for no increase in equity.[245] The FDIC has never explained how this infusion would not have violated Hurwitz's duty to Maxxam. After all, directors must spend shareholders' money responsibly.[246] In addition, Hurwitz was not a director of the thrift. The supposed breach of fiduciary duty rested on the irrational premise that Hurwitz's duty to a company for whom he was not a director was greater

237. Ex. 121.

238. *In re Conner Corp.*, 127 B.R. 775, 781 (E.D.N.C.1991); *RTC v. Tetco, Inc.*, 758 F.Supp. 1159, 1165 (W.D.Tex.1990), *vacated as moot*, No. 91–5612, 1992 WL 437650 (5th Cir. Apr.22, 1992); *RTC v. Savers, Inc.*, No. LR–C–89–529, 1990 WL 290314 (E.D.Ark. June 12, 1990); *see also* Dkt. 123 ¶ 21.

239. Ex. 71.

240. *See, e.g.*, exs. 71 at PLS000148.

241. Dep. of Jack Smith, ex. 218 at 52.

242. Ex. 14 at OFD2640.

243. Ex. 49 at OFD2766.

244. Ex. 14 at OFD2633–73; Ex. 17 at US–3002307; Ex. 16 at 2; Ex. 23 at 1; Ex. 15.

245. Dkt. 1 ¶ 25.

246. *FDIC v. Wheat*, 970 F.2d 124, 129 (5th Cir.1992); *Meyers v. Moody*, 693 F.2d 1196, 1210–11 (5th Cir.1982).

than his duty to a company for whom he was.

Contrasting United Financial's net-worth obligation and Maxxam's presumed one shows the weakness of the claim. Unlike Maxxam, United Financial had agreed to maintain United Savings's net worth.[247] Hurwitz, as a United Financial director, *twice* authorized *United Financial* to infuse capital into the thrift.[248] Next, the regulators requested a plan from United Financial for maintaining the thrift's net worth.[249] They never requested a plan from Maxxam. On the eve of United Savings's receivership, the regulators twice requested an infusion from United Financial, but never from Maxxam.[250] After the receivership, the regulators sent a demand letter to United Financial to maintain the thrift's net worth.[251] They sent no similar letter to Maxxam. United Financial had an obligation to support United Savings, and it contributed additional capital until it, too, was impoverished.

27. *Mortgage–Backed Securities.*

The FDIC argued that United Savings's portfolios were the product of Hurwitz's gross, negligence. Those portfolios were managed, however, not by *"de facto"* directors, but by experts whom United Savings employed. Those experts consulted outside experts.[252] The thrift hired Peat Marwick to audit its books.[253] The audits revealed no material irregularities.[254] Federal regulators encouraged thrifts like United Savings to have these types of portfolios.[255] Numerous thrifts had much larger ones than United Savings did.[256] The regulators praised the thrift for its portfolios, saying that they were well managed and successful. The portfolios would have made—not lost—millions of dollars, if the government had not precipitously liquidated them.[257] Even if they were not profitable, it is not gross negligence for United Savings to invest in highly marketable securities based on the fundamental business of the thrift—mortgages.

The FDIC knew that Hurwitz had no role in the actual management of the portfolios.[258] The investment committee made the decisions. Consistent with his limited role at the thrift, when OTS called Hurwitz to testify, it never asked him about the portfolios.[259]

■ Finally, the thrift expanded its portfolios into mortgage-backed securities in 1985 and 1986.[260] A two-year statute of limitations governs these claims.[261] Limitations begin running from the moment of the supposed breach—when the thrift made decisions affecting the portfolio.[262]

---

**247.** Ex. 13.

**248.** Exs. 18, 27.

**249.** Ex. 34.

**250.** Exs. 45, 47.

**251.** Ex. 48.

**252.** Dkt. 1 ¶¶ 31–32, 50; Dkts. 12 at 2, 13 at 2; Ex. 17 at 38–40.

**253.** Dkts. 12 at 8, 13 at 8; Ex. 53 at 8.

**254.** Ex. 19.

**255.** Ex. 21 at 30–31; Ex. 29.

**256.** Ex. 37.

**257.** Ex. 193, pt. D, at 6.

**258.** *See, e.g.,* Govt. Mem., dkt. 41 at 7–8.

**259.** Recommended Decision, ex. 217 at 74.

**260.** Ex. 17 at 2–4.

**261.** Tex. Civ. Prac. & Rem.Code Ann. § 16.003(a); *RTC v. Acton,* 49 F.3d 1086, 1089 (5th Cir.1995).

**262.** 12 U.S.C. § 1821(d)(14)(B)(ii); *Resolution Trust Corp. v. Acton,* 844 F.Supp. 307, 316–17 (N.D.Tex.1994), *aff'd,* 49 F.3d 1086 (5th Cir.1995); *see also FDIC v. Henderson,* 849 F.Supp. 495, 497 (E.D.Tex.1994), *aff'd,* 61 F.3d 421 (5th Cir.1995).

Because United Savings failed on December 30, 1988, the breach had to have occurred on or after January 1, 1987, for the FDIC to be able to sue on this claim.[263] No breach occurred on or after January 1, 1987, because United Savings expanded its portfolio only in 1985 and 1986.

Though federal law extends the limitations period of viable claims when the FDIC takes over a thrift, no law revives claims that are stale when the FDIC acquires them.[264] The FDIC took over the FSLIC's duties on August 10, 1989.[265] A claim based on the mortgage-backed portfolios had expired by then.[266] The mortgage-backed-securities claims were, therefore, time barred.

28. *Leverage: 1995.*

On August 1—the day that the FDIC sued—the Special Assistant to the Secretary of Interior, Allen McReynolds, wrote George Frampton, who was Assistant Secretary of Fish and Wildlife and Parks. McReynolds proposed swapping the banking claims for the redwoods. He noted that "FDIC and OTS are amenable to this strategy if the Administration supports it." [267] He suggested that Justice, Interior, FDIC, and OTS meet to discuss Justice's view on the debt-for-nature idea. He also wanted an Interior team to represent the agency in negotiations, if the FDIC and OTS wanted Interior's participation.[268]

In mid-September, Helfer responded to a letter from Ratner about the suit. She assured Ratner that the FDIC was "coordinating" with OTS.[269] Helfer did concede that neither Maxxam nor Pacific Lumber were defendants in the suit. She admitted that there was no direct relationship between the redwoods and United Savings's insolvency; that Pacific Lumber owned no interest in United Financial or United Savings; and that neither United Financial nor United Savings ever owned an interest in Pacific Lumber. She also said that while the FDIC could not compel Maxxam or Pacific Lumber to relinquish the forests, she was open to the idea of forcing Hurwitz to influence that result.

The purpose of the suit was exactly what Helfer publicly disclaimed: to bring the forces of the national government to bear on a citizen in order to achieve a result that the agency had no authority to accomplish: extorting the redwoods.

In late September, Fish and Wildlife's Frampton wrote Katie McGinty from the Council on Environmental Quality—part of the executive branch—and T.J. Glauthier from the Office of Management and Budget about California Governor Wilson's inability to put together a deal to buy the Headwaters. McGinty had been Vice President Gore's chief of staff and campaign aide. She now ran the CEQ.

Frampton suggested that McGinty and Glauthier use the FDIC's suit as "legal leverage" to get the forests, especially "in light of increased calls for a 'debt for nature swap.' " [270] He further suggested convening officials from government agen-

---

263. *Resolution Trust Corp. v. Seale,* 13 F.3d 850, 852 (5th Cir.1994); *Henderson,* 849 F.Supp. at 497; *Resolution Trust Corp. v. Phelps,* 860 F.Supp. 389, 390 (S.D.Tex.1994); *Acton,* 844 F.Supp. at 316–17.

264. 12 U.S.C. § 1821(d)(14)(C); *Phelps,* 860 F.Supp. at 390; *Randolph v. Resolution Trust Corp.,* 995 F.2d 611, 619 (5th Cir.1993).

265. Notes following 12 U.S.C. § 1821(a).

266. 12 U.S.C. § 1821(a)(5)(A)(ii), (B).

267. Ex. 124 at 2.

268. Ex. 124 at 3.

269. Ex. 128 at 1.

270. Ex. 129 at 1–2.

cies to analyze options, especially in light of "the crescendo of public attention that is ahead of us." [271]

Frampton also relayed that the leaders of Pacific Lumber were "working closely" with his agency *"at their request"* to ensure that the logging did not endanger animals living in the forests. (emphasis added) [272] This illustrates that the FDIC's public motivation—saving the redwoods and species who lived there—was false. Despite this, it caved to environmental factions to placate them.

In October, Congress asked to see the original tolling agreements between the FDIC and potential defendants. United Financial had already disclosed its agreement to the Securities and Exchange Commission, so its agreement was public information. The names of other potential defendants were not. The FDIC decided that it would give Congress a copy of United Financial's agreement but not those of the individual directors. It did not tell the defendants about Congress's interest in the case for fear that they would suspect the FDIC's having bowed to congressional pressure in suing. [273]

On October 20, FDIC General Counsel Kroener met with the Vice President to discuss the debt-for-nature swap. The Forest Service, OTS, Interior, Treasury, Justice, and OMB had people in Gore's office, too. Kroener briefed Gore on the history of the case, the status of the litigation and investigations, obstacles to the swap, and settlement discussions. On settlement, Kroener said that "Hurwitz has never, however, indicated *directly* to the FDIC a desire to negotiate a settlement of the FDIC's claims." (emphasis original) [274] This contradicts the FDIC's representa-

tions that it was Hurwitz—and not the FDIC—who initially proposed the debt-for-nature exchange. [275]

Kroener also explained the obstacles to the swap. Like Helfer had earlier, Kroener noted that the FDIC had no direct claim against Pacific Lumber to compel it to surrender of the trees; that neither Maxxam nor Pacific Lumber were defendants in the case; that there was no link between the redwoods and the insolvency of United Savings; that Pacific Lumber had no interest in United Savings or United Financial; and that neither the thrift or United Financial had an interest in Pacific Lumber. Kroener explained the shortcomings of the FDIC suit. These were that:

> "FDIC's claims alone are not likely to be *sufficient to cause Hurwitz* to offer the Headwaters Forest, because of their size relative to a recent Forest Service appraisal of the value of the Headwaters Forest ($600 million); because of very substantial litigation risks including statute of limitations, Texas negligence-gross negligence business judgment law, and Hurwitz's role as a de facto director; and the indirect connection noted above, including the risk of Hurwitz facing suit from Pacific Lumber securities holders if its assets were disposed of without Pacific Lumber being compensated by either outsiders or Hurwitz or entities he controls." (emphasis added) [276]

This is confirmed that the suit was about the redwoods—not compensating the taxpayers for United Savings's failure through Hurwitz's legal obligations.

At the meeting, Frampton said that "the reason we want to exchange the claims in

271. *Id.* at 2.

272. *Id.* at 1.

273. Ex. 342.

274. Ex. 138 at 2.

275. *See, e.g.,* dkt. 398 at 57.

276. Ex. 138 at 3.

the first place is we don't have the cash." [277] Another participant noted that the "risk of litigation is what's driving the issue now—if FDIC loses, then pressure is off." [278]

In late October, Elizabeth Blaug, associate general counsel for the CEQ, asked the participants at the meeting with Gore to assess the legal issues that their agencies would have to confront for the swap. She also asked them to look at whether the FDIC could pass title to the redwoods to Treasury and whether Treasury could pass title to a land-management agency.

That day, FDIC's Jeff Williams e-mailed Jack Smith about the Department of Defense's offering Hurwitz a closed military base in the swap. Williams's exchanges with Defense made "the key point even more clear that it will take more than FDIC's claims to get the trees and that FDIC remains an important part of exploring creative solutions to the issue." [279]

Also that day, Williams received from the National Heritage Institute a twelve-page memorandum about how the FDIC could transfer the redwoods to a government or private entity instead of selling the trees. [280] The Institute had prepared the memorandum at Ratner's request.

The administration people met again. They said that they would "need to open dialogue w/Hurwitz soon" and that Blaug should "have McGinty (Gore?) call him." [281] As part of its practice of disinformation, the FDIC represented to the court and others that Hurwitz initiated the debt-for-nature swap. The meeting notes—like numerous documents—show its predilection for making up facts as well as directors.

Helfer continued to correspond with members of Congress in late October and early November. [282] She assured them that the FDIC was open to the swap.

Around this time, Hurwitz alerted this court that OTS was going to sue him based on claims identical to the FDIC's claims. [283] This was despite the court's warning days earlier that:

> 3. The FDIC shall confer with the OTS to stop the OTS from duplicating the discovery needed in this case; the OTS's sudden administrative activity that parallels the FDIC's suit is manifestly suspect. [284]

The FDIC had to confess its secret deal with OTS. [285] It downplayed the arrangement, saying that it was forced to sue Hurwitz when—"To the FDIC's surprise"—he did not extend his tolling agreement, as if not extending limitations is itself grounds for suing after six years or at all. It condescendingly advised the court that the OTS and FDIC had collaborated before and that their arrangement was lawful under their broad powers. It dishonestly advised the court that the OTS was acting independently from the FDIC. The court warned:

> The use of overlapping authority to harass individuals or to manipulate a lawsuit, especially one brought by the government itself, conflicts with the constitutional requirement that the government not act arbitrarily and irrationally.

---

277. Ex. 139 at 2.

278. *Id.*

279. Ex. 142.

280. Ex. 143.

281. Ex. 144 at CNM394864.

282. Exs. 145, 146.

283. Dkt. 25.

284. Dkt. 22.

285. Dkt. 26.

The F.D.I.C. will appear to disclose the *government's* whole position in its choice of remedies for the collapse of United Savings of Texas, whether judicial, administrative, or military.[286]

On November 7, Williams circulated to other FDIC officials a memorandum that the FDIC had worked on with other agencies at the request of the CEQ. The memorandum addressed whether Hurwitz could compel Pacific Lumber to transfer the Headwaters to the agency, whether the FDIC could transfer them to Treasury, what legislation was necessary to allow the transfer, how the transfer would affect the budget, and what indemnity obligations Maxxam owed Hurwitz.[287]

At the time, the Headwaters were appraised at $499 million. This number excludes the rest of the redwoods. The FDIC said that its claims and OTS's claims alone were not sufficient to force the swap.[288] They were necessary, however, as the "core of a global settlement offer." [289] The FDIC said that it did not know how much OTS would sue for, but it did say that its claim and OTS claims were "overlapping." It perhaps reasoned, therefore, that OTS would sue for a similar amount as the FDIC had: $250 million.

The FDIC said that banking claims usually settled for one-half of the damages sought.[290] In other words, if the FDIC and OTS jointly sought $500 million, those claims would settle for about $250 million—not enough to persuade Hurwitz to hand over the Headwaters. Since "it is clear that the FDIC and OTS claims combined would not have enough value to swing a trade for the redwoods," the FDIC wanted the government to add property whose value exceeded $200 million to its settlement offer.[291] The FDIC suggested that Gore work on including other government property in the deal.

Williams also circulated a photocopy of a 1995 article from *The Press Democrat*. It was an interview of Hurwitz discussing Pacific Lumber's ownership of the redwoods, contributions that Pacific Lumber had made to rebuilding the California town where it was located, regulatory and environmental battles over the Headwaters, and discussions to trade the redwoods for other land of comparable value. The FDIC says that the article was Hurwitz's signal to the government that he was open to debt for nature. Actually, Hurwitz explicitly rejected debt for nature in the article, saying that the lawsuit against him was a personal one and that the assets of Maxxam or Pacific Lumber could not be used in a settlement.[292]

On November 15, Hurwitz told the court about the debt-for-nature conspiracy.[293] He detailed the campaign, the coercive efforts by environmentalists, congressmen, and administration officials, the pressure on former directors of the thrift to testify against him, and the FDIC's tactics to shut Maxxam out of business opportunities.

On November 28, the federal conspirators met again. They wanted the "OTS claims" to "go first" because they preferred an "Admin. proceeding" to a "Federal Dist. Ct. proceeding." [294] The agencies discussed "how to fill the gap bet.

---

286. Dkt. 23.

287. Ex. 150.

288. *Id.* at CNM 418580, para. 3.

289. *Id.*

290. *Id.*

291. *Id.*

292. *Id.* at CNM418558.

293. Dkt. 31; Ex. 154.

294. Ex. 155 at CNM 394811.

forest value and the FDIC claims." At the time, they said that OTS would sue for around $500 million. They also decided that the FDIC and OTS would open settlement discussions after OTS sued.

Also on November 28, the FDIC moved to stay this suit, saying that it wanted to avoid "duplicative concurrent litigation."[295] This was a lie. It wanted to keep up the "pressure" without the "risk of litigation." The court denied the request.[296]

In late December, OTS sued Maxxam, Federated, Hurwitz, and five United Savings directors. OTS's claims were identical to the FDIC's, but it sought nearly $1 billion in damages. This is a change from the $500 million that, only a month earlier, it said that it would seek. It accused the respondents of failing to maintain United Savings's net worth; illegally purchasing Drexel bonds; gambling with the mortgage-backed securities portfolios; lying about how those portfolios were hedged; inflating the thrift's net worth; and overall managing the thrift recklessly.[297] The FDIC again moved to stay.[298] The court again denied it.[299]

29. *A New Front: 1996–1997.*

Until Hurwitz's letter to the court, the FDIC had said that it welcomed the debt-for-nature swap. After the letter, the agency reversed course. A note from Smith in March 1996 urges, "Tell Mcwe need exit strategy from Redwoods. NO collusion."[300] When asked about a possible swap, an Interior official said that the discussions with Interior, Hurwitz, and Pacific Lumber "have nothing whatsoever to do with the FDIC or the Office of Thrift Supervision, and cannot at this point."[301] He also said that he was "forbidden by law from discussing any possible arrangements with the FDIC or the Office of Thrift Supervision to drop their claims against Hurwitz as part of a Headwaters deal."[302]

Privately, the FDIC was undeterred. Williams suggested accelerating the case:

> As I suggested many months ago, it may be advantageous for us to tie him up in lengthy depositions and commence a moderately aggressive discovery plan of our own that *inconveniences* him and strengthens our case. (emphasis added)[303]

This exchange—like the rest of the agency's internal communications—screams abusive use of civil litigation—beyond vexatious—and betrayal of the public trust.

In November 1996, the court joined OTS as an involuntary plaintiff based on the duplicative nature of the claims here and in the administrative proceeding.[304] OTS resisted. The FDIC knew that it would not be able to stay the case here, but it could not risk dismissal of either action because it needed the pressure of both suits. In January 1997, the FDIC amended its complaint, abandoning the claims that it—through OTS—had brought administratively.[305] This court dismissed OTS but reiterated its suspicion of the FDIC's deception.[306]

---

**295.** Dkt. 37.

**296.** Dkt. 42.

**297.** Ex. 157.

**298.** Dkt. 65.

**299.** Dkt. 111.

**300.** Ex. 161.

**301.** Ex. 164, at CNM393783.

**302.** *Id.*

**303.** Ex. 165.

**304.** Dkts. 115, 120.

**305.** Dkt. 123.

**306.** Dkt. 210.

In amending its complaint, the FDIC dropped the mortgage-backed-securities claims and made the net-worth claim contingent on the OTS proceeding.[307] The remaining claim was that Hurwitz should pay the FDIC the difference between what OTS could collect from Maxxam and Federated and what OTS claimed they could have contributed if they had complied with net-worth obligations.

The FDIC's amended claim rested on these contingencies: (a) Maxxam and Federated owed a net-worth obligation to United Savings; (b) the administrative judge makes this determination, and this is upheld on appeal; (c) the thrift's net worth declined to a point that required Maxxam to make capital infusions; (d) the administrative judge makes this determination, and this is upheld on appeal; (e) Maxxam owes more than it can pay; and (f) OTS does not recover the difference from Hurwitz.

To reach this point, these contingencies would had to have occurred:

- Hurwitz had a fiduciary duty to the thrift to cause Maxxam to infuse this capital, and Hurwitz was in a position to cause Maxxam to infuse that capital between January 1, 1987, and the thrift's failure on December 30, 1988;
- Maxxam's obligation to infuse capital occurred after January 1, 1987; and
- Maxxam would have been able to satisfy the obligations after January 1, 1987.

The amended complaint did not improve the government's position. The FDIC converted its suit here into a claim against Hurwitz for whatever amounts that the defendants in the OTS action owed and were unable to pay. It became an indemnity action derived from an administrative reassertion of the claims abandoned here.

The nature of Hurwitz's obligation to indemnify is mystical—somehow Hurwitz should have and could have made all these people and companies do whatever the government after the fact decided they should have done. Peculiar.

### 30. *Candor.*

Throughout 1996 and 1997, the government continued resisting Hurwitz's efforts to uncover evidence about the debt-for-nature machinations. It was working to get something—at least one-half billion dollars in forests—for the comparatively little cost of the taxpayer-funded investigations and litigation.

If the FDIC could get its and OTS's claims included in a land swap with Hurwitz, the FDIC would accomplish its " 'political' goal of having this be a debt-for-nature swap." [308] It also wanted to help the CEQ and Interior make Hurwitz " *feel some pain* ' " by his relinquishing the forests "so that it is in fact a 'debt for nature' transaction and can be publically characterized as such." (emphasis added) [309]

█ The Council on Environmental Quality is purely an advisory body. Its statute allows it to study and recommend to the president about trends in the environment.[310] It has no operating authority over anything—not the Forest Service, FDIC, or EPA. It has no lawful authority to broker deals within the executive branch or between it and citizens. Its actions, including receiving FDIC legal disclosures, was illegal.

### 31. *It Just Continues: 1998–1999.*

In April 1998, the FDIC's outside counsel observed that, in the course of giving testimony to OTS, "The Respondents claim

---

**307.** Dkt. 123.

**308.** Ex. 344.

**309.** *Id.* at 2.

**310.** 42 U.S.C. § 4344.

they are being pressured to make untruthful statements which they will not do."[311] He said that settling with everyone but Hurwitz would not interfere with the government's claims against Hurwitz, Maxxam, and Federated. Counsel said that the remaining claims were "substantial and, *whatever proof problems they present,* represent a significant threat to the remaining defendants." (emphasis added)[312] Last, he noted that, if Hurwitz were dismissed in either forum, it would be difficult for OTS to convince the administrative judge that Maxxam and Federated were involved in United Savings's operations. Of this, counsel said simply, "Since this causal link was pleaded by OTS, one must presume it can present adequate proof."[313] The FDIC, including its outside counsel, had prepared the OTS case. It knew that no evidence—much less proof—existed.

In August 1998, the FDIC published its self-congratulatory account of how it handled the S & L crisis. It discussed its test for deciding whether to sue. First, the suit had to be meritorious and likely to succeed. Second, the case had to be cost-effective.[314] The government abandoned these pretended criteria when it sued Hurwitz. Its own documents—whose disclosure it has fought for years—reveal the agency's knowledge that the case was worthless. In addition, it knew that its valuation of the case was speculative. The government has never presented evidence showing how it could calculate its damages. It simply picked a number to force Hurwitz to hand over the trees.

Others began asking questions about the propriety of the suit. In February 1999, Congressman Tom DeLay wanted answers from the new FDIC chairman, Donna Ta-

noue, and the FDIC Inspector General Gaston Gianni. DeLay demanded an investigation to determine:

- How environmentalists were able to influence the FDIC;

- Why the FDIC was involved in political meetings with the White House and Interior about the suit;

- Why the White House had injected itself into a dispute between Hurwitz and the FDIC;

- How no inspector general in the FDIC, OTS, and Treasury was alarmed by the collusion between the FDIC and OTS;

- How the government had the audacity to entice Hurwitz to bid for United Savings, reject his offer, and then stiff the taxpayers for the $100 million difference between Hurwitz's bid and the accepted bid.[315]

Tanoue promised DeLay that Gianni was investigating DeLay's concerns.[316] The Legal Division also responded. It said that it did not sue for political reasons. Legal also said that the FDIC had consistently said that it preferred to settle the claims for cash, although it would consider a debt-for-nature proposal.

The Legal Division through Chairman Tanoue told the congressman other lies. These were:

- The FDIC's investigation found that Hurwitz was directly responsible for United Saving's failure. *The FDIC's second counsel concluded this only after two outside firms determined that he was not. The FDIC still had no evidence.*

---

**311.** Ex. 335 at 2.

**312.** *Id.* at 3.

**313.** *Id.* at 6.

**314.** Ex. 191 at 266.

**315.** Ex. 194.

**316.** Ex. 196.

- The board of directors formally authorized the suit. *This ignores the staff's conclusion only two days before the board's vote that the FDIC should not sue. It also ignores Chairman Helfer's forcing the result on the staff and board.*
- The case was meritorious and cost-effective. *Overwhelming evidence shows that the FDIC knew that the case was an 85% loser and a waste of money.*
- There was no government conspiracy against Hurwitz. Hurwitz first approached Interior about a debt-for-nature swap, and at no time did the Administration interfere with the FDIC's lawsuit. *Garbage.*
- The FDIC has statutory authority to undertake its arrangement with OTS. *The FDIC far exceeded its authority by collaborating with and financing OTS.*
- Maxxam's bid was not better than the selected bid. *A long trail of documents reveals the agency's mendacity.*

It took the inspector general a month more to reply. Gianni drafted a letter to DeLay promising a thorough examination and even offered to meet regularly with the congressman to brief him on the investigation's progress.[317] Gianni's letter was never sent. The FDIC suspended Gianni's investigation. Instead, it thanked DeLay for his interest and refused his demands for information.[318] Stiffing DeLay while corresponding with other members of Congress shows a partisan bent. Thomas Schulz, the FDIC's assistant general counsel, and Jack Smith, the FDIC's assistant deputy counsel, wrote General Counsel Kroener that an inspector-general investigation would damage the case, "give aid and comfort to Mr. Hurwitz," and "ad-

versely affect the recoveries achievable by the FDIC and OTS." [319]

Gianni had already written DeLay once. Schulz and Smith feared that a second letter detailing a more involved investigation would create "the inescapable, troubling impression that the OIG has discovered sufficient evidence" that justified DeLay's alarm.[320] The investigation was risky because it "gives credence to Hurwitz's arguments and fuels Judge Hughes' suspicions of FDIC." [321] Schulz and Smith also feared—incredibly—that an investigation would lead to more discovery, waive privileges, damage negotiations, impair cooperation by a "thinly staffed" OTS, and might even encourage other agencies to investigate. Because of the "tinder-box nature" of the case and the "hostile forum" in Houston "due to the predilections of Judge Hughes," Schulz and Smith suspended the investigation.[322]

The inspector general at an agency is the internal conscience. Here we have the independent inspector not auditing the independent bureau's corrupt practices with other officials at the instruction of the very people whom he is paid to double check. This is parallel to having the auditor report to the finance officer. That is a new layer of corruption, and it is corruption that directly affected this case.

If there was no evidence to support Hurwitz's allegations about government misbehavior, then an investigation would have furthered the FDIC's claims of innocence. The suspension of an internal investigation compels the conclusion that the FDIC was continuing to hide evidence of its misleading Congress and the court.

**317.** Ex. 199.

**318.** Ex. 201.

**319.** Ex. 200 at 000130.

**320.** *Id.* at 000192.

**321.** *Id.*

**322.** *Id.* at 000195.

In March, Pacific Lumber sold the Headwaters to the government for $480 million. The government had found the money. The OTS case was completed at around this time.[323] The FDIC continued its case here.

32. 2000.

In early 2000, Williams forwarded to other FDIC lawyers an article called "The Redwoods and the Trees" from *Jewish Monthly*. The article discusses the various views of Jewish scholars and rabbis on Pacific Lumber's logging practices. For Williams,

> Of particular interest is the reference to the event, which I have repeatedly heard from enviros, that Earth First placed a dead deer in the swimming pool of Pal-Co CEO John Campbell.
>
> As a practicing jew, I frankly was pleased to see the article, since Jewish publications do not often criticize philanthropic jews. It means, at least to me, that Hurwitz has lost substantial sympathy and support in the community. This could be a good thing for us.[324]

Now these people have injected politics and *religion* in the disinterested, technical processes of the FDIC. No one who saw the message replied to Williams to say that his political and religious predilections were distinct from the legitimate public interest. The e-mail also confirms the continued cozy relationship with environmentalists.

By the middle of the year, the House Committee on Resources—the committee responsible for the Headwaters legisla-tion—began reviewing the FDIC–OTS suit. Chairman Don Young said that the agencies' claims were contrary to the Headwaters statute, the FDIC's mission, and the committee's interests.[325] Young noted the authority-to-sue memorandum's admission that the claims would likely fail. He also noted the memorandum's reference to the redwoods as "what appears to be the only possible motive" for the suit. Young said that the FDIC had sued to appease the Administration and "militant elements of the extreme environmental community." [326] Young's committee—a body actually charged with protecting trees—would investigate two agencies for wandering into the woods of environmental policy.

33. *Administrative Case.*

The FDIC says that OTS's case against Hurwitz was the largest and most expensive case in the history of OTS. This is a tribute to its incompetence; it says nothing about the merits of its claims. Quantity and quality are different.

OTS sued the respondents for $858,073,005.[327] The FDIC claimed $821,319,405—nearly 98% of that amount. The damages sought were almost three times the amount of Maxxam's market capitalization of $288 million.[328] Six OTS lawyers presented its witnesses at trial, taking 107 days over eighteen months from September 1997 to March 1999. The defense took 12 days. The transcript is nearly 30,000 pages, with about 2,400 exhibits.[329]

---

**323.** Dkt. 450, Stip. Re. Administrative Proceedings ¶ 3.

**324.** Ex. 206, at JS000050.

**325.** Ex. 207 at 2.

**326.** *Id.*

**327.** Ex. 217 at 2. This figure is derived from the restitution sought and the amount that OTS sought from each of the eight respondents in civil penalties.

**328.** Dkt. 480, Tr. 201.

**329.** Dkt. 450, Stip. Re. Administrative Proceedings ¶¶ 3, 5; Ex. 217 at 2.

In February 1999, OTS settled with five respondents for $1,030,000.[330] This is about one-tenth of 1% of the damages sought. The settling respondents. spent tens of millions in legal fees.[331] The small settlement reveals that the claims were a ploy to increase the debt because, again, the "FDIC's claims alone" were not enough "to cause Hurwitz to offer the Headwaters Forest." [332] The government needed OTS's claims to "fill in the gap bet. forest value and FDIC claims." [333] The more friends of Hurwitz you sue, the more pressure on him to betray his loyalty to them and, frankly, the more pain for him. It could also work the other way: friends would betray Hurwitz to protect themselves. Either way, Hurwitz loses, and the government wins. It hoped.

The government anticipated a friendly administrative forum. No administrative judge had ever ruled against OTS. In September 2001, the judge—an employee of OTS—rejected each claim, saying that OTS had a "rather unrestrained view" of its powers.[334] In a stern, 248–page recommendation, the judge said that case had no factual basis and that the notice of charges was rife with inconsistencies, contradictions, and mis-readings of the law.

*Net Worth.* Like the FDIC, OTS made a net-worth claim against Maxxam and Federated. It argued that Maxxam and Federated owed the thrift millions but that somehow no regulator ordered payment. The judge said that this was absurd and concluded that "regulators, with Respondents, understood that there was no basis for making such a demand for funds." [335]

*Arbitrage.* Like the FDIC, OTS sued for losses in the mortgage-backed-securities portfolio. The judge said that OTS had the benefit of hindsight and was trying to "search the records for roads not taken, while ignoring the necessity of choice in the decisions made." [336] This was one of "its least responsible claims." [337] There was "not a scintilla of evidence to support this sensational allegation." [338]

The OTS depicted the officers and directors as so absent from their jobs that they ceded their authority to Hurwitz. The judge rejected this, saying:

> To sustain Enforcement's claim that Mr. Hurwitz exercised a dominant control over all of [United Savings's] activities presumes that these eminently qualified individuals, each with a history of personal accomplishment, and responsible conduct in high positions, utterly failed to perform their duties as UFG and [United Savings] directors.[339]

He found that OTS's "denigrations" of the bank's leadership "amount to little more than unseemly name-calling for advocacy purposes." [340]

*Real estate.* OTS, though not the FDIC, criticized real-estate transactions in San Antonio and Austin. The judge concluded that there was "no plausible basis" for these claims.[341] OTS was not trying to vindicate United Savings, but was "fashioning criticisms for the sole purpose of imposing liability on Respondents...." [342]

330. Ex. 195 at 4.

331. Dkt. 504.

332. Ex. 138 at 3.

333. Ex. 155.

334. Ex. 217 at 9.

335. *Id.* at 25.

336. *Id.* at 57.

337. *Id.* at 51.

338. *Id.*

339. *Id.* at 64.

340. *Id.* at 72.

341. Ex. 217 at 91.

342. *Id.* at 87.

*Hurwitz.* Like the FDIC, OTS claimed that Hurwitz controlled United Savings and caused its failure. The judge found that "The record amply demonstrates that his activities at [United Financial] and [United Savings] were intended for their benefit, not their detriment, though ultimately his effort did not save the institution from failure."[343] He added:

I do not accept, and find it inconceivable that any regulatory agency takes this stance against delegation of responsibility and would hold that the CEO of a multi-billion dollar institution is responsible for the described minutia. It seems doubtful that this position would even be asserted outside the context of this proceeding.[344]

The administrative judge obliterated the claims. OTS appealed. The appeal would have been to the OTS director.[345] The respondents—quite reasonably—were apprehensive about the director's tainted perspective. They faced years of acrimony, millions of in legal bills, an adverse decision, and an appeal to the courts. In October 2002, Hurwitz, Maxxam, and Federated settled with OTS for $206,000.[346]

The FDIC brandishes the settlement as an admission of guilt. It is wrong. The settlement does not acknowledge fault. Having the administrative judge's thorough and thoughtful recommendation, OTS settled its billion-dollar case with a whimper. When OTS settled, the contingencies needed for the FDIC's claim to ripen could never occur. The FDIC's claim went from untenable to moot. One month after the OTS settled its case, the FDIC abandoned

its claim here, taking nothing from the defendants.[347]

Incredibly, as a defense to sanctions, the FDIC says that the court never dismissed its case on limitations. To blunt the government's two-prong attack, this court allowed the administrative process to work without parallel costs to everybody here. The FDIC finally conceded that the case here was worthless—a view tentatively voiced by this court years ago.

Following its predilection for dissembling, the FDIC says that, because the respondents released OTS and the FDIC, Hurwitz, Maxxam, and Federated are barred from seeking fees and costs from the FDIC; however, only Barry Munitz, Jenard Gross, Arthur Berner, Ronald Huebsch, and Michael Crow released both OTS and the FDIC. Hurwitz, Maxxam, and Federated expressly reserved their rights against the FDIC for its conduct in the administrative proceeding and the litigation in this court.[348]

### 34. *Arrangement.*

The FDIC said that it was "merely coordinating" or "cooperating" with the OTS to avoid "duplication, confusion, and delays" in the two suits.[349] It lies. The FDIC brought this case. It later sought to open a second front against Hurwitz for more pain. The FDIC described the suits as "parallel" and involving "same or similar issues."[350] Next, the suits confused the FDIC board. It spent substantial time distinguishing between the suits and wondering how they would affect each other. The suits were, as the FDIC described, "overlapping."[351] Last, the two cases

---

**343.** *Id.* at 74.

**344.** *Id.* at 90.

**345.** 12 C.F.R. § 509.40.

**346.** Ex. 220.

**347.** Dkt. 382.

**348.** Dkt. 220, ¶ 15.

**349.** Ex. 128, at 1; *see also* ex. 203, at 2, ex. 151, at 2.

**350.** Ex. 52 at 2.

**351.** Ex. 150 at CNM418580, para. 3.

have caused incredible delays. The investigation into United's failure began in the late 1980s. The FDIC and OTS's claims were not resolved until 2002. Along the way, the FDIC impeded discovery, evaded orders, meddled in the administrative action, and at least twice tried to stall the case.

The FDIC insists that OTS maintained its autonomy from beginning to end. It is inconceivable that one agency—whose entire case was being financed by another—would be able to maintain its independence. If human nature were not enough to support this, the record reflects:

*Cash.* The FDIC paid the OTS nearly $3 million for its investigation and suit. OTS gave FDIC a 20–75% discount from OTS's regular rates.[352] OTS could not have brought the administrative action without the FDIC's cash.[353]

*Information.* The FDIC gave OTS privileged documents and designed its case.[354] It even drafted the notice of charges.[355] OTS regularly reported to the FDIC.[356]

*Strategy.* The FDIC says that it chose not to take formal action against Hurwitz at around the time when it "developed a new strategy" for pursuing Hurwitz administratively.[357] The agency said that it "chose the OTS venue" based on the favorable statute of limitations, an easier burden of proof, and the expeditious nature of the administrative forum.[358]

*Recovery.* The FDIC, not the OTS, would receive the recovery from the administrative action.[359] In the FDIC's words, this "muddied" the distinction between the two agencies.[360]

In the beginning, OTS was interested in only a "small, discreet claim." Williams's review with Hopkins & Sutter revealed "nearly insurmountable legal hurdles springing up in Tx cts (SOL; Bus. Judgmt; Stnd of Care)."[361] Williams said that "there had to be a better way," so he "began to meet regularly w/OTS ... to see if we could wet their appetite on at least some broader D & O claims."[362] In addition to giving OTS documents, Williams wrote, "We embarked on a lengthy & expensive course of *preparing their case for them,*" including "drafting portions of the N. of Charges for them." (emphasis added)[363] OTS needed the FDIC's help because "they can't do indep. invest."[364]

When it met with the OTS, the FDIC said, "We need to more clearly be integrated into your investing." because "We are working on issues that may be of subst. benefit to you—[particularly] if FDIC decides not to file in [federal court in Houston] bec/ of [substantive] legal difficulties."[365] It needed greater "reciprocity letting FDIC in on *your* claims since its our dime & very expensive."[366] Williams

---

**352.** Exs. 190, 192; Dkt. 493.

**353.** Ex. 74, Ex. 80 at 1–2; Ex. 82 at 2, 101.

**354.** Ex. 71; Ex. 74; Ex. 185 at items 476, 1705.

**355.** Ex. 334.

**356.** *See, e.g.,* ex. 345.

**357.** Ex. 118 at 2.

**358.** Ex. 203 at 2; Ex. 333 at 24.

**359.** Ex. 121 at 5.

**360.** Ex. 100 at 20 n. 11.

**361.** Dkt. 491 at 16.

**362.** *Id.*

**363.** *Id.* at 16, 17.

**364.** *Id.* at 11.

**365.** *Id.* at 19.

**366.** *Id.*

specifically wanted to meet with OTS weekly and have working groups among the FDIC, OTS, and Hopkins & Sutter to "assist" OTS "in putting together & refining OTS theories." [367]

The FDIC says that its relationship with OTS was legal, fully disclosed, and authorized by its board.[368] It, however, did not confess this arrangement until ordered by this court. When the FDIC did articulate the relationship, it was clear that the deal with OTS was illegal because it violated (a) Congress's mandate to the agencies, (b) the FDIC's limited powers, (c) a statute about the FDIC's recommending to the OTS, and (d) appropriations law.

## A. Roles.

■ In its corporate capacity, the FDIC insures deposits in banks and thrifts.[369] It gets part of its money from Treasury, part from bank fees. It may act as a receiver for failed institutions and pursue claims for them.[370] When it does sue on behalf of a failed institution, the FDIC must sue in civil court. Defendants in those actions are entitled to constitutional protections, like jury trials. The FDIC must prove its case like other litigants; it has no advantage simply because it is the government.

The Office of Thrift Supervision regulates savings associations. The OTS director may adopt regulations to ensure the sound operation of thrifts and to punish institutions or individuals who break those regulations. The OTS funds itself through fees and assessments from thrifts; it gets no money directly from Congress.[371]

Occasionally, in this case, the FDIC has made some sort of distinction about its

costs not being from the taxpayers—no appropriations. The OTS could assume the same posture. Well, first, waste is waste. Second, the agencies' ability to assess fees, charge premiums, and impose fines to fund its operations are taxes. They are congressionally permitted transfers from citizens to the government. Even if the first imposition is on a bank, the cost is ultimately borne by the consumer.

An OTS suit is an enforcement proceeding in an administrative forum. This forum is different than a federal court. The OTS enjoys longer statutes of limitations, lower evidentiary burdens, and fewer state-law defenses than would be available in a civil-court proceeding. In addition, there is no impartial jurist; an administrative judge—an OTS employee—hears the case and makes a recommendation to the OTS director. The director makes a final decision that is appealable only to the United States Court of Appeals. The court may reverse the decision only if the director abused his discretion, violated the Constitution, or made a decision unsupported by substantial evidence.[372]

The OTS case was more favorable to the FDIC than the FDIC's own case was. The FDIC hired OTS because of OTS's exclusive authority to enforce net-worth agreements and its administrative forum. Hurwitz had to defend himself against what were FDIC claims without the protections of a civil court—the only forum where the FDIC may sue.

## B. Powers.

■ The FDIC says that Congress has given it broad powers, including the power

---

**367.** *Id.*

**368.** Govt.'s Resp., dkt. 398, at 26.

**369.** 12 U.S.C. § 1811.

**370.** 12 U.S.C. § 1821(c).

**371.** 12 U.S.C. § 1462a(i), 12 U.S.C. § 1467(m).

**372.** 5 U.S.C. § 706.

to undertake its arrangement with OTS.[373] It says that it may determine what obligations the agency will assume and how it will pay them. According to the FDIC, the law gives it limitless incidental powers to perform its express duties, including using other agencies for whatever end. It is wrong.

Congress created the FDIC to insure deposits at commercial banks. It is a corporation in name only; in substance it is a tertiary piece of the national government. To accomplish this, it may form contracts and sue and be sued. It has a board of directors.[374] The FDIC must insure deposits and examine those banks to reduce risk of loss to the agency. It may adopt regulations.[375] While the board may use the "information, services, and facilities" of other federal agencies, it may do that only for "carrying out the provisions of this Act."[376] Congress has given the FDIC no authority to hire another agency to bring claims that the FDIC itself may not bring. The FDIC cannot pay the Navy to shell Hurwitz's beach house, even it would advance agency objectives. Hurwitz should be glad that the FDIC did not think of that.

### C. Recommendation.

 The FDIC says that its statutes authorized the arrangement, although it concedes that "there is no explicit statutory reference" permitting it.[377] When it relies on statute, the FDIC says that Section 1818(t) authorized its renting OTS.

The section merely permits the FDIC to *recommend* in writing that another federal banking agency take action against an institution or individuals.[378] If that agency does not act within sixty days, the FDIC may act if authorized by its board.[379] If the board authorizes action, the FDIC has the powers that the other agency would have had.

At no time did the FDIC fulfill these requirements. The record shows only an exchange of four letters that vaguely express the terms of the agencies' collaboration.[380] This is not enough.

When asked about the FDIC's compliance with the statute, Jeff Williams testified that the statute allows the recommendation in the form of a "package of correspondence," not just a single writing.[381] He said that only part of the recommendation had to be in writing; discussions at meetings and telephone calls could be the recommendation.[382]

Instead of a single date for the recommendation, Williams said that the four dates of the letters are the dates when the recommendation was made.[383] When asked when the 60-day period began to run, Williams shifted and said that the FDIC did not believe that there were four different dates. He said that the 60-day period was irrelevant since the FDIC chose not to use its "back-up authority" under section 1818(t)(2). When asked where the section authorizes paying OTS, Williams ducked the question.[384]

---

373. Govt.'s Resp., dkt. 398, at 28.

374. 12 U.S.C. § 1819(a)-(d).

375. 12 U.S.C. § 1819(a).

376. 12 U.S.C. § 1820(a).

377. Ex. 203 at 1.

378. 12 U.S.C. § 1818(t)(1).

379. 12 U.S.C. § 1818(t)(2).

380. Exs. 71, 74, 80, and 82.

381. Depo. of Jeff Williams, ex. 211, at 214, l. 12; 193, l.18–194, l.9.

382. *Id.* at 194, l.12–195, l.2.

383. *Id.* at 200, ll.2–6.

384. *Id.* at 207, l.6—213, l. 10.

Williams is perjurious, not illiterate. There was never a legal recommendation to OTS. The plain language of the statute says that a recommendation must be contained in a single, dated writing. Next, one agency may not receive money from another to carry out duties that it is already charged to perform. Last, the FDIC may not say that the date when it "recommended" suit to OTS is irrelevant because it did not act under its "back-up" authority. It has the benefit of hindsight. At the time that it made its recommendation, it presumably did not know that OTS would sue.

### D. Purpose Law.

■ The FDIC manages the Bank Insurance Fund, the Savings Association Insurance Fund, and the FSLIC Resolution Fund.[385] These funds allow the FDIC to loan money to insolvent institutions, wind up the affairs of failed ones, and pay for lawsuits when it acts as receiver. It may not commingle the funds.[386]

The FSLIC Resolution Fund consists of the assets and liabilities of the extinct Federal Savings and Loan Insurance Corporation and the Resolution Trust Corporation.[387] The FDIC maintains the assets and liabilities of each in a separate pool. It may not use assets from one pool to satisfy the obligations of the other. Since the FSLIC had insured United's deposits, the FDIC paid OTS's costs for its investi-

gation of United from the FSLIC pool.[388] Only that pool is relevant.

■ Treasury disburses money to the FDIC and the FSLIC pool.[389] Treasury gets its money from taxes through Congress. Money that Treasury sends the FDIC are appropriated funds. Congress specifies the amount, purpose, and time for spending appropriated funds. Even if a deal between agencies may save money or generate other benefits, agencies may spend appropriated funds only as Congress says.[390] This rule—known as the Purpose Law—is nothing new: the Founders conceived of it over two hundred years ago by establishing that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." [391] In the words of the one Treasury Comptroller, "The law is plain, and any disbursing officer disregards it at his peril." [392]

■ An agency may not pay another to do what the first may not do directly.[393] The arrangement with OTS violated the law because it transferred the FDIC's resources to OTS to bring claims that the FDIC could not. In addition, OTS gets its money directly from thrifts, not Congress. The FDIC supplied its appropriated funds to an agency not entitled to receive them.[394]

Whether OTS sued as a service to the FDIC or in furtherance of its own respon-

---

**385.** 12 U.S.C. §§ 1821(a)(5), 1821(a)(6), 1821a.

**386.** 12 U.S.C. §§ 1821(a)(4)(ii), 1821a(a).

**387.** 12 U.S.C. §§ 1821a(a)(2), 1441(a)(m)(2).

**388.** Depo. of Jeffrey Williams, ex. 211, at 57, 1.10–58, 1.6.

**389.** 12 U.S.C. §§ 1821a(c).

**390.** 31 U.S.C. § 1301(a); *Reeside v. Walker,* 52 U.S. 272, 291, 11 How. 272, 13 L.Ed. 693 (1850); *United States v. MacCollum,* 426 U.S.

317, 321, 96 S.Ct. 2086, 48 L.Ed.2d 666 (1976); 39 Comp. Gen. 388, 390 (1959).

**391.** U.S. Const. art. I, § 9, cl. 7.

**392.** 4 Comp. Dec. 569, 579 (1898).

**393.** 18 Comp. Gen. 262, 285 (1938); 5 Comp. Gen. 757, 758 (1926).

**394.** 64 Comp. Gen. 110–111 (1984).

sibilities, its use of FDIC funds was illegal. OTS may use only the fees and assessments that it collects to conduct its activities.[395] It may not take money from other agencies to fulfill its charge.

### E. *Economy Act.*

 Agencies may work for each other only if they act under (a) specific statutory authorization or (b) the Economy Act, if no specific statute exists. The act allows an agency to procure services or goods from another agency if:

- Funds are available;
- The head of the ordering agency decides that the arrangement is in the best interest of the United States;
- The other agency can supply the order; and
- The head of the ordering agency decides that the other agency would fill the order more cheaply or conveniently than could a private company.[396]

The FDIC and OTS's arrangement satisfied none of these requirements.

 *Availability.* The ordering agency must have enough money to pay the other agency. It must also be able to spend its funds for the intended purpose. The Economy Act does not override the Purpose Law: agencies must still use their funds only as authorized.[397] Because Congress never authorized the FDIC and OTS's arrangement, no funds were available.

*Best Interest.* The head of an ordering agency must decide that hiring another agency is in the best interest of the United States. Though the statute does not require written findings, the regulations do. Agency heads must determine that the arrangement is in the nation's best interest and that the other agency would be a better supplier than a private company.[398] The agency head must then place an order with the other agency that describes: (a) the service to be supplied; (b) delivery requirements; (c) cost; (d) payment method; and (e) authority for the arrangement.[399] Ricki Helfer never complied with these requirements.

The only "contract" between the FDIC and OTS was a letter from the OTS's Carolyn Lieberman that Jack Smith signed for the FDIC in late May 1994. It said that OTS would (a) bring the net-worth claim against United Financial, (b) submit its investigative plan to the FDIC, and (c) need the FDIC's money for the investigation and suit.[400] It said nothing about the legal authority for the arrangement, the terms, the cost, the maximum that the FDIC could spend, or the agencies' compliance with other laws.[401] Since the FDIC did not have the proper express agreement, its transfer of funds to OTS was illegal.[402] Even if the FDIC had complied with these requirements, the arrangement would still have been illegal. The FDIC may not pay other agencies to do its job or their jobs.

*Supply.* The supplying agency must be able to furnish the goods or services. The OTS's own documents and correspondence between the agencies show that OTS would not have been able to undertake the

---

**395.** 12 U.S.C. § 1467(m).

**396.** 31 U.S.C. § 1535(a)(1–4).

**397.** 26 Comp. Gen. 545, 548 (1947); 18 Comp. Gen. 489, 490–91 (1938).

**398.** 48 C.F.R. § 17.503(a).

**399.** 48 C.F.R. § 17.504(a), (b).

**400.** Ex. 82.

**401.** Government Accountability Office, Policy and Procedures Manual for Guidance of Federal Agencies, tit. 7, § 2.4.C.2e.

**402.** 31 U.S.C. § 1501; 13 Comp. Gen. 234, 234 (1934).

enforcement proceeding absent support from the FDIC. OTS was unable to supply the services that the FDIC had requested.

*Efficiency.* An agency must be able to furnish goods or services more cheaply and conveniently than a private company could. Implicit is that the work is commercial in nature.[403] OTS's role, however, was governmental: the FDIC did not hire its lawyers; it hired its authority.

*Costs.* Agencies must be paid their actual costs.[404] OTS, however, gave the FDIC a discount of 20–75% on its costs.[405] This made OTS subsidize the FDIC's work and illegally augmented the FDIC's appropriations.

35. *Discovery.*

The FDIC has been obstreperous in discovery throughout the case. It says that Hurwitz's complaints about its obdurance are overblown. It says that he has simply encountered "unique" issues in discovery that arise when dealing with the United States.[406] Apparently, mere citizens must learn to absorb the blows when they are administered by the mandarins of the regulatory state. This attitude is characteristic of the FDIC and its conduct of this litigation. Fortunately, the FDIC's arrogance is transcended by our charter's commitment to equal justice under law.

Evidence of the FDIC's misconduct exists despite the agency's efforts to block the record's development. The record overwhelmingly shows that (a) the FDIC claims lacked merit, (b) the FDIC knew it, (c) the debt-for-nature campaign drove the FDIC's suit, and (d) the campaign caused the FDIC to buy OTS. This court repeatedly has had to compel the FDIC to comply with the court's discovery orders.[407] Other courts have also had to compel production.[408]

Fortuity and third parties have aided discovery here, too. After repeated requests by Hurwitz, the FDIC inadvertently produced seven boxes of documents without looking inside.[409] Those boxes contained the FDIC outside counsel's conclusions that the claims would fail. Next, the *Houston Chronicle* obtained the authority-to-sue memorandum and posted it on the Internet. The memorandum revealed the FDIC's knowledge that its claims lacked merit and confirmed the conspicuous timing of the suit and debt-for-nature pressure.[410] Last, the congressional committee that investigated the FDIC's misconduct uncovered a wealth of information, and, against the FDIC's wishes, disclosed documents.[411] The committee's investigation resulted in many of the disclosures reported here.[412]

As with the rest of this opinion, this recounting of the FDIC's obstruction is illustrative, not exhaustive.

*United Savings's records.* The FDIC's production of the government's examination reports—crucial to the decision to sue—occurred only after Hurwitz moved to compel.[413] The FDIC still fought production for over a year.[414] To date, it has

**403.** 5 Comp. Gen. 757, 758 (1926).

**404.** 31 U.S.C. § 1535(b); 57 Comp. Gen. 674, 678 (1978).

**405.** Exs. 190, 192; Dkt. 493.

**406.** Govt's Resp., dkt. 398 at 44.

**407.** *See, e.g.,* dkts. 9, 22, 121, 174, 263, 270, 273.

**408.** *See* exs. 178, 214.

**409.** Dkt. 154.

**410.** Ex. 121 at 7–8.

**411.** Dkt. 322.

**412.** *See, e.g.,* exs. 65, 68, 70, 79, 87, 110, 114–16, 118–20, 138, 161, 165, 198–200, and 206.

**413.** Dkt. 72.

**414.** Exs. 136, 148, 158, 159, 160; dkt. 73 at 6–7.

not produced some of the regulator's communications, including those of the OTS's predecessor, the Bank Board.[415]

The FDIC maintained a warehouse of documents taken from United Savings.[416] The FDIC knew that these boxes contained important—in its word "hot"—documents.[417] It failed to identify these documents in its disclosures.[418] When asked about them, the FDIC represented that they were "junk."[419] The part of the warehouse that Hurwitz was invited to inspect housed only the junk; another part hid the hot documents. The FDIC withheld documents, despite its saying that it made available "a substantial volume of . . . material, with the bulk of it not relevant."[420]

The FDIC placed different numbers on boxes of documents from United Savings, making them impossible to track them with the indices that the thrift had given Maxxam.[421] The FDIC made sure that its people had the right indices.[422] The FDIC also placed files into different boxes and DESTROYED some.[423] Finally, the FDIC produced no record of the documents that it had taken from the thrift until ordered by the administrative judge in the OTS proceeding.[424]

*Office of Thrift Supervision.* In response to Maxxam's requests for production, the FDIC frequently claimed that OTS controlled the documents.[425] The FDIC objected to producing documents not in its "current possession or direct control."[426] When Maxxam asked OTS for them, OTS refused. This is a shell game.

■ The government has violated rules that require production of documents in its "possession, custody or control."[427] This includes documents that OTS possessed. First, Congress has ordered OTS to "make available all supervisory records to" the FDIC.[428]

Next, the FDIC paid OTS millions to sue Hurwitz, Maxxam, and Federated.[429] It is inconceivable that OTS would have refused a true FDIC discovery request. Moreover, the FDIC paid OTS under an agreement that made OTS the FDIC's lawyers.[430] Documents of a government's attorney are within the control of the government.

In addition, OTS had agreed to "promptly provide" to the FDIC "all information" in the OTS's "possession, custody or control."[431] When a litigant has a contractual right to documents from a non-party, the litigant has control of the documents.

---

**415.** Exs. 136, 158, 160; dkt. 73 at 7–8.

**416.** Ex. 169.

**417.** Ex. 62.

**418.** Dkt. 12–13 at 12.

**419.** Dkt. 73 at 11.

**420.** Ex. 137.

**421.** Ex. 166.

**422.** Ex. 169. John Rogers wrote, "I will be sending a copy of the index to the Kestrel facility . . . tonight. You should have it by tomorrow. I will be sending some additional indices to Catherine Botticelli in a few days."

**423.** Exs. 170, 172, 174.

**424.** Ex. 167.

**425.** Dkt. 88 at 4–5; Ex. 209.

**426.** Ex. 208 at General Objection No. 5.

**427.** Fed.R.Civ.P. 34(a).

**428.** 12 U.S.C. § 1821(*o*).

**429.** Ex. 197 at 3.

**430.** Exs. 82, 101.

**431.** Ex. 52 at 5.

Last, the OTS director sits on the FDIC board.[432] He could have ordered his agency to produce the documents. The FDIC may not escape the consequences of the law, its agreement, and its sharing officers with OTS.

*Privilege Log.* Initially, the FDIC did not admit that it was withholding documents.[433] When Hurwitz learned that it was, he moved to compel.[434] The FDIC argued that the documents were privileged.[435] In mid-November 1996, the court ordered the FDIC to use its "best efforts" to produce a log and say what else it needed to do to complete it and when it would finish. It had until January 30, 1997.[436] By this time, the case was over a year old.

January 30th came with no log from the FDIC. One week earlier, the FDIC had written Hurwitz to relay, "We hope to complete that process promptly."[437] By mid-February, the government still had not finished the log. It said simply that the "process continues."[438] The FDIC said that it was taking more time because it was having to respond to a subpoena in the OTS case. Only in response to another sanctions motion and another order from this court did the FDIC produce its log. This was on March 31, 1997, nearly two years after the case was filed and two months after the court ordered it to be done.[439]

The log identified hundreds of documents that were not privileged.[440] The FDIC said that work-product and attorney-client privileges protect documents sent by or to a government employee with a law license, even when that employee acts as an executive, investigator, or regulator. It is wrong. A person must give legal advice in a context of advice sought to render his communication privileged; that he has a law license is not enough.[441] The government was investigating a failed thrift and had simply elected to have attorneys be the investigators.

The log also depends on the contention that the agency could, without waiving privileges, exchange documents with OTS, RTC, FHLBB, Labor, Justice, Treasury, Interior, U.S. Attorney, Forest Service, the Vice President, and Congress. The FDIC claimed that it could do so under the statute that allows a "covered agency" to transfer information to another agency without waiving privilege.[442] That provision, however, was not effective until October 28, 1992—well after the FDIC had disclosed documents to other agencies.[443] Further, a "covered agency" is limited to an "appropriate Federal banking agency," defined as "the Federal Deposit Insurance Corporation in the case of a State non-member insured Bank."[444] United Savings was a thrift, not a state nonmember

---

**432.** 12 U.S.C. § 1812(a)(1)(B).

**433.** Dkts. 12–13.

**434.** Dkts. 72, 73.

**435.** Dkt. 88 at 1.

**436.** Dkt. 121.

**437.** Ex. 168.

**438.** Exs. 171, 173.

**439.** Ex. 176.

**440.** Ex. 185.

**441.** Edna Selan Epstein, *The Attorney–Client Privilege and the Work–Product Doctrine,* 226–27 (4th ed.2001).

**442.** 12 U.S.C. § 1821(t).

**443.** *See* notes following 12 U.S.C.A. § 1821 (West 1996).

**444.** 12 U.S.C.A. §§ 1813(q)(3), 1821(t)(2)(A)(i) (West 1996).

insured bank. The FDIC, therefore, was not a covered agency.

■ The Vice President of the United States is an officer of the legislative branch. His official function is to preside in the Senate.[445] In the absence of a statute that invests him with other responsibilities, he is the President of the Senate. No statute authorized the disclosures of the FDIC's confidential data, legal opinions, and case preparation to Albert A. Gore, Jr. Disclosure to him was disclosure to a member of the public. Another public disclosure was the FDIC's sharing information and legal strategies with the people at the Rose Foundation. The CEQ was not a covered agency either.

A covered agency can also be the director of the Office of Thrift Supervision.[446] None of the challenged communications, however, was from the OTS director.

■ After being shown that the statute did not apply to it and in response to a motion to produce, the agency disclosed for the first time its agreement with OTS to exchange information on a confidential basis.[447] The FDIC was forced to concede that it and OTS were jointly prosecuting the case.[448] It, however, argued that the agencies' disclosures to one other were protected under the common interest—or joint defense—doctrine. This is wrong. The doctrine is available only to co-parties with a common interest in litigation.[449] The OTS was not a co-party to the FDIC here when it started its own attack in Washington. The FDIC had, in fact, resisted OTS's joinder here. The agencies

had no common interest; the only interest was the FDIC's.

In addition, the two agencies may "contract" with each other that the disclosures are confidential, but that agreement does not bind the public or those whom they sue.

In its log, the FDIC identified documents to or from people whom the OTS had designated as testifying experts in its proceeding. The FDIC designated those individuals as consulting experts here to prevent Hurwitz from deposing them since the rules do not allow consulting experts to be deposed except under extraordinary circumstances.[450] If the reports were discoverable from the OTS, they would be discoverable from the FDIC, regardless of its subjective concept of its use of them.

On the one hand, the FDIC says that it could exchange information with OTS and other agencies without waiving privilege. On the other, it says that the FDIC and OTS are entirely separate parties for the purpose of designating their experts. The government has exhibited this duplicitous schizophrenia throughout the case.

■ *Hiding Disclosures.* The production of the draft authority-to-sue memorandum reveals more misconduct. FDIC outside counsel Tom Manick swore that no drafts of the memorandum existed and that he did not see the document until 1995.[451] One of the FDIC's experts, Joel "Joe" Hargett, swore that, in late 1993 or early 1994. Manick gave him a copy of a draft dated November 17, 1993.[452] Nei-

445. U.S. Const. art I, § 3, para. 4.

446. 12 U.S.C.A. § 1813(q)(4) (West 1996).

447. Ex. 52.

448. Dkt. 175 at 6–7.

449. *In re Grand Jury Subpoenas,* 902 F.2d 244, 249 (4th Cir.1990).

450. Fed.R.Civ.P. 26(b)(4)(B).

451. Ex. 140 at 34–36.

452. Dep. of Joel Hargett, Ex. 177 at 19–20; ex. 180.

ther the FDIC nor Manick corrected Manick's testimony. The draft memorandum validates Hurwitz's contentions about the true nature of the case and the agency's knowledge that the case would fail. For this reason, the kind of fraud on the court that the FDIC and Manick exhibited makes all of the FDIC's records discoverable.[453]

The FDIC continued to assert that the memorandum was privileged and never disclosed that it had been produced to witness Hargett.[454] Williams swore that no person outside the FDIC had ever seen the memorandum.[455] He failed to note the disclosure to Hargett, something that the FDIC knew by 1996, at least six months before Williams's declaration.[456]

*Debt for Nature.* Early in the case, Hurwitz requested documents about debt for nature.[457] The FDIC produced two boxes of citizen postcards and congressional correspondence. It kept from him every document showing the FDIC's role in the plan.[458] The FDIC's role became known only when Congress got the documents.[459]

▮ The FDIC offered excuses for only two documents.[460] One document was an Interior memorandum that the FDIC received in 1998 and produced in 2000. The FDIC produced the second document—an analysis from November 1995—five years after Hurwitz requested it.[461] For the first, the FDIC said simply that the memorandum was not an "FDIC document." [462] For both, the FDIC has yet to explain its delay. An order to disclose covers documents that are not in some spiritual sense an FDIC document. Newspaper clippings that the bureaucrats thought enough of to include in the files must be produced. A claim of privilege requires a disclosure of the item's existence, its nature that might justify a privilege, and its date. The FDIC did not support its claims of privilege as the law requires.

*"Lost."* The FDIC has lost documents. It has never found the United Savings's files of the head regulator, Danny Wall. Presumably, these would have shown that the government's claims were meritless. Next, it has lost documents about the FDIC's investigation and evaluation of this case. These were:

- Handwritten evaluations and analyses of the United Savings litigation by the two firms that conducted the initial investigation for the government[463]; and
- Attorney "Comments re: Wall Street Journal article re: U.S. Probe and effect on Redwoods." [464]

▮ The FDIC says that this was accidental. This is implausible. It identified the documents as relevant, reviewed them, and then logged them as privileged. These acts confirm the documents' existence and suggest their placement in storage. Since the court may assume facts against a party that destroys or loses evidence, the documents' absence implies that

**453.** *In re Southern and Eastern District Asbestos Litigation*, 730 F.Supp. 582, 585 (S.D.N.Y. 1990).

**454.** Exs. 163, 179.

**455.** Ex. 175 at 2.

**456.** Ex. 181, para. 10.

**457.** Exs. 148, 149.

**458.** *E.g.*, Exs. 68, 143, 124, 141, 150.

**459.** Ex. 207.

**460.** Dkt. 313.

**461.** Ex. 150.

**462.** Ex. 313 at 3.

**463.** Dkt. 185, items 407, 408, 409, 414.

**464.** *Id.* item 747.

they weakened the case and that their loss—or destruction—was intentional.[465]

*Protective Order.* The court signed an agreed protective order on December 18, 1995. It allowed each party unilaterally to designate documents as confidential until the court ruled otherwise.[466] On August 31, 2000, the FDIC designated as confidential its correspondence with OTS about their arrangement.[467] The FDIC wanted to keep confidential a deal between public agencies using public funds to pay for a public proceeding.

■ The FDIC fought to withhold those documents, claiming that they had to be kept confidential, that the material was "sensitive," that there was no urgent need to lift their designation, and that the defendants wanted to leak the documents to the press.[468] None of these reasons makes an evidentiary privilege. When the court lifted the designation, the FDIC backpedaled, saying that the letters were "old news," "There is nothing new in the letters," and "All the information in them has already been made public...."[469] Not until the court unsealed the record did the public see the scope of the government's malfeasance over the past eighteen years.[470]

36. *Depositions.*

The FDIC impeded the depositions of its officials. When depositions were taken,

witnesses lied, rambled evasively, or testified with the party line, in contradiction of the record as it turned out.

Hurwitz tried to depose the FDIC representative who was most knowledgeable about the FDIC's suit.[471] The FDIC moved to quash, claiming that only attorneys had that information and that, therefore, the information was privileged.[472] The court rejected this argument.[473] The FDIC then produced representatives, but it instructed them not to testify about what they knew, only what they had been coached to say.[474] The agency said that producing its representatives satisfied its obligations and that the substance of their answers was irrelevant.[475] The FDIC is saying that it cannot be held responsible for the behavior of its agents. The FDIC is nothing but agents; everything that it does is done through people.

■ The court compelled the representatives to say what they knew. At the next round of depositions, the FDIC asserted the deliberative-process privilege.[476] Only the head of an agency may claim the privilege. The privilege is not absolute. The court must weigh the government's desire for secrecy against the court's need for evidence.[477] This case does not present an extraordinary situation—like a risk to national security or disclosures that might injure unrepresented people—that justifies the privilege. Evidentiary privileges van-

465. *Nation–Wide Check Corp., Inc. v. Forest Hills Distributors, Inc., et al.,* 692 F.2d 214, 217–218 (1st Cir.1982).

466. Dkt. 53.

467. Ex. E to dkt. 317; Ex. A to dkt. 315.

468. Dkt. 320 at 2.

469. Ex. 215.

470. Dkt. 477.

471. Ex. 133.

472. Dkt. 7 at 2.

473. Dkt. 9.

474. *See, e.g.,* Dep. of Thomas Manick, ex. 140 at 14, ll. 17–25.

475. Govt's Resp., dkt. 398 at 44–45.

476. Depo. of Robert DeHenzel, Ex. 153 at 254, 261, 270, 341, 343–46, 349, 393–94.

477. Wright & Graham, Federal Practice and Procedure: Evidence, § 5680 (1992).

ish in the face of fraud and crime, like perjury. This evidence was about insurance and auditing agencies' historic records about a defunct thrift and their basis for initiating a suit against the person seeking the evidence.

Hurwitz tried to depose the FDIC's directors on the issues not answered by the representatives.[478] The FDIC moved to quash, claiming that the directors did not know relevant, non-privileged information.[479] The court ordered the FDIC to propose a "substitute for the depositions" of the directors and precisely to "define how it will furnish Hurwitz the information that he could get from the depositions." [480] The FDIC suggested that the staff answer interrogatories, giving Hurwitz access to more manufactured position pronouncements, not hard data.[481]

*Hove.* Hurwitz tried to depose then-acting FDIC Chairman, Skip Hove. The FDIC moved to quash, claiming that he was too important and too busy to be deposed.[482] The court ordered Hove to be deposed by written questions.[483] Hove managed not to enlighten the record at all.[484] When asked to describe in full the debt-for-nature swap discussions, he answered:

> The discussions I have had have been within the FDIC, primarily with the general counsel of the FDIC, who had some conversations with the Treasury Department and the Department of Interior and with the Commerce Depart-

ment relative to the issue of the redwoods being swapped for the debt that Hurwitz has owed.[485]

Hove *refused* to say whether the FDIC board discussed the debt-for-nature swap when it decided to sue Hurwitz. He swore to total ignorance of the FDIC's funding OTS. He even claimed not to recall that the board had decided to sue Hurwitz. Hove, however, had been the focus of political pressure to sue Hurwitz.[486] He received the FDIC legal staff's briefings on debt for nature and participated in the deliberations to sue.[487] Hove had filed two "declarations" and read the depositions and many of the FDIC's withheld documents.[488] Yet he knew nothing.

*Williams.* Williams was the senior supervising FDIC attorney for the suit against Hurwitz. The FDIC designated him as the most knowledgeable person about Hurwitz's counterclaim. It was the first and only deposition that the FDIC did not resist. Not one word that came from Williams's mouth was credible. The scope of his perjury can only be sketched.

Williams insisted that the FDIC gave no "serious consideration" to the environmentalists.[489] He said that the FDIC did not devote "any time at all evaluating," "discussing," or even coming up with "analysis in any way whatsoever" of the debt-for-nature proposal.[490] The FDIC did "not follow up, analyze, factor into our considerations . . . or spend our own resources, in-

---

478. Ex. 162.

479. Dkt. 77.

480. Dkt. 80.

481. Dkt. 91.

482. Dkt. 244.

483. Dkt. 247.

484. Ex. 189.

485. *Id.* at 6–7.

486. Exs. 63, 67, 69, 83, 86, 75, 88; *see also* ex. 127.

487. Exs. 66, 68, 121, 123, 328.

488. Exs. 163, 188.

489. Depo. of Jeffrey Williams, Ex. 211 at 303–308.

490. *Id.* at 308.

cluding personnel time and funds, to review and consider statements made by" the environmentalists. Williams said that debt for nature never influenced the FDIC or the decision to sue Hurwitz.[491]

Williams omitted these facts:

- On December 21, 1993, the FDIC legal staff was "reviewing a suggestion by 'Earth First' that the FDIC trade its claims against Hurwitz for 3000 acres of redwood forests owned by Pacific Lumber, a subsidiary of Maxxam."[492]

- On June 13, 1994, the legal staff talked with the Rose Foundation.[493] Four days later, the FDIC's outside counsel met with the Rose Foundation at its headquarters.[494]

- Throughout the first half of 1994, the FDIC assured politicians that it was "following" the debt-for-nature "issue closely" and was "conducting a thorough examination of the factual and legal" issues, "including" debt-for-nature ones.[495]

- On July 28, 1994, the legal staff received an "Analysis of Rose Foundation materials" from the agency's outside counsel.[496] On October 3, 1994, outside counsel briefed the legal staff about these materials.[497]

- On October 4, 1994, Williams talked with five lawyers from the debt-for-nature campaign for over an hour and even

said, "There is a lot to be explored there & perhaps it could work."[498]

- On November 25, 1994, outside counsel analyzed more Rose Foundation materials.[499]

- On January 20, 1995, the staff met with debt-for-nature lobbyists.[500]

- On March 24, 1995, outside counsel sent a summary of the "environmental developments" of the past year to Williams.[501]

- Also in 1995, Williams was "exploring creative options that may induce a settlement involving the sequoia redwoods in FDIC/OTS case." Williams said that it was "clear that it will take more than FDIC's claims to get the trees and that FDIC remains an important part of exploring creative solutions to the issue."[502]

- Throughout this period, the FDIC prepared numerous evaluations of the Headwaters issues.[503]

- Williams was apparently the recipient of information from, in his words, the "enviros."[504]

Williams denied that Hopkins & Sutter's environmental expertise influenced the decision to hire the firm.[505] This directly contradicted the agency's internal correspondence.[506]

---

491. *Id.*

492. Ex. 68 at 2, 328.

493. Ex. 185, item 782; Ex. 84.

494. Ex. 108 at 3.

495. Exs. 69, 83, 86.

496. Ex. 186, item 3.

497. Ex. 185, item 781.

498. Ex. 91 at 1.

499. Ex. 186, item 5.

500. Ex. 108 at 3–4.

501. Ex. 108.

502. Exs. 110, 142.

503. *See, e.g.*, Ex. 186, items 2, 6, 9, 73; Ex. 185, items 529, 530, 1279, 1280.

504. Ex. 206. ("I have repeatedly heard from enviros, that Earth First placed a dead deer in the swimming pool of" Pacific Lumber's CEO.)

505. Ex. 211 at 346, ll. 6–9.

506. Ex. 72.

Williams swore that "The FDIC made a determination that egregious wrongdoing occurred at [United Savings] that resulted in substantial losses. They made a determination that it would be cost effective and the claims had merit and they initiated litigation against Mr. Hurwitz." [507] Williams failed to mention the staff's original conclusion that Hurwitz *not* be sued, Helfer's intervention, and one board member's statement that the economics of a suit made no sense.

Given Williams's lack of candor, Maxxam sought to depose:

- Ricki Helfer, who ramrodded the decision to sue;[508]
- Kroener, whom Helfer told to "take another look at" the staff's negative recommendation;[509] and
- Thomas and Smith, who were part of nearly every FDIC debt-for-nature event.[510]

The FDIC moved to quash each deposition.[511] The court compelled each one.[512]

*Ricki Helfer.* Ricki Helfer lied as much as Williams did. She professed not to be familiar with the lawsuit and said that she knew only that it existed.[513] Helfer said that no drafts of the authority-to-sue memorandum had existed, other than the final one presented to the board.[514] She had no knowledge of meetings or discussions with Interior until years later when she read Kroener's deposition.[515] She also claimed not to know who Jeffrey Williams was.[516] While it is not impossible that her ignorance was that abysmal, Helfer swore that she did not know Williams, who was the head of her professional-liability section and who had drafted the complaint for her agency's most high-profile suit.

On the FDIC's independence, she insisted that Congress did not influence the agency.[517] Helfer "emphatically" disagreed "that politics entered into the decision to bring this suit." [518] This was despite her repeated communications with members of Congress and making sure that at least ten of her staff knew what those representatives wanted.

Helfer swore that debt for nature did not influence her vote at the board meeting.[519] She even swore that she did not understand the term.[520] She swore that she would not have settled the FDIC's claims through a swap, even when confronted with her own correspondence in which she said that she was open to it. Amazingly, she brazenly testified that she had heard the term "debt for nature" only in her briefing with Kroener and Thomas. Helfer feigned ignorance about what The Rose Foundation was, though she regularly communicated with Jill Ratner, its head.

Despite professing only a vague recollection of her briefing with Thomas, Helfer was remarkably lucid on the details of their discussion.[521] She said that she did

---

507. Ex. 211 at 322, ll. 9–14.

508. Dkt. 352

509. Dkt. 338–41

510. Dkt. 361.

511. Dkt. 337, 351, 354.

512. Dkts. 342, 371, 373.

513. Dep. of Ricki Helfer, ex. 310 at 5.

514. *Id.* at 27.

515. *Id.* at 25.

516. *Id.* at 28.

517. *Id.* at 29–38.

518. *Id.* at 38.

519. *Id.* at 16.

520. *Id.* at 55.

521. *Id.* at 59–62.

not know about the staff's initial recommendation not to sue. This, however, had prompted her to call the briefing. On the claims, she remembered only what the authority-to-sue memorandum had said about their likelihood of success; she never heard the staff's assessment that the claims would be dismissed. Helfer said that she later summoned Kroener to tell him, "I really want you to personally take a look at this case and be sure the recommendations to the board are strong and sound."[522] According to Kroener, Helfer told him to "take another look at the claims."

On the OTS suit, Helfer said that the FDIC did not interfere in OTS's investigation, decision to sue, or the enforcement action. Helfer even said that she did not know how that suit ended or who the judge was. The record shows this to be a lie.

*Jack Smith.* Jack Smith swore that it was coincidence that, in early February 1994, the FDIC met with OTS the day after its meeting with Congressman Hamburg.[523] He said that there was no connection between Hamburg's interest in a suit and his letter to OTS about a suit, even though the lengthy last paragraph of his letter is *devoted to the media attention* given to Hurwitz, debt for nature, pressure from environmental groups, and an inquiry by Congressman Henry Gonzalez, Chairman of the House Banking Committee. Smith swore merely that he informed OTS of those details because "agencies traditionally do not like to get involved in things which might be excessively controversial or political."[524] He maintained this view, even though he acknowledged that

OTS did nothing for a year and a half after its first meeting with the FDIC. As Smith explained, "They had not been asked to do anything."[525]

Smith entered into the agreement with OTS. He said that he did so under his "delegated authority."[526] He insisted that he was able to make the deal, despite being shown the delegation that gave only the FDIC chairman the authority to enter intra-agency agreements.

Smith testified that his notes of the meeting with Hamburg reflected that Hamburg suggested ways to get the trees and that the FDIC rejected each one.[527] The notes actually reveal the FDIC's interest in Hamburg's ideas and that if it could "convince other side that we have claim worth $400m, they want to settle. Could be a hook into the holding co."[528] Smith evaded other questions.

Three days before the sanctions hearing, the FDIC filed a "declaration" by Smith, purporting to inform the court what he knew about notes. The declaration was full of detail—detail that was lacking in Smith's deposition from two years earlier. At the hearing, the court asked Smith about his sudden recollections. His memory had not recovered at all. Smith admitted that his declaration was the product of what the FDIC had told him to say. It was not his recollection, even refreshed, but a position paper invented to counter the truth. Smith's live testimony demonstrated a common FDIC theme. On points that harmed the agency, Smith's memory was poor; on points that the FDIC wanted to make, his recollection was remarkably clear.

---

522. *Id.* at 70.

523. Depo. of Jack Smith, ex. 218 at 33.

524. *Id.* at 32.

525. *Id.* at 33.

526. *Id.* at 37.

527. *Id.* at 132.

528. Ex. 70.

*Others.* The depositions of John Thomas, Bob DeHenzel, and William Kroener were more of the same. Like Thomas and De-Henzel, Kroener said that debt for nature did not influence the agency, the claims had merit, the staff had recommended suit, and the FDIC's arrangement with OTS was lawful.

Thomas swore that he had only a hazy recollection of the days leading up to the board meeting and his briefing with Helfer. He at least conceded that the staff changed its initial recommendation because of Helfer's instruction.[529]

DeHenzel professed total ignorance that a former bank examiner was illegally sharing United Savings's examinations with the Rose Foundation.[530] He swore that it was not strange that the Rose Foundation sent the FDIC a draft of a report by Steptoe & Johnson, the FDIC's outside counsel.[531] He even claimed not to know what the Rose Foundation was.[532] DeHenzel said that the redwoods had no connection to the FDIC's suit, despite his writing congressional representatives that the agency was open to the swap.[533] He said that he did not know how a debt-for-nature swap would create the maximum recovery, despite being confronted with his notes on that subject.[534]

### 37. *Response.*

The FDIC's response to Hurwitz's motion for sanctions is replete with unsupportable generalities, factual distortions, and misrepresentations of the law. It is incomprehensible.

### A. *Initiation.*

The FDIC says that Hurwitz first proposed debt for nature and that he should not complain that the FDIC acted under that campaign's influence.[535] This was a tactical blunder, for the agency at last admits that it succumbed to debt-for-nature pressure. Hurwitz, however, was not the source of it. In its internal correspondence, the FDIC never once identified him as initiating the campaign.

The FDIC points to two events that it says show Hurwitz's involvement. The first is testimony in 2001 by Katie McGinty, Director of the CEQ. McGinty said that Hurwitz proposed the swap at a meeting with Gore in February 1994. Her story is belied by her own testimony in 1997 to Congress about her role in the Headwaters transaction. She never mentioned Hurwitz's supposedly telling her in 1994 that he sought a debt-for-nature swap.[536] Further, she never mentioned the FDIC campaign. She swore that she only urged the government to make a trade with Pacific Lumber. The contemporaneous documents undermine her 2001 version of the truth, the *whole* truth, and nothing but the truth.[537]

The second event is based on McReynolds' testimony in 1998. McReynolds said that John Martin—a partner with a firm that represented Maxxam—proposed the swap to him in mid-July 1995. McReynolds originally testified that this did not happen.[538] He remembered it only

---

**529.** Depo. of John Thomas, ex. 219 at 63. For Thomas's account of his hazy recollection, see also pages 62, ll.20–68, ll.5.

**530.** Ex. 153 at 306–308.

**531.** *Id.* at 311–313.

**532.** *Id.* at 330.

**533.** *Id.* at 337.

**534.** *Id.* at 340.

**535.** *E.g.,* dkt. 326 at 7.

**536.** Ex. 231 at 1, 10, 13.

**537.** Exs. 243, 230, 108.

**538.** *E.g.,* ex. 308 at 23, 26–29, 53–54, 67–68, 72–73.

after a recess during his deposition.[539] Martin denies that he proposed the swap.[540] The contemporaneous documents support him.[541]

Although the FDIC now says that Hurwitz first proposed the swap, as early as April 1995, it said that it "had no discussions with Maxxam about a debt-for-land swap."[542] Even months after it had sued, the FDIC admitted that "Hurwitz has never...indicated *directly* to FDIC a desire to negotiate a settlement of the FDIC's claims."[543] The one piece of evidence that the FDIC says supports its contention of Hurwitz's initiating the swap was an article in which he unequivocally rejects it.[544] At a meeting with other Administration officials on October 26, 1995, FDIC people noted that they still "need to open dialogue w/Hurwitz soon."[545] Ultimately, the government decided to "open discussions" "after OTS files," presumably when the pressure on Hurwitz was greatest, in December 1995.[546]

Whether Hurwitz had initiated debt-for-nature discussions is irrelevant. Even if he had—and the record shows clearly that he did not—that says nothing about the merit of the government's case. It would have meant only that Hurwitz—like most people—would have wanted to settle a baseless, abusive, malicious suit rather than risk a $1 billion judgment against him.

B. *Intervention.*

The FDIC says that it cannot be held liable for Maxxam's and Federated's de-fense costs because they voluntarily intervened in this case. The claims and defenses in this case and those in the administrative forum—where Maxxam and Federated had been sued—were the same. The FDIC was, after all, suing Hurwitz for not making Maxxam and Federated do something. Maxxam and Federated had a direct interest in this mess.

Maxxam had discovered that FSLIC, OTS's predecessor, had illegally rejected Maxxam's bid for United Savings. Maxxam wanted to sue OTS. Because the failure of the thrift was the basis of the suit here, Maxxam intervened.

To prove Hurwitz's breach of fiduciary duty, the FDIC first had to prove that Maxxam's net-worth obligation existed. Maxxam anticipated that Hurwitz would argue that, even if Maxxam had a net-worth obligation, that obligation would never have been triggered if FSLIC had sold United Savings to Maxxam as the law required. Because Hurwitz's defense and Maxxam's claim against OTS, if joined, rested on identical law and facts, Maxxam could intervene.[547]

After the court joined OTS, Federated intervened. The FDIC's net-worth claim implicated it, too. Federated could have found that a decision in this court harmed it in the enforcement proceeding. In addition, its defenses there arose out of the facts of this case. Federated's intervention was necessary and proper.[548]

It is curious why the FDIC did not sue Maxxam and Federated in this court, since

---

539. *Id.* at 104–106, 115.

540. Ex. 233 at 57–63, 73–76.

541. Exs. 114, 115, 119, 120, 121 at 7–8, 123 at 12, 124, 234, 235, 236.

542. Ex. 111.

543. Ex. 138 at 2.

544. Ex. 150 at CNM418558.

545. Ex. 144 at CNM394864.

546. Ex. 155 at CNM394811.

547. Fed.R.Civ.P. 24(b)(2).

548. Fed.R.Civ.P. 24(a),(b)(2).

in the administrative forum, it—through OTS—accused them of directly causing United Savings's failure. This is yet another confirmation that the government targeted Hurwitz for nothing appearing on the face of its complaint.

### C. *Immunity.*

 The FDIC says that it enjoys immunity for its discretionary acts and its malicious prosecutions.[549] It is wrong. Perjury and general obstructionism are not discretionary. The FDIC has yet to demonstrate that it has the raw capacity to exercise discretion about anything related to this problem. Discretion implicates discernment, judgment, reflection, discrimination, perspective, and a passing acquaintance with principle. Shallow partisan reaction, convenient memory, and craven attack have nothing to do with discretion or constitutional government. Malicious prosecution is not the only legal redress for abusive behavior in court.

The FDIC relies on an act that requires the court to determine whether it may entertain a *plaintiff's complaint* about injuries by the government. Hurwitz is a defendant—not a plaintiff; he dismissed his counterclaim against the government and has moved only for sanctions based on the government's abuse in its own claim. Because this court had jurisdiction over the FDIC's complaint, it has authority over related matters like sanctions.[550]

In addition, the FDIC stands in the shoes of United Savings. When it sues as receiver, the FDIC sues as if it were the institution, and it assumes under state law the rights and liabilities of the failed institution.[551] The FDIC enjoys defenses as a receiver only where federal law creates them.[552] Congress has given the FDIC no immunity for thuggery, in or out of prosecutions. The FDIC enjoys no immunity for this case, just as the thrift itself would have had none.

### D. *Expenses.*

 Each party must cover the costs of its case. A prevailing party is usually not entitled to collect its expenses from the loser. Courts, however, may award expenses to prevailing parties when their adversaries' conduct has been oppressive or harassing.[553] Congress expanded this rule to include the federal government.[554] The United States may be liable for its opponent's expenses as "any other party would be liable" if its suit or conduct is unreasonable.[555]

The FDIC says that, because its position was substantially justified, an award is not proper.[556] It also says that, because it brought a tort suit, Hurwitz cannot collect his expenses since the law prohibits awards of fees for tort cases.[557] Neither

**549.** Federal Tort Claims Act, 28 U.S.C. § 2680(a), (h).

**550.** 28 U.S.C. §§ 1331, 1345; *Willy v. Coastal Corporation, et al.,* 503 U.S. 131, 112 S.Ct. 1076, 117 L.Ed.2d 280 (1992).

**551.** 12 U.S.C. § 1821(d)(2)(A)(1); *O'Melveny & Myers v. FDIC,* 512 U.S. 79, 85, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994).

**552.** *O'Melveny & Myers v. FDIC,* 512 U.S. at 86–87, 114 S.Ct. 2048 (1994).

**553.** *Hall, et al. v. Cole,* 412 U.S. 1, 4–6, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973); *Sterling Energy, Ltd. v. Friendly Nat'l Bank,* 744 F.2d 1433, 1435 (10th Cir.1984).

**554.** Equal Access to Justice Act, 28 U.S.C. § 2412.

**555.** 28 U.S.C. § 2412(b).

**556.** Govt.'s Resp., dkt. 398 at 53, *citing* 28 U.S.C. § 2412(d)(1)(A).

**557.** Govt.'s Resp., dkt. 398 at 53, *citing* 28 U.S.C. § 2412(d)(1)(A).

the record nor the law support these views.

For a party to benefit from the act and collect his expenses, there must be a final, unappealable judgment.[558] Because the FDIC dismissed its claims, that is the judgment; it cannot appeal its own abandonment. The act does not apply and gives the FDIC no protection, despite its having brought tort claims among others.

Even if there had been a take-nothing final judgment in this case, the government would still owe Hurwitz his expenses. The court may award fees and costs when a demand by the government is "substantially in excess" of the judgment obtained, even if the case sounds in tort.[559] In addition, no special circumstances exist that make the award unjust.[560] The government's recovery here was zero; that is less than its six-year demand for $250 million—its original demand—or the indemnity of $860 million.

Last, this decision is about sanctions. The act does not apply.

### E. *Debt for Nature.*

The FDIC says that, when it met with and wrote environmentalists, it was merely letting its constituents voice their concerns. Elected officials have constituents; the FDIC does not. These were not innocent encounters between the agency and the public. The correspondence among the FDIC, OTS, various federal agencies, congressional representatives, the Administration, and numerous environmental groups reveals a concerted, systematic, unlawful effort to obtain the redwoods.

The FDIC argues that debt for nature is irrelevant to sanctions. Motive is entirely relevant. It also says that Hurwitz's contentions about a government-wide, debt-for-nature conspiracy are unfounded, saying that the record "is remarkably clear that: (a) there was no environmental conspiracy...."[561] With this, the FDIC persists in its predilection for deceit. The record shows that the swap was the only reason for this suit. It also shows that the FDIC knew that it had no factual or legal basis for its claims, and that its cases— here and in Washington—were shams.

### 38. *Sanctions.*

The court may sanction a party if it submitted a pleading (a) to harass, delay, or increase needlessly the cost of the litigation or (b) to make claims with no basis in law or fact.[562] The court may also make an attorney pay the costs, expenses, and fees incurred because he "multiplies the proceedings" "unreasonably and vexatiously."[563] It may sanction a party or an attorney who abuses discovery.[564] Last, the court has inherent power to sanction and broad discretion in crafting a sanction, though the sanction must be the least severe that achieves its purpose.

### A. *Pleadings.*

By submitting a writing to the court, an attorney pledges that he has reasonably inquired into the facts and law.[565] It means that lawyers must be

---

**558.** *Melkonyan v. Sullivan,* 501 U.S. 89, 96, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991); 28 U.S.C. §§ 2412(d)(1)(B), (d)(2)(G).

**559.** 28 U.S.C. § 2412(d)(1)(D). Section 2412(d)(1)(A) excludes tort cases from coverage under the act. Section 2412(d)(1)(D), however, does not omit them, implying that Congress intended to include tort cases under this section.

**560.** *Id.*

**561.** Govt.'s Resp., dkt. 398 at 55.

**562.** Fed.R.Civ.P. 11(b) & (c).

**563.** 28 U.S.C. § 1927.

**564.** Fed.R.Civ.P. 37.

**565.** Fed.R.Civ.P. 11; *Thomas v. Capital Security Services, Inc.,* 836 F.2d 866, 874 (5th Cir.1988).

honest with the court. This is the rule that Ricki Helfer did not know at the board meeting.

 If pleadings are frivolous or malicious, counsel or the client must pay the opponent's expenses. To an ordinary person, "frivolous" would suggest silly. There is nothing funny about being sued by two federal agencies for a decade over hundreds of millions of dollars. In legal circles, "frivolous" implicates a thorough lack of factual or legal rigor in the party's position. It is hard to find a word that captures the essence of the FDIC's bringing this action. Irresponsible is close. Arbitrary, dishonest, exploitive, extortionate, and abusive all fit. Sanctions for bad-faith pleadings depend on the objective reasonableness of the pleading. A mistaken belief in the case's merit is not enough; sincerity must match reality.

 The FDIC insists that it filed its case only after conducting an extensive investigation and exhaustive legal analysis.[566] It overlooks that (a) two outside firms said that the suit would fail, (b) its own staff originally recommended that the agency not sue, and (c) it sued only because Helfer coerced the staff and concealed the switch from the board. Parenthetically, *none* of the staff had the integrity to tell the board about the genesis of the final recommendation. The record also shows the FDIC's deceit, extra-governmental collusion, illegal intra-governmental collaboration, and voluntary dismissal of the claims when it could no longer hide the truth.

The FDIC was unable to define its legal theories or its factual support, much less connect the two. A pleading is not examined on its face; it is reviewed in light of what the party knew and could have known. The several outside counsel advised that the FDIC had a 15% chance of recovery on the big claim.

A party may avoid sanctions if it makes a non-frivolous argument for a change in existing law.[567] Thomas told the board that the FDIC hoped to convince the Fifth Circuit that gross negligence should toll limitations in adverse-domination cases.[568] This was smoke; the appellate court had just ruled the opposite. The FDIC has never represented to this court why the law should change. More important, the claims were governed by Texas law, which the federal court of appeals cannot change. This argument was to distract the board from the suit's gross weakness.

The FDIC says that Hurwitz never moved for summary judgment and that he seeks sanctions out of desperation.[569] It also says that he is not entitled to sanctions because he did not serve his motion on the government, depriving it of the opportunity to respond.[570] Bizarre.

Hurwitz served the FDIC with his sanctions motion for its bad-faith pleadings in October 1997.[571] He supplemented that motion.[572] Throughout the case, he has moved for sanctions on other grounds.[573] The government has known that Hurwitz would seek monetary sanctions. Even if he had not, it would not matter because this court may assess sanctions on its own.[574]

---

**566.** Govt.'s Resp., Dkt. 398 at 35–36.

**567.** Fed.R.Civ.P. 11(b)(2).

**568.** Ex. 123, Tr. at 65, l.5–67, l.10.

**569.** Govt.'s Resp., Dkt. 398 at 36.

**570.** Fed.R.Civ.P. 11(c)(1)(A).

**571.** Dkts. 214, 215.

**572.** Dkts. 295, 299.

**573.** Dkts. 72, 73, 135, 137, 197, 198, 219, 284, 295, 312, 317, 322, 364.

**574.** Fed.R.Civ.P. 11(c)(1)(B); *Clark, et al. v. Mortenson, et al.*, 93 Fed.Appx. 643, 652 (5th Cir. March 31, 2004).

## B. *Discovery Abuse.*

█ A litigant may be obliged to pay his opponent's expenses and fees if he resists or impedes discovery.[575] Amazingly, the government says that Hurwitz has identified no information it did not produce. It says that its witnesses appeared and answered questions and that it produced documents as request or ordered. Much of its "cooperation" was only after repeated motions and orders. The court has already discussed at length the government's continual flouting of orders, its evasive and false answers at depositions and in interrogatories, and its failure to produce or destruction of documents. It has earned sanctions.

## C. *Attorney Misconduct.*

Lawyers who abuse the judicial system may pay the other party's costs.[576] These are court costs—that is to say, fees for the clerk of the court, court reporter, or other institutional charges.[577]

Hurwitz and the government agree that the court should not sanction the FDIC attorneys individually. They say that personal notice of possible sanctions to those attorneys is required for the court to have jurisdiction over them.[578] The government also says that, because the FDIC's case against Hurwitz, Maxxam, and Federated is now dismissed, the court may not sanction FDIC attorneys on its own initiative without giving the attorneys the opportunity to respond.

Hurwitz offers more practical reasons. First, the court would have to hold another sanctions hearing. Next, collecting monetary sanctions from individuals would be difficult. Most important, sanctioning the individuals would not deter or penalize the agency, whose actions were, as he argues, "a team effort." [579]

█ The lawyers—retained as well as employed—whose acts are described in this opinion have violated standards of the bar in things from simple lack of candor to the court all the way to false testimony. These lawyers were agents—high or low—of the American people. As lawyers and as public officers, one phrase describes them: breach of faith. The lawyers have persisted in taking wholly false positions on the facts and law. Sometimes a client does not tell a lawyer the truth, but here the FDIC's parades of lawyers knew the facts—the absence of fact. When a lawyer makes arguments that are disconnected from both the facts that he knows and the law, the reason is either gross incompetence, dishonesty, or both. Sanctions is the answer.

The court will acquiesce in not sanctioning the lawyers individually. In part, it will abstain in the expectation that licensing authorities and public integrity officers will meet their responsibilities.

## D. *Inherent Power.*

█ Courts govern their own affairs.[580] When parties exploit the judicial process, a court may sanction conduct beyond the reach of other rules.[581] When a

---

**575.** Fed.R.Civ.P. 37.

**576.** 28 U.S.C. § 1927.

**577.** 28 U.S.C. § 1920; *Roadway Express v. Piper,* 447 U.S. 752, 761, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980).

**578.** Fed.R.Civ.P. 11(c)(2)(B).

**579.** Dkt. 495 at 2.

**580.** U.S. Const., art. III, § 2, cls. 1, 2; *United States v. Hudson,* 7 Cranch 32, 34, 3 L.Ed. 259 (1812); *Chambers v. NASCO,* 501 U.S. 32, 42–45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991).

**581.** *Chambers,* 501 U.S. at 50, 111 S.Ct. 2123; *Natural Gas Pipeline v. Energy Gathering, Inc.,* 2 F.3d 1397, 1407 (5th Cir.1993); *Clark,* 93 Fed.Appx. at 652.

party engages in sanctionable conduct, the court may shift the entirety of an aggrieved party's expenses to the offending party.[582]

■ The FDIC says that the court may exercise this power only when a party commits fraud on the court. It says that it has not, despite its buying another agency, scheming with special-interest groups, federal agencies, congressional representatives, and the Administration, bringing meritless suits in two courts for an amount it could not explain, and lying about it all. It is hard to conceive how much more egregious the FDIC's conduct should have been to merit sanctions under the FDIC's view of the court's power.

The FDIC admits that it "made no effort whatsoever to obtain discovery, take depositions or otherwise prosecute its claims before this Court" and that its suit here was a "protective one."[583] Suits are not place holders. No private litigant would be able to bring identical actions in different courts. In addition, plaintiffs must pursue cases that they bring or suffer the consequences. The government—despite its conduct to the contrary—is not above the law.

■ The FDIC says that this court has no authority to sanction it for the OTS action and that the administrative case was not an issue before this court. The FDIC, however, made that case the business of this court by amending its complaint and making its recovery here derivative of the administrative claim. In addition, the OTS suit was not separate. The FDIC bought OTS, dictated what claims OTS would

bring, and exploited both forums to make Hurwitz feel pain. OTS's participation in the FDIC's case was critical. It is well established that the court may sanction a party for abuses occurring beyond the courtroom.[584]

### 39. *Analysis.*

■ To support sanctions, the court must articulate (a) the conduct that generates the sanction, (b) the costs that the conduct caused, (c) the reasonableness of the costs, and (d) the least severe sanction to achieve the purpose of the rule under which it was imposed.[585] Although much of the FDIC's conduct merits punishment, the sanctions that are imposed are only done as an equitable adjustment of the burden of this misbegotten case.

### A. *Conduct.*

The FDIC's improper purpose in suing Hurwitz is objectively ascertainable. The agency wanted to placate environmentalists and politicians, not redress the failure of the thrift. The court agrees with the observation of Congressman John T. Doolittle of California: "This case is government corruption at its worst."[586]

Besides suing for an improper purpose, the FDIC's sanctionable conduct includes:

- Filing imaginary claims, unfounded in law and fact. Objectively and subjectively, the FDIC sued in bad faith;

- Suing despite its extensive investigation that concluded that Hurwitz was not guilty of actionable conduct;

---

**582.** *Chambers,* 501 U.S. at 58, 111 S.Ct. 2123.

**583.** Govt.'s Resp., dkt. 398 at 39.

**584.** *Chambers,* 501 U.S. at 44, 111 S.Ct. 2123; *CJC Holdings, Inc. v. Wright & Lato, Inc.,* 989 F.2d 791, 793 (5th Cir.1993); *Clark,* 93 Fed. Appx. at 653.

**585.** *Topalian v. Ehrman,* 3 F.3d 931, 937 (5th Cir.1993).

**586.** Dkt. 322 at 2.

- Engaging in abusive investigation that in at least one instance involved an FDIC attorney asking a witness to "rethink" his testimony to avoid a personal suit;
- Pursuing this case—in the face of its and its internal and external lawyers' opinions about the lack of merit—either to extort environmental concessions or appease those in and out of government who wanted those concessions or even simply to look like it was doing something about a large loss;
- Trying to delay the case at each opportunity;
- Failing to pursue its claims and seek meaningful discovery;
- Trying to thwart nearly all depositions of its officials;
- Repeatedly obstructing documentary discovery, playing a shell game with its own, the OTS's, and United Savings's documents, hiding documents, withholding documents based on unfounded or waived privileges, disobeying discovery orders, and lying to the court;
- Trying to avoid dismissal on the merits by amending its complaint and leaving only an unripe—but equally bad—claim;
- Suing here first and then instigating, paying for, and supervising—and hiding its role in—a second proceeding that covered identical facts as the case here and would have given the FDIC the recovery;
- Trying to hide its illegal arrangement; and
- Engaging in an open war of attrition.

B. *Costs.*

Without the government's unprincipled attack, Hurwitz would not have spent one dime defending himself here or in Wash-

ington. This was a classic case of the government's "unique" ability to complicate discovery and defense. When sanctionable conduct infects the entire litigation, as it has here, it causes the entirety of the expenses of the opposing party, including attorneys and paralegal fees, out-of-pocket expenses, and expert costs. The court finds that the FDIC's conduct caused Maxxam to spend $35,243,966.24 over ten years in defense of itself and the other defendants.[587] This excludes the interest that it paid. The contemporaneous invoices paid by Maxxam document these fees. Maxxam incurred expenses not only in this proceeding and the administrative one, but also in other actions that it brought against the FDIC, OTS, and OMB under the Freedom of Information Act because of the FDIC's refusal to produce documents.[588] Each of the seven suits— with one exception—was successful in uncovering evidence of the government's transgressions. The exception was the suit in which Hurwitz sought the files of Danny Wall. It would have been successful if the object of the action had not been conveniently lost.

The nature of the proceedings explains the magnitude of the costs. Nearly twenty years ago, United Savings failed, and the FDIC's predecessor began investigating Maxxam. Eleven years ago, the FDIC rented OTS. Ten years ago, the cases were filed. The administrative trial took 119 days. During the eight years of the two proceedings, 163 days of depositions occurred, and nearly two million pages were produced and copied.[589] Although the principal target was Hurwitz, Maxxam indemnified eight respondents. The claims were complex:

- The mortgage-backed securities claims covered sophisticated investment pro-

587. Dkt. 504.

588. Dkt. 498.

589. Exs. 226, 225; dkt. 450, Stip. Re. Administrative Proceedings ¶¶ 3, 9–11, 14.

grams and the accounting that accompanies those investments.

- The real-estate claims involved arcane appraisal issues and required familiarity with the San Antonio and Austin real-estate markets.

- The net-worth claim involved each aspect of running United Savings, a $5 billion institution, since the claim was based on whether Maxxam exercised a "controlling influence" over the thrift. It also required familiarity with regulatory affiliation and net-worth issues and enforcement.

Although the respondents knew that the claims were delusional, they had to defend themselves.

## C. *Reasonableness.*

The reasonableness of attorney fees as a sanction is considered with the goals of deterrence, punishment, and compensation. In this case, punishment is omitted. The court must consider how much of the fees could have been avoided or were self-imposed. To determine the amount to award, the court must assess: (a) time and labor required for the case; (b) novelty and complexity of the questions; (c) skill required; (d) preclusion of other employment by the attorney due to the demands of the case; (e) fees for similar work; (f) nature of the fee—fixed or contingent; (g) effect of the case on the lawyer's other work; (h) amount of damages involved and results obtained; (i) experience, reputation, and ability of the attorneys; (j) undesirability of the case; (k) nature and length of the professional relationship with the client; and (*l*) awards in similar

cases.[590] Though the court must address these factors, not every factor need be considered separately.

### 1. *Time and Labor.*

This case involved seventeen years of investigation and litigation. The time that Maxxam and its counsel devoted to this case was substantial. The labor necessary to defend complex—though baseless—charges in two forums was also substantial.

Maxxam tried to avoid its costs. It sought to have the administrative judge recommend summarily disposing of OTS's case.[591] Hurwitz moved to dismiss the FDIC's case within three months of the start of the case here.[592] Maxxam intervened here as a defendant.[593] It also sought to join OTS as a plaintiff so that this court—the forum that the FDIC first chose—would decide identical issues in the two cases.[594] The FDIC responded by gutting its complaint here.[595] In this way, the FDIC avoided a single forum's deciding the issues but kept this proceeding as a second pressure point. This tactic undermined this court's ability to resolve the case expeditiously. To the extent that the case pended longer than it should have is not Hurwitz's responsibility; this court's tolerance of the delay here for the administrative action was out of consideration to the FDIC. The FDIC bore the risk of delay when it decided to bring a case as complex as it and OTS's suit.

The OTS case identifies who prolonged the proceedings: OTS took 107 trial days to present its case while the respondents took 12.[596]

**590.** *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974).

**591.** Dkt. 209 at 19–20; Dkt. 326 at 2–3.

**592.** Dkt. 18.

**593.** Dkt. 46, 50, 149.

**594.** Dkts. 28, 29.

**595.** Dkt. 123.

**596.** Dkt. 450, *Stip. Re. Administrative Proceedings* at ¶ 3.

The FDIC argues that Maxxam paid the costs and that Hurwitz is not entitled to sanctions because he spent none of his own money. It says that it never sued Maxxam. If the FDIC's argument were correct, then no victim of sanctionable conduct could recover sanctions if his defense costs were covered by a third party. This would give the government a pass for its behavior in cases involving indemnified parties—no doubt a large portion of suits that the FDIC brings. Hurwitz is entitled to his costs of defense whether the lawyers charged him nothing or his mother paid the bills; his contractual relations are a collateral source, not a resource for an abusive bureau.

### 2. Novelty & Complexity.

That a banking agency decides to defend trees in tandem with its official role as a manager of banks makes this case quite novel. The novelty and complexity of this case explains the time and labor that the lawyers expended. The case here and in Washington involved banking issues, securities regulation, risk-controlled arbitrage, the regulatory requirements of two agencies, and a ten-year record of voluminous facts and complexity that the defendants' lawyers had to master. It encompassed issues that are "unique" to litigation involving the government.

### 3. Skill.

The experience, reputation, and ability of Hurwitz's attorneys have not been challenged. In fact, an FDIC expert noted that Hurwitz's lawyers were highly qualified.[597] Hurwitz was dragged into the case by a formidable adversary—the government. He needed formidable advocates.

### 4. Preclusion of other work.

The court has no exact knowledge about how this case affected the lawyers' other work. It likely did. This factor, however, is not used to raise their fees.

### 5. Fees for similar work.

Maxxam's lawyers defend cases involving these issues on a regular basis. They work in a competitive market.

The FDIC has spent at least $20.5 million—likely many multiples of that figure.[598] The FDIC has also conceded that it cannot account for its cost reliably. It has *never* shown how much it spent on outside lawyers and consultants. For the actual cost to the government to have exceeded four times the reported number would be reasonably expected.

The FDIC's figure of $20.5 million overlooks the true effect of its malfeasance—the hiring of OTS, the manipulation of two forums, the parties' resources that it drained, its recalcitrance in discovery, its abuse of power and collusion with other agencies, the harm to its targets, including the personal and economic damage to Hurwitz.

The FDIC's purported expenses are less than Maxxam's expenses for at least three reasons. First, the FDIC used the OTS-government prosecutors. Government lawyers have a lower direct cost than private attorneys. In addition, OTS illegally discounted its rates. Second, the government sued eight parties in the OTS action. This often required those people to hire separate counsel, an expense that the FDIC did not have. Third, Maxxam was in an unforgiving administrative forum. OTS wrote and enforced the rules. Maxxam had to prove its innocence, an inherently more costly proposition. These obsta-

---

**597.** Report of Joseph Morris, at 14.

**598.** Ex. 221.

cles also help account for the difference between the costs in the administrative forum and those in this one.

### 6. *Nature of the fee.*

There was no risk of credit or collection risk with Maxxam. It paid its fees as they became due.

### 7. *Effect on other work.*

This factor does not affect the court's determination.

### 8. *Damages sought & Results.*

The amount in controversy explains the extent of attorney fees. OTS sought nearly $860 million.[599] The FDIC first sought over $250 million, and then it sought the whole OTS claim.[600] The sanction sought is about 8% of the total amount in controversy.

Maxxam obtained favorable results. Together, the OTS and FDIC sued Hurwitz for about $1.11 billion. Five of the other respondents settled with OTS for just over $1 million. Maxxam settled the claims against Hurwitz, Maxxam, and Federated for just over $200,000 after the administrative judge exonerated them. The amount that Maxxam paid to settle the administrative action—about $1,200,000—is one one-thousandth of the damages sought in both actions.

The FDIC dismissed its original case, modified its case here to an indemnity, and finally dropped it for nothing. The FDIC has argued that the settlement prevents Maxxam from claiming success. This ignores the ruling by the administrative judge. The FDIC may pretend that he never ruled, but his decision is another part of its uncomfortable reality. Hurwitz,

Federated, and Maxxam settled so that they would not risk an adverse decision on appeal by the OTS director. The settlement was less than their attorneys fees to prepare for the appeal. Success is this: a ten-year, two-front war by the government against its citizens ended with the field abandoned and with vindication of the victim elsewhere.

### 9. *Experience.*

Hurwitz's lawyers came with a wealth of experience and ability.

### 10. *Undesirability.*

This factor overlaps with the reasonable fee. One would prefer to defend a suit against the Sisters of Charity than the United States Government.

### 11. *Relationship.*

The nature and the length of the professional relationship with Hurwitz varied among the firms according to the type of work that they did for the case. It is not a factor.

### 12. *Awards in similar cases.*

This is the only case of its kind, to the court's knowledge.

### 13. *A Thirteenth Factor: Warnings.*

Maxxam sought to sanction the FDIC in 1996 for failing to produce numerous responsive documents. It again moved in 1997 for the agency's disobeying a court order.[601] From September through October 1997, Maxxam moved to sanction the FDIC for suing on baseless claims and political motives.[602] Maxxam repeatedly supplemented those motions as new evidence surfaced.[603] In addition, the FDIC

---

599. Ex. 217 at 2.

600. Dkts. 1, 123.

601. Dkts. 72, 73, 135.

602. Dkts. 197, 198, 199, 214, 215.

603. Dkts. 299, 300, 312, 315, 322, 323, 328, 344, 345, 359, 364, 366, 369.

acknowledged internally that it was risking sanctions if it sued.[604] This was not the first time that the FDIC had encountered this issue. It had examined it in another case two months before it decided to sue Hurwitz.[605]

### D. *Purpose.*

Courts are allowed to impose sanctions for abusive litigation to deter the misuse of this public facility. The misuse both consumes scarce public resources and forces expenditures on others. Deterrence can take the form of punishment and compensation. The court chooses compensation; compensation is the least, the very lowest, sanction that reasonably may be imposed under the egregious circumstances of this case.

▮▮▮▮ In assessing sanctions, the court looks at: (a) the financial resources of the sanctionable party; (b) whether its conduct was part of a pattern of activity or an isolated event; (c) whether the party has engaged in similar conduct in other litigation.

### 1. *Resources.*

The FDIC's wealth insulates it from the effects of smaller sanctions. The FDIC has nearly $50 billion at its disposal.[606] As this court has said in another case, "Given that the FDIC is not constrained by the ordinary economic forces that affect private parties, . . . its policy of litigating to the death must be taken as a substantial factor that obliterates illusions of quick, cheap resolution."[607]

The monetary sanctions that Hurwitz seeks represent about one one-thousandth of the FDIC's wealth. Monetary sanctions is the only way to deter this government from continuing in its wrong path. The court has tried "tongue lashing" the FDIC without effect.[608] These include:

- "The use of overlapping authority to harass individuals or manipulate a lawsuit, especially one brought by the government itself, conflicts with the constitutional requirement that the government not act arbitrarily and irrationally."[609] "The FDIC has represented to the court that the [OTS] is proceeding entirely separately from this case. The FDIC never disclosed that it had actually hired the OTS to front for it in attacking Hurwitz administratively."[610]

- The FDIC agreement to pay the OTS was "Champerty."[611]

- The OTS proceeding was "duplicative and—as it turns out—duplicitous" and the FDIC/OTS relationship is a "bureaucratic shell game." "Instead of exercising regulatory judgment about America's interest, the OTS is hammering citizens at the direction of the FDIC."[612]

On the FDIC's conduct during this case, the court has said:

- The FDIC was trying to commit "fraud" and "a transparent dodge," had engaged in "active material misrepresentations of fact to the court" and, in submissions to the court, had "demonstrate[d] the agency's bad faith" and "a lack of candor." The FDIC had tried

---

**604.** Ex. 123 at 24, l. 22–25, l. 18.

**605.** Notes of Jack Smith, dkt. 473, attach. at 2.

**606.** *See, e.g., ex. 205 at 33, 49, 63; ex. 227 at 41, 62, 81.*

**607.** *In re MCorp Financial, Inc.,* 160 B.R. 941, 957 (S.D.Tex.1993).

**608.** Dkt. 35, Nov. 16, 1995 Hrg. Tr. at 11.

**609.** Dkt. 23.

**610.** Dkt. 204 at 4.

**611.** Dkt. 329.

**612.** Dkt. 210.

."to mislead the public, Hurwitz, and this court." [613]

● The FDIC had, with its amended complaint, engaged in "yet another manipulation of the court system." "The FDIC has given up its case against Hurwitz in this court and delivered it to the OTS, getting an administrative forum in Washington and avoiding the public rigor of a court of law." [614]

● The FDIC, after first "forget[ting]" about a witness, which was "troubling," tried to "jurisprudentially lobotomize" a testifying witness in the OTS case by withholding documents from the same witness because he was an FDIC "consultant." [615]

### 2. *Pattern.*

Hurwitz, Federated, and Maxxam have been subjected to an unprecedented governmental assault. Only because of the courage of the administrative judge, Arthur L. Shipe, did the FDIC's plan fail. Only because Hurwitz fought the government, instead of capitulating, did the FDIC's plan become known.

This case does not represent an episode of misconduct. This is an epidemic. The fraudulent case and its pervasive, profound obstructionism is epic and monumental.

### 3. *Other Litigation.*

In 1993, the FDIC sued the wife of its true target in another case to get her property.[616] In another case, it seized a defendant's real property, even though the defendant had paid the notes in full and had even posted a bond to cover the amounts in dispute. The appeals court remanded the case so that the trial court would consider sanctioning the FDIC for using the lien as "leverage in settlement discussions." [617]

The FDIC was sanctioned for taking "unfair advantage" of its "awesome powers" when making "misrepresentations of fact and omissions of material fact" in its submissions to the court.[618] The judge said, "While the Court recognizes a counsel's right and obligation to assert their client's position strenuously, the FDIC's counsel, as officers of the Court, and the FDIC, as a government agency, have a further obligation to be truthful to the Court."

The FDIC has sued for bank losses "by filing sixteen claims that were insupportable as a matter of law." [619] The court found "that imposing costs and attorneys fees is an appropriate sanction to place upon FDIC for filing claims that clearly are—and were—not ripe." [620]

An FDIC witness has demonstrated a "continuing unwillingness of the FDIC to give straight forward answers to questions seeking the factual bases for their multimillion dollar claim...." [621]

The FDIC has been chastised for:

● Its "miscreant behavior." [622]

**613.** Dkt. 204.

**614.** Dkt. 210.

**615.** Dkt. 269, Sept. 1, 1998 Hrg. Tr. at 41.

**616.** Ex. 212; *FDIC v. Schuchmann,* 319 F.3d 1247, 1250–51 (10th Cir.2003).

**617.** *FDIC v. Bender,* 182 F.3d 1, 7 (D.C.Cir. 1999).

**618.** *FDIC v. Park Side Investors, Inc.,* No. 92–273–CIV–ORL–19 (M.D.Fla. Feb. 9, 1993).

**619.** *Washington Bancorporation v. Said (FDIC v. Hodges),* 812 F.Supp. 1256, 1275 (D.D.C. 1993).

**620.** *Id.* at 1274.

**621.** *FDIC v. Fidelity & Deposit Co. of Maryland,* No. Civ. 97–1068TW(AJB), 2000 WL 1175626, at *3 (S.D.Cal. Aug.2, 2000).

**622.** *FDIC v. Conner,* 20 F.3d 1376, 1382 (5th Cir.1994).

- Its "foot-dragging," a "piecemeal approach to document production," and "persistent recalcitrance":[623]
- Its "Protean mutability" and a "carapacial nature" that allowed it to disobey court orders;[624] and
- A "confused, obstructionist, inept, and uncooperative litigating style," an "unjustified procrastination," a "Machiavellian ploy aimed at delaying the preparation of these cases for disposition," a "blatantly false assertion that the court was without jurisdiction," a "Falstaffian bit of trial tactics," and "dilatory tactics."[625]
- Its "manifest" abuse of power.[626]

When the FDIC "failed to conduct reasonable inquiry into the law," "the only reasonable explanation" for the FDIC's suit was to "harass" the defendant, "to burden it with costs of litigation," and "to extract an unwarranted settlement payment." The trial judge said that the conduct of the FDIC and its counsel was "outrageous and that there was no possible justification for the infliction on [the defendant] or the judicial system for such unmeritorious litigation."[627]

In 1994, Chairman Ricki Helfer received a warning in Connecticut.[628] The court decided not to hold the agency in criminal contempt, but directed the clerk of the court "to convey as soon as possible" a copy of the opinion to Ricki Helfer (alias Tigert):

Chairman Tigert is invited and encouraged to review this matter internally

and with care, to determine... whether the conduct of FDIC officials and attorneys has conformed to applicable professional standards. While the court entertains few doubts that the FDIC behaved improperly in the instances described above,... the court intimates no view as to which of the individual respondents may have borne responsibility for the various questionable actions taken by and in behalf of the FDIC. It is enough to say that the record reveals a most unattractive portrait of behavior by agents of an important public agency. She ignored it.

### 40. *Amount.*

The time value of Maxxam's money is a consideration in determining the sanction. One method to account for delay is to use current-market billing rates. The court could multiply the total of hours worked over the years by today's hourly rate. This is a simple—yet imprecise—way to compensate for delay. Determining the sanctions award by tracking hours worked and hourly rates would be difficult given the number of years and timekeepers.

Maxxam has already paid its fees. Where the client finances the litigation by paying fees as they become due, the cost of the client's money is the proper yardstick for sanctions. This method reflects Maxxam's cost of borrowing the money that it needed to cover defense costs. This approach takes the attorney fees actually

---

623. *In re Lincoln North Assocs.*, 163 B.R. 403, 410 (Bankr.D.Mass.1993).

624. *Abney, et al. v. Patten, et al.*, 696 F.Supp. 570, 572–74 (W.D.Okla.1987).

625. *In re Selected Somersworth Bank Cases*, 148 F.R.D. 1, 2–3 (D.Me.1993); *see also FDIC v. Levine*, 674 So.2d 744 (Fla.App.—4th Dist. 1996) (affirming contempt finding against FDIC).

626. *In re MCorp Financial, Inc.*, 160 B.R. at 955.

627. *FDIC v. Calhoun*, 34 F.3d 1291, 1295 (5th Cir.1994).

628. *Hirsch, et al. v. FDIC*, No. 2:92–CV–161(JAC), 1994 WL 760662, **8–9, 1994 U.S. Dist. Lexis 19746, at *24–25 (D.Conn. Nov. 22, 1994).

paid and adjusts for the delay in repayment. This is especially proper in this case since the FDIC prolonged these proceedings. A cost-of-funds factor avoids allowing the FDIC to pay in today's dollars what Maxxam spent years ago. The FDIC should understand the economics of delays in collection since it is a bank regulator.

Maxxam has fully documented its expenses in this case, including the law firms that it paid, the matter on which each law firm worked, expenses for outside vendors, and the number, date, and amount billed for each invoice. This is a level of evidentiary support that the FDIC cannot match on any issue. Maxxam's cost of capital for the last decade was 11%.[629] Its expenses were:[630]

| Action | Invoice | Interest | Invoice & Interest |
|---|---|---|---|
| *FDIC v. Hurwitz* | $ 7,182,190.20 | $ 6,959,876.96 | $14,142,067.16 |
| OTS action | $27,478,842.84 | $29,441,398.69 | $56,920,241.53 |
| Ancillary | $ 582,933.20 | $ 609,905.62 | $ 1,192,838.82 |
| TOTAL | $35,243,966.24 | $37,011,181.27 | $72,255,147.51 |

These amounts exclude about $10 million that Maxxam spent for in-house-counsel, a qui-tam action that was part of the debt-for-nature campaign, extra-judicial proceedings, a suit by Maxxam for OTS's illegally rejecting the bid, and the pre-suit investigation.[631]

■ Maxxam has paid $35,243,966.24 in expenses for the FDIC and OTS action. Applying the interest rate of 11%, the cost of the delay for the fees and expenses is $37,011,181.27. Maxxam's cost in the two actions plus the delay factor is $72,255,147.51. The FDIC will pay this full amount.

Out of hostility toward Hurwitz, the FDIC compelled regulators to reject his company's bid to acquire United Savings seventeen years ago. This cost to the taxpayers was $100 million. In its continued spite, the FDIC paid for two baseless, extortionate suits against Hurwitz at a cost to him—through his indemnitor, Maxxam—of over $72 million. The

FDIC's costs were commensurate. Those funds, however, are not the FDIC's. Taxpayers and consumers supplied them and entrusted them to Congress, who appropriated them to the FDIC for its responsible use. In this litigation, the FDIC has squandered about $252 million that it had only as a trustee for the public. That is: $100 million for coercing the rejection of Maxxam's bid for United Savings, plus $72 million in Maxxam's expenses in this litigation, plus $80 million for the FDIC's expenses. This is the tax burden of nearly 34,000 households in the United States.[632]

If only the expenses in this case are recoverable, this court makes the contingent finding that the FDIC must pay $15,334,905.98. This represents $14,142,067.16 for Maxxam's expenses in this case and $1,192,838.82 for the costs of the ancillary proceedings—proceedings that were necessary because the government refused to produce documents to which Hurwitz was entitled. Though most of those actions were against OTS, they

**629.** Ex. 223; Dkt. 480, Tr. 201.

**630.** Ex. 504. These totals differ with those at the end of Maxxam's spreadsheet.

**631.** Dkt. 498 at 2.

**632.** According to the United States Census Bureau, the three-year-average median household income for 2001–2003 was $43,527. The tax burden on this level of income is about 17%. Source: Cato Institute.

related directly to the FDIC's case here. In addition, the FDIC possessed or had access to the documents that Hurwitz sought.

The FDIC argues that accounting for a delay factor imposes on it prejudgment interest. It says that it, as the government, is immune from this absent an express waiver.[633] Prejudgment interest on a pre-existing obligation is different from current pricing of an award to compensate for harm *inflicted through the suit itself.*

Fully compensating someone by including the measure of the costs of delay is not the same as granting prejudgment interest in an ordinary case. The court has the authority to triple the actual cost of the attorneys' fees as a sanction for misconduct, as is often done. The court could approximate the drain on Hurwitz's time and energy, the effect on Maxxam's credit rating, or Federated's cost for continually assessing the securities-law effects of the suits. These all would be larger than the cost of delay in repayment of the attorneys' fees. It is illustrative that the FDIC says that it cannot be made to render just compensation for its abusive litigation like everyone else. It is still above the law, it says.

The FDIC acts either as a corporation or receiver. It acts in its corporate capacity when it regulates banks or sues based on obligations of failed banks owed to the receiver. In those instances, the FDIC is an arm of the government, and federal law governs.[634] As receiver, however, the FDIC assumes the rights and liabilities of the institution.[635] State law applies, as it would have applied to an action brought by the thrift. Prejudgment interest is award-able against the FDIC as receiver, just as it would have been against United Savings. Since the FDIC sued in its capacity as the thrift's receiver,[636] it is liable for prejudgment interest, but that is not what is happening here.

The FDIC also says that Maxxam's expenses were not reasonable. They are comparable, however, to those of the FDIC's own retained counsel. The FDIC's statement ignores what Hurwitz faced. The FDIC and OTS proceedings were immense and protracted. They involved complex yet vague claims. It is much harder to defend a claim that evolves, skips, and metamorphosizes than anything reasonably straightforward. The damages sought were staggering. Hurwitz faced a Goliath-like adversary: his government. The court finds that his expenses only brought him a reasonable stone for his sling.

By now, Hurwitz has spent nearly twenty years defending himself against the government. This court cannot restore completely the damage that this case has done to him personally. It can, however, make the government pay for its betrayal of the public trust, its vindictive political assault on a private citizen, and part of the economic loss that it has caused him.

### 41. *Conclusion.*

The FDIC will pay Maxxam $72,255,147.51 in sanctions. If the court of appeals allows recovery for the costs of only this action, the FDIC will pay Maxxam $15,334,905.98.

Between 1870 and 1910, American political science developed the "progressive" vision: technically competent, disinterested

**633.** *See, e.g., United States ex rel. Angarica v. Bayard,* 127 U.S. 251, 260, 8 S.Ct. 1156, 32 L.Ed. 159 (1888).

**634.** *FDIC v. World University, Inc.,* 978 F.2d 10, 13 (1st Cir.1992).

**635.** *O'Melveny & Myers v. FDIC,* 512 U.S. 79, 86, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994); 12 U.S.C. §§ 1821(d)(2)(A)(i).

**636.** Govt.'s Compl., dkt. 1 at 2–4; Amended Compl., dkt. 123 at 2–4.

workers in narrowly focused bureaus under fixed-term boards would administer rather than govern. The public interest would be imposed on whole segments of social and economic life free from crass politics. The progressive dream—like every dream of social engineering—had the potential to become a nightmare.

The FDIC is a version of the dream—the nightmare on 17th Street, N.W. In this case, the FDIC will be compelled to pay for the costs that it inflicted. The FDIC caused Hurwitz pain. The effects of these relentless attacks on his reputation and on the value of the businesses that he led cannot be repaired. The drain on his entrepreneurial energies cannot be undone. The actual costs of his defense can and must be repaid.

The record bears no instance of a staff member resisting rogue chairmen, reporting excesses or perjury, cautioning one another not to violate the law, reporting candidly to the board, or otherwise functioning like regular government—one bound by its foundational statutes and the rule of law. Even the FDIC's inspector general turned out to be a co-conspirator by his cowardly abdication.

Equally as bad as the governmental insiders, the retained counsel prostituted themselves to the FDIC's whims, with the exception of the early report by Hutcheson & Grundy. Both inside and outside sets of FDIC minions persist in their vile posturing. As Edmund Burke put it, "They defend their errors as if they were defending their inheritances." [637] This truculence has multiplied the costs of this case to Hurwitz, Maxxam, and Federated.

The court has a predilection—one for lawful government. It has a predilection for oaths that bind—oaths as witnesses, as lawyers, and as public officers. The response to the misdeeds of the individuals will be left to public integrity offices, bar licensing authorities, and grand juries.

Since none of the individuals was constrained by his conscience and since many of them have left the government, the only means to change the institutionalized abuse is to affect the one thing known to be sacred to mid-level bureaucrats—their budget. Ultimately, the costs will be borne elsewhere, but the FDIC at least needs to have in its ledgers a bookkeeping entry for this case under "Breach of Trust."

The solution ultimately is not episodic sanctions for FDIC wrongdoing that is occasionally uncovered. Conceivably, these could help, but the real answer has to be profound change in it and its fellow agencies. The solution lies in an administration that will nominate people to its vacancies. The solution lies in requiring its staff to be dedicated, responsible, and honest. The solution lies in a congress that does not actively work to subvert the independence and focus of the agency for its ideological, partisan, and personal purposes. Sam Adams would say that somebody needs to dump the FDIC's tea overboard.

They set about using their agency's authority to compel an illegal result wholly unconnected with their legitimate responsibilities and they lied about it all under oath. Whether getting the redwoods was tied to craven submission to a congressional bully or to personal ideology, they were not content with stealing from Hurwitz. Through this case they sought to "cause him pain." They sought to humiliate him.

As George Bernard Shaw said, "power does not corrupt men; fools, however, if they get into a position of power, corrupt power." [638] These people discarded the

---

637. Edmund Burke, Speech to the House of Commons (Feb. 11, 1780).

638. George Bernard Shaw (1940).

mantle of the American Republic for the cloak of a secret society of extortionists. If the vice president called, they responded. If a congressman called, they responded. If a lobbyist called, they responded. They heeded every call but that of duty and honor.

The agency became more of a *cosa nostra* than *res publica.*

## FEDERAL DEPOSIT INSURANCE CORP. v. HURWITZ, ET AL.

### APPENDIX A

### SIMPLIFIED ORGANIZATION

## APPENDIX B
### DRAMATIS PERSONAE

| Name | Position | Lawyer |
|---|---|---|
| Blaug, Elizabeth | Associate General, Council on Environmental Quality. | ✗ |
| DeHenzel, Robert | Staff Attorney, FDIC. | ✗ |
| Dellums, Ronald V. | Congressman, California; urged FDIC to do debt for nature. | |
| Dingell, John | Congressman, Michigan; Chair, Energy & Commerce. | ✗ |
| Fiechter, Jonathan | Acting Director, OTS. | |
| Frampton, George | Assistant Secretary for Fish, Wildlife, and Parks. | ✗ |
| Gonzalez, Henry A. | Congressman, Texas; Chair, Banking Committee. | ✗ |
| Gore, Albert A., Jr. | Vice President of the United States of America. | |
| Hamburg, Dan | Congressman, California; introduced Headwaters bill. | |
| Hecht, F. Thomas | Outside counsel, FDIC. | ✗ |
| Helfer, Ricki | Chairman, FDIC, sometimes goes by Tigert | ✗ |
| Hove, Andrew C. "Skip" | Acting Chairman, FDIC; voted to sue as Vice Chairman. | |
| Kroener, William | General Counsel, FDIC. | ✗ |
| Lambert, Steve | Outside counsel, FDIC. | ✗ |
| Lieberman, Carolyn | Acting Chief Counsel, OTS. | ✗ |
| Manick, Thomas | Outside counsel, FDIC. | ✗ |
| McGinty, Katie | Director, Council on Environmental Quality; VP Staff Chief. | ✗ |
| McReynolds, Allen | Special Assistant to the Secretary of Interior. | |
| Ratner, Jill | Founder of the Rose Foundation. | ✗ |
| Smith, Jack | Deputy General Counsel, FDIC. | ✗ |
| Steinbrink, George | Acting Comptroller of the Currency. Director, FDIC. | |
| Thomas, John | Staff Attorney, FDIC. Lead investigator, United Savings. | ✗ |
| Wall, Danny | Head regulator for United Savings, FHLBB. | |
| Williams, Jeff | Head, Professional Liability Section, FDIC. | ✗ |